ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

FILED

DEC 1 3 2012

U.S. COURT OF
FEDERAL CLAIMS

PROTEST OF SOUTHWEST HOUSING
COMPLIANCE CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Case No. _12 - 869 - C_

Judge _____

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff Southwest Housing Compliance Corporation ("SHCC"), through the undersigned counsel, hereby submits this Complaint and states and alleges as follows:

## NATURE OF THE ACTION

1.     This pre-award bid protest is filed by interested party SHCC pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1).  SHCC seeks declaratory and injunctive relief.

2.     This action seeks review of the U.S. Department of Housing and Urban Development's ("HUD") use of its Fiscal Year 2012 Notice of Funding Availability ("NOFA"), Docket No. FR-5600-N-33, to issue cooperative agreements for the rebid[1] of contract

---

[1] As discussed *infra* at Paragraphs 26 to 28, contracts were previously awarded and then withdrawn as part of the agency's corrective action in the face of numerous GAO protests.

administration of the Performance-Based Contract Administrator ("PBCA") Program, a program

concerning Project-Based Section 8 Housing Assistance Payment ("HAP") contracts.

3.     HUD's procurement decisions in this matter violate federal statute, federal

procurement regulations, and HUD's own procurement policies.  SHCC seeks declaratory and

injunctive relief against Defendant United States, acting through HUD, to prevent HUD from

proceeding to use a defective and unlawful "cooperative agreement" process to award the rebid

contracts for the administration of Project-Based Section 8 HAP Contracts.

4.     SHCC also seeks review of HUD's determination that it would not follow

GAO's August 15, 2012 decision regarding this matter (B-406738.5, Protest of Southwest

Housing Compliance Corporation, which was consolidated with a number of other protests).

HUD's decision not to follow GAO's recommended action was arbitrary and capricious.

5.     HUD's improper actions directly harm SHCC, which is currently

performing contract administration services for HUD as a PBCA, and which timely submitted

applications for the rebid contract administration services in response to the NOFA.

6.     SHCC seeks a temporary restraining order and preliminary and permanent

injunctive relief to restrain HUD from awarding the rebid contracts pursuant to the NOFA.  In

addition, SHCC seeks a declaration: (1) that HUD's express disregard of the GAO's decision

was improper, arbitrary, and capricious; (2) that HUD's use of the NOFA to issue cooperative

agreements for the rebid contract administration services for the PBCA Program is improper and

contrary to law; and (3) that HUD should obtain the rebid PBCA Program services through a

competitive procurement that results in the award of a procurement contract.

7.     As HUD has not yet awarded any contract that is the subject of this

protest, the requested declaratory and injunctive relief can be issued by this court without

disturbing any executed contracts.

## PARTIES

8.     SHCC is a 501c (3) corporation headquartered in Austin, Texas.  Its

principal place of business is at 1124 South IH 35 Austin, TX 78704.

9.     The Defendant is the United States acting through HUD, specifically,

HUD's Office of Housing Assistance and Contract Administration Oversight.  The contracting

officer for this procurement is Mr. Kerry E. Hickman, 451 7th St., S.W., Room 6151,

Washington, DC 20410.

## JURISDICTION AND STANDING

10.     This Court has jurisdiction over SHCC's pre-award bid protest pursuant to

28 U.S.C. § 1491(b)(1), which specifies that this Court "shall have jurisdiction to render

judgment on an action by an interested party objecting to a solicitation by a Federal agency for

bids and proposals for a proposed contract."

11.     SHCC has standing as an "interested party" to file this bid protest.  28

U.S.C. § 1491(b)(2) (2000); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir.

2009).  SHCC has been providing PBCA services to HUD in the states of Texas and Arkansas

for over 10 years.  As the PBCA contractor in these states, SHCC currently administers 855

housing rental subsidy contracts and 60,747 units on behalf of HUD that provide Project Based

Section 8 Housing to low-income residents.  SHCC is a prospective bidder on follow-on

contracts for these and other states.  As such, SHCC's direct economic interests are implicated

by HUD's use of the NOFA to award cooperative agreements.  SHCC will suffer substantial

competitive injury if HUD is permitted to proceed with its award of "cooperative agreements" to perform PBCA services.

## FACTUAL BACKGROUND

12.     The subject NOFA, Docket No. FR-5600-N-33, was signed on February 29, 2012, and was posted online by HUD on March 9, 2012.  Exhibit 1, NOFA.  This pre-award bid protest concerns HUD's use of the NOFA to rebid the contract to obtain PBCA services for the contract administration of Project-Based Section 8 HAP contracts through the issuance of cooperative agreements.

### HUD's Section 8 Project-Based Housing Assistance Program

13.     Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f *et seq.* ("Housing Act"), authorizes HUD to provide rental assistance in the form of various types of subsidies.  Through the Project-Based Housing Assistance Program, HUD provides Section 8 rental assistance to property owners in the form of rental subsidies for units set aside for and rented to qualified low-income residents.  *Id.*  In turn, the property owners agree to provide decent safe and sanitary housing that is in good repair to qualified low-income residents.  *Id.*

14.     HUD pays the rental subsidies to the property owners through HAP contracts, which HUD enters into directly with the property owner.  24 C.F.R. § 880.501 *et seq.* HUD chooses the property owners who participate in the program and controls its relationships with the property owners, reserving authority to revise or terminate the subsidy paid under the HAP contract as well as the authority to revise or terminate the HAP contract.  *Id.*

15.     From the authorization of the Project-Based Section 8 Rental Assistance Program in 1974, and until 1999, HUD itself administered the majority of Section 8 HAP contracts between HUD and private property owners.

16.     In 1999, due to "staffing constraints," HUD began "an initiative to contract out the oversight and administration of most of its project-based contracts." *See Project-Based Rental Assistance: HUD Should Update Its Policies and Procedures to Keep Pace with the Changing Housing Market* (GA0-07-290), Apr. 2007, at 10. This initiative was the inception of the Performance Based Contract Administrator Program (PBCA Program).

### HUD's 1999 Contracting Efforts

17.     HUD first issued a Request for Proposals for HAP contract administration services through the PBCA Program on May 3, 1999.  64 Fed. Reg. 27358 (May 19, 1999) (the "1999 RFP").  The 1999 RFP stated that HUD was "seeking sources interested in providing contract administration services for project-based [HAP] Contracts under Section 8," *id.* at 27358, and that "[u]nder this RFP, the offerors will competitively bid to perform contract administration services for properties with project-based Section 8 HAP Contracts," *id.* at 27359.

18.     The 1999 RFP specified that "[p]roposals in response to [the] RFP may cover an area no smaller than an individual State (or U.S. Territory)." *Id.* at 27358.  It also stated that "[u]nder the approximately 20,000 Section 8 HAP Contracts this RFP covers, HUD pays billions of dollars annually to owners on behalf of eligible property residents," and that "HUD seeks to improve its performance of the management and operations of this function through this RFP." *Id.*

19.     Submission of proposals under the 1999 RFP was limited to public housing agencies ("PHAs"), defined as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing."  42 U.S.C. § 1437a(b)(6)(A).

20.     The 1999 RFP included a detailed statement of work, and stated that successful PHAs would be required to:  (1) monitor property owners' compliance with their

obligations to provide decent, safe, and sanitary housing; (2) pay property owners on time and accurately; (3) submit required documents to HUD; and, (4) comply with all other HUD regulations and requirements governing the administration of Section 8 HAP contracts. *Id.* at 27360-69.

21.     Eventually, over a period of years, HUD awarded thirty-seven PBCA Annual Contributions Contracts ("ACCs")[2] under the 1999 RFP. At some point, HUD received approval from the Office of General Counsel to extend the contracts for an additional ten years.

22.     SHCC was awarded the ACC for the state of Texas in 2000, and the ACC for Arkansas in 2004, and has been providing and continues to provide PBCA services to HUD under those contracts. As the PBCA in these states, SHCC currently administers 855 housing rental subsidy contracts and 60,747 units on behalf of HUD that provide Project Based Section 8 housing to low income residents.

### HUD's 2011 Invitation for Submission of Applications

23.     In 2007, HUD announced that it would re-compete the PBCA contracts to update requirements and ensure the Government was receiving the best value for the taxpayer dollar. A year later, the National Council of State Housing Finance Agencies, an industry group representing state housing finance agencies, requested that HUD provide a right of first refusal or preference for existing state housing finance agencies that were currently holding contracts for PBCA services with HUD. HUD rejected this request, stating that it favored open competition.

24.     In March 2011, HUD issued an "Invitation for Submission of Applications: Contract Administrators for Project-Based Section 8 [HAP] Contracts" ("Invitation"). Exhibit 2. The Invitation sought applications from PHAs to administer the

---

[2] "Annual Contributions Contracts" are written contracts that are the vehicle for the agreement between HUD and a PHA. *See* 42 U.S.C. § 1437f(b); 24 C.F.R. § 5.403 (2012).

Project-Based Section 8 Housing Assistance Payments Contracts as PBCAs. *Id.* at 3. Under the Invitation, HUD stated its intent to select one PBCA for each of the fifty United States, the District of Columbia, the United States Virgin Islands, and the Commonwealth of Puerto Rico. *Id.* at 9. The Invitation specifically encouraged PHAs to submit applications in multiple states. *Id.*

25.     SHCC submitted timely applications for eight states in response to the Invitation.

### 2011 GAO Protests

26.     In July 2011, HUD announced its awards of the ACCs under the Invitation. SHCC was awarded contracts in five of those states. Thereafter, GAO received 66 protests challenging the propriety of the awards of the ACCs. SHCC filed two of these protests.

27.     Due to the overwhelmingly large number of protests at GAO, HUD withdrew the ACC awards in 42 states, including the five awarded to SHCC. In the eleven states and territories where there was no competition because there was only one bidder, HUD awarded an ACC to each such sole bidder.

28.     On August 10, 2011, HUD announced that it would re-compete the same PBCA program support services in the other 42 states, but would procure the services through a NOFA. On August 11, 2011, GAO dismissed the protests as academic.

### HUD's 2012 NOFA

29.     HUD issued the subject NOFA on March 9, 2012. Exhibit 1. The NOFA seeks PHAs to serve as the PBCAs for the Project-Based Section 8 HAP contracts for 42 states. Exhibit 1 at 3.

30.     The NOFA uses language very similar to that in the 1999 RFP to describe the "Performance-Based Tasks" that PBCAs will have to perform as part of their contract administration duties.  Under the NOFA, PBCAs are responsible for:

> monitoring project owners for compliance in providing decent, safe, and sanitary housing to assisted residents; ensuring payments to property owners are calculated accurately and paid in a timely manner; submitting required documents to HUD (or a HUD designated agent); and complying with applicable Federal law and regulations . . . as they exist at the time of ACC execution and as amended or otherwise issued.

*Id.* at 6.

31.     Despite this similar language, the NOFA differs from HUD's 1999 RFP and 2011 Invitation by expressly providing that "[t]he ACCs that HUD seeks to award via this NOFA are cooperative agreements." *Id.* at 7.  Neither the 1999 RFP nor 2011 Invitation mentioned the issuance of cooperative agreements rather than contracts, nor did they impose requirements particular to issuance of a cooperative working agreement, such as compliance with OMB Circular A-87.

32.     Also for the first time, the Agency has included in the NOFA new, unlawful restrictions on competition.  Specifically, the NOFA states:

> HUD will consider applications from out-of-State applicants *only* for States for which HUD does not receive an application from a legally qualified in-State applicant.  Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications that HUD receives from an out-of-State applicant for that state.

*Id.* at 4.  The NOFA also imposes additional burdens on those PBCAs who desire to serve in states other than their home states, including a requirement for the provision of a detailed legal opinion. *Id.* at 9-12.  The Agency has offered no justification for these restrictions that violate statutes and regulations, and result in disparate treatment of offerors.

33.    Thus, although the PBCA contract administration services to be provided under the NOFA are nearly identical to those performed in the past, HUD has inexplicably included in the NOFA new provisions and limitations, which effectively provide for the sole source award of ACCs in numerous states. *Id.* at 4.

34.    HUD has offered no justification for the imposition of these restrictions. In fact, HUD explicitly acknowledges in the NOFA that "nothing in the 1937 [Housing] Act prohibits an instrumentality PHA that is 'authorized to engage in or assist in the development or operation of public housing' within the meaning of section 3(b)(6)(A) of the 1937 Act from acting as a PHA in a foreign state." *Id.*

35.    Although SHCC filed its GAO protest of the NOFA prior to the due date for applications, HUD refused to delay the application submission date until after resolution of the GAO protest, and as a result, SHCC was forced to submit applications that complied with the NOFA's restrictive provisions.  In response to the NOFA language effectively directing the award of an ACC to an in-state applicant, SHCC concluded that it had no meaningful opportunity to compete in states in which it believed it could be a successful bidder, because it would not be considered an in-state applicant.  SHCC submitted bids in some other states, despite the restriction, to reserve its rights should there be no in-state qualified applicants and/or should HUD decide to remove the geographic restriction on competition.  And SHCC submitted a direct bid for the state of Texas, in which it operates as a PHA.

36.    Due to the restrictive provisions, SHCC, the incumbent contractor for Texas and Arkansas, with an excellent performance record, has lost the opportunity to compete in a fair and open competition in Arkansas and other states because the HUD process improperly effectively restricts competition for these agreements to in-state PHAs, resulting in essentially a

de facto sole-source award, unless in fact there are no other qualified in-state PHA bidders for the state.

37.     In addition, under the restrictive terms of the NOFA, SHCC will also lose the opportunity to earn an administrative fee under the out-of-state ACCs.  SHCC receives a significant monthly administrative fee under the Arkansas ACC.

38.     As a non-profit organization, SHCC relies on these funds to sustain its operations.  It has no other source of funding.  Even a temporary loss of these contracts will be disruptive-- SHCC will be unable to proceed with its short-term budgeting efforts and to maintain operations, and it may be required to lay-off numerous staff members.

39.     The due date for the submission of applications in response to the NOFA was June 11, 2012.  Exhibit 1 at 40.  SHCC timely responded to the NOFA with several applications.

### 2012 GAO Protests and Decision

40.     In May 2012, SHCC and several other PHAs[3] filed pre-award protests at GAO challenging HUD's use of the NOFA, rather than a procurement contract, to rebid the PBCA services.

41.     On August 15, 2012, GAO issued a decision sustaining the protests. Exhibit 3.  GAO found that "HUD is required to use a procurement instrument that results in a contract in order to obtain the provision of contract administration services by PHAs for the Project-Based Section 8 HAP contracts."  *Id.* at 14.

---

[3] These included: Assisted Housing Services Corporation (B-406738.1), North Tampa Housing Development Corporation (B-406738.2), The Jefferson County Assisted Housing Corporation (B-406738.3; B-406738.7), National Housing Compliance (B-406738.4), and CMS Contract Management Services (B-406738.6).

42.     GAO also stated that that "HUD's issuance of the NOFA providing for the award of cooperative agreements was unreasonable and in disregard of applicable statutory guidance." *Id.*

43.     GAO rejected HUD's argument that because the PBCAs or PHAs made subsidy payments to property owners, this amounted to the transfer of a "thing of value" to the PHAs, stating:

> [A]lthough the HAP contract payments are made through the PHAs in accordance with their obligations under the ACCs to administer the HAP contracts, the PHAs themselves have no rights to the payments (or control over them) once HUD authorizes the payments and transfers the funds to the PHAs for distribution. The PHAs, consistent with their roles as contract administrators, act only as a "conduit" for the payments. *See* AR, Tab 4, 53 Fed. Reg. 8050 (1988), at BATES 247 (HUD's explanation as to why it views its Section 8 housing assistance payments as "outside the scope" of Office of Management and Budget's Circular A-102 that governs grants and cooperative agreements with state and local governments). That is, and as described above, the PHAs have no right to retain or use for other purposes any of the funds it receives for payment to the property owners. In fact, the ACCs require that the funds, once received by the PHAs from HUD, be promptly transferred to the property owners, and require that any excess funds and interest earned on HAP funds by the PHAs be remitted to HUD or invested in accordance with HUD requirements. AR, Tab 3, ACC, at BATES 194.

*Id.* at 12.

44.     GAO also rejected the notion that the principal purpose of HUD's payment of an administrative fee to the PHAs is to "assist" the PHAs in the performance of their mission, finding instead that the payment of administrative fees was "compensation for their provision of service — *i.e.* administering the HAP contracts." *Id.* at 12-13 (*citing* AR, Tab 3, ACC, at BATES 194) ("The PHA shall use Administrative Fees to pay the operating expenses of the PHA to administer HAP Contracts")).

45.     GAO also rejected HUD's assertion that it is not under an obligation to administer the HAP contracts.  Citing the "HUD Occupancy Handbook," GAO noted "HUD has primary responsibility for contract administration but has assigned portions of these responsibilities" to PHAs whose "responsibilities focus on the day-to-day monitoring and servicing of Section 8 HAP contracts." *Id.* at 13 (citing Supp. AR, Tab 17, HUD Occupancy Handbook 4350.3 REV-1, at BATES 533).  GAO therefore found that "HUD is providing assistance to low-income households, in the form of a rental subsidy paid to property owners, pursuant to the terms of HAP contracts" and that "[r]ather than [HUD] administering the program through which this assistance is provided, that is, the Project-Based Section 8 Rental Assistance Program—as HUD has in the past and continues to do in limited circumstances— HUD has retained, through its 1999 RFP and 2011 [Invitation], and is seeking to retain through this NOFA, the services of PHAs to perform the HAP contract administration services." *Id.*

46.     Ultimately, GAO found that "the principal purpose of the NOFA and ACCs to be awarded under the NOFA is for HUD's direct benefit and use," stating:

> [T]he NOFA provides, and HUD's past practices demonstrate, that
> if a PHA is unable to provide contract administration services for
> the Project-Based Section 8 rental assistance program, HUD staff
> has provided and will provide such services. *See 360Training.com
> v. United States, Inc., supra* (an agency is acquiring the
> intermediary's services for its own direct benefit or use if the
> agency otherwise would have to use its own staff to provide the
> services offered by the intermediary); *see also* GAO, Principles of
> Federal Appropriations Law, Vol. II, at 10-20.

*Id.* at 14.

47.     GAO ultimately recommended that HUD "cancel the NOFA, and solicit the contract administration services for the Project-Based Section 8 rental assistance program through a procurement instrument that will result in the award of contracts." *Id.* at 15.  In

addition, GAO stated: "In so doing, the agency should address the other concerns expressed by the protesters to the extent appropriate." [4]  *Id.*

### HUD's Response to the GAO's Recommendations

48.     On October 19, 2012, HUD reported that, pursuant to 31 U.S.C. § 3554(b)(3), it had provided GAO with a letter reporting on the status of its response to GAO's recommendations.  Exhibit 4.  HUD stated that it was "continuing to assess the legal and operational issues raised by [GAO's] recommendations." *Id.*

49.     On December 4, 2012, HUD posted a notice on its PBCA website stating that it "has decided to move forward with the 2012 PBCA NOFA and plans to announce awards on December 14, 2012." Exhibit 5.

### COUNT I
### HUD's USE OF THE NOFA TO AWARD COOPERATIVE AGREEMENTS RATHER THAN PROCUREMENT CONTRACTS IS IMPROPER

50.     SHCC re-alleges and incorporates herein the allegations contained within paragraphs 1-49 as set forth above.

51.     HUD has not cited any statutory authority that would permit it to issue cooperative agreements to procure PBCA services.  The Section 8 statute, 42 U.S.C. § 1437f(b), does not permit HUD to acquire by grant or cooperative agreement the contract administration

---

[4] This statement relates to the protesters' assertions that certain aspects of the NOFA, if considered as a solicitation that will result in a procurement contract, fail to comply with the Competition in Contracting Act ("CICA"), the Federal Acquisition Regulation ("FAR") and other applicable procurement statutes and regulations.  During the development of the protest record, HUD conceded that it "did not follow the requirements in CICA or the FAR" in preparing its NOFA, and that it "would expect the protests to be sustained" should GAO determine that the protests are within GAO's jurisdiction.  Exhibit 3, GAO decision, at 14-15. Based on these admissions, GAO did not require HUD to provide documents or arguments responding to the protest assertions on these issues. *Id.* at 15 n.21.

services under HUD's Section 8 Project Based Program that it seeks to acquire from PBCAs pursuant to the NOFA.

52.      "While federal agencies generally have 'inherent' authority to enter into contracts to procure goods or services for their own use, there is no comparable inherent authority to enter into assistance relationships (i.e., cooperative agreements or grants) to give away the government's money or property to benefit someone other than the government." 65 Comp. Gen. 605, 607 (1986); *see also* GAO, Principles of Federal Appropriations Law, Vol. II, at 10-17.

53.      In questions submitted to the Agency as part of the prior protests, GAO specifically asked HUD to explain in its supplemental report, "HUD's statutory authority to enter into a cooperative agreement with regard to the Section 8 project-based rental assistance program." Exhibit 6 at 1.  Ultimately, GAO found that it did not need to rule on the statutory authority issue, given its determination "that HUD should solicit the contract administration services here through a procurement instrument that results in a contract, rather than a cooperative agreement." Exhibit 3, GAO decision, at 15-16 n.20.

54.      HUD has not and cannot demonstrate the requisite statutory authority for the approach it has taken.  The relevant statutory provision, 42 U.S.C. § 1437f(b), does not provide HUD with grant authority for PBCA services, it only provides authority to contract for these services. *See also* HUD's regulations at 24 C.F.R. § 880.505(a) ("HUD may contract with another entity for the performance of some or all of its contract administration functions.").

55.      In sum, HUD's use of the NOFA to award cooperative agreements, instead of procurement contracts, is improper because HUD does not have statutory or regulatory

authority to enter into grants or cooperative agreements with PBCAs for contract administration services.

## COUNT II
### HUD'S USE OF THE NOFA TO ENTER INTO COOPERATIVE AGREEMENTS WITH PBCAs IS IMPROPER UNDER THE FEDERAL GRANT AND COOPERATIVE AGREEMENT ACT

56.     SHCC re-alleges and incorporates herein the allegations contained within paragraphs 1-55 as set forth above.

57.     The Federal Grant and Cooperative Agreement Act ("FGCAA"), 31 U.S.C. §§ 6301-08, includes criteria that agencies must use in selecting which legal instrument to use to establish a relationship between the agency and another party.  Among the types of agreements specified are procurement contracts, grants, and cooperative agreements.

58.     The FGCAA states that an agency shall use a procurement contract where "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," 31 U.S.C. § 6303, and should use a grant or cooperative agreement where "the principal purpose of the relationship is to transfer the thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States." 31 U.S.C. §§ 6304, 6305.

59.     When an agency uses an intermediary to perform agency functions, it "acquir[es] the intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide to beneficiaries the services offered by the intermediary."  GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. 2, Ch. 10 (3d ed. Feb. 2006); *see also 360Training.com, Inc. v. U.S.*, 2012 U.S. Claims LEXIS

502 (Fed. Cl. Apr. 26, 2012) (analyzing the difference between a cooperative agreement and a procurement contract and determining when the latter is required).

60.     In 1981 legislation amending the FGCAA, a Senate committee report addressed "intermediary situations." The report stated:

> [T]hat the product or service produced by the intermediary may benefit another party is irrelevant. What is important is whether the federal government's principal purpose is to acquire the intermediary's services, which may happen to take the form of producing a product or carrying out a service that is then delivered to an assistance recipient, or if the government's principal purpose is to assist the intermediary to do the same thing. Where the recipient of an award is not receiving assistance from the federal agency but is merely used to provide a service to another entity which is eligible for assistance, the proper instrument is a procurement contract.

S. REP. NO. 97-180, at *5 (1981), 1982 U.S.C.C.A.N. 3; Pub. L. No. 97-162.

61.     Here, the PBCAs are not receiving Section 8 subsidy payments but instead are paid an administrative fee in return for their contract administration services. Exhibit 3, GAO decision, at 13 (*citing* AR, Tab 3, ACC, at BATES 194) ("The PHA[5] shall use Administrative Fees to pay the operating expenses of the PHA to administer HAP Contracts").

62.     The PBCAs transmit the Section 8 subsidy payments from HUD to the property owners providing low-income housing as part of the PBCA contractual obligations under the ACCs to administer the HAP contracts. The PBCAs themselves have no rights to the subsidy funds and act only as a "conduit" for the payments. In fact, the ACCs require that the funds, once received by the PBCAs from HUD, be promptly transferred to the property owners,

---

[5] While the GAO decision refers to PHAs in lieu of PBCAs, we use the term PBCAs herein for consistency purposes. As explained *supra* at ¶ 19, PHAs are the public housing agencies that act as PBCAs.

and require that any excess funds and interest be remitted to HUD or invested in accordance with HUD requirements.  Exhibit 3, GAO decision, at 13 (citing AR, Tab 3, ACC, at BATES 194).

63.     Accordingly, because the principal purpose of the NOFA is to acquire contract administration services for the direct benefit or use of HUD (which would otherwise have to perform these services itself), HUD was required under the FGCAA to use a procurement instrument that results in the award of contracts to obtain these services.

64.     The fact that HUD itself performed these contract administration services for many years (from 1974 until 1999) is further evidence that HUD now should use a contract vehicle to provide these services.

### COUNT III
### IN THE ALTERNATIVE, EVEN IF USE OF A COOPERATIVE AGREEMENT IS PROPER, THE NOFA UNLAWFULLY FAILS TO PROMOTE COMPETITION

65.     SHCC re-alleges and incorporates herein the allegations contained within paragraphs 1-64 as set forth above.

66.     Pursuant to the FGCAA, all grant and cooperative agreement programs involving discretionary recipients must provide for competition among the prospective recipients whenever appropriate. *See* 31 U.S.C. § 6303(3) ( the Act "promote[s] increased discipline in selecting and using procurement contracts, grant agreements, and cooperative agreements, maximize[s] competition in making procurement contracts, ***and encourage[s] competition in making grants and cooperative agreements***.")  (emphasis added).

67.     Here, consistent with the FGCAA, HUD should have maximized efforts to promote competition.  Instead, HUD set up a restrictive and limited competition.  The restrictions will result in de facto sole source awards to a certain classes of PHAs and also include an improper fee cap, as well as a flawed, mechanical evaluation methodology.

68.     The current NOFA is far more restrictive than the competitions HUD conducted for PBCA services in the past.  HUD's restrictive NOFA cannot be justified as compliant with of the FGCAA.

69.     The restrictive provisions of the NOFA prejudice SHCC because they preclude SHCC from competing on an equal basis in all of the States.

### COUNT IV
### HUD'S USE OF THE NOFA CIRCUMVENTS
### PROCUREMENT LAW AND REGULATION

70.     SHCC re-alleges and incorporates herein the allegations contained within paragraphs 1-69 as set forth above.

71.     The Competition in Contracting Act ("CICA") expressly requires agencies to obtain full and open competition through the use of competitive procedures, and to use the least restrictive terms that can meet the agency's needs.  41 U.S.C. § 3301(a).

72.     The Federal Acquisition Regulation ("FAR") provisions implementing CICA state that, "contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts."  FAR 6.101.  These regulations clearly note that "contracting without providing for full and open competition . . . is a violation of statute" unless permitted by one of the exceptions included in the regulation.  FAR 6.301.

73.     These exceptions include cases where the restrictions:  (1) are geared to the agency's need to increase or maintain competition and result in reduced overall cost, (2) are required in the interest of national defense, (3) are required to satisfy an unusual or compelling urgency, or to ensure the continuous availability of a reliable source of supply of the property or service being acquired, or (4) are expressly authorized or required by statute.  41 U.S.C. § 3303(a)(1); FAR 6.302.  None of these exceptions apply here.

74.     Although, as HUD states in the NOFA itself, nothing in the 1937 Housing Act prohibits an instrumentality PHA from acting as a PHA in a foreign state, HUD has further stated in the NOFA that it will not consider applications from out-of-state applicants unless HUD does not receive an application from a qualified in-state applicant.  Exhibit 1, NOFA at 4 ("Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications that HUD receives from an out-of-State applicant for that state.").  HUD has provided no rational basis for this restriction, which will result in de facto "sole source" awards to in-state applicants.

75.     In addition, the NOFA prohibits applicants from proposing a fee greater than 2%.  Exhibit 1, NOFA at 31.  HUD provides no basis, however, for imposing this artificially-created fee cap, which is anathema to full and open competition and the fundamental principle of awarding contracts on the basis of a price competition.

76.     Further, the NOFA includes a mechanical point scoring scheme.  Specifically, the NOFA states that HUD will base its selection on up to 30 points for price/fee and up to 70 points for the technical factor.  *Id.* at 23-31.  Per the NOFA, HUD will select awardees based on totaling the score for price/fee and the technical factors.  *Id.* at 33.  The points apportioned for the price/fee percentage proposed are arbitrary and there is no justification to point score price/fee.  This will result in a mechanical and formulaic evaluation of applications in contravention of FAR principles.

77.     These improper restrictions amount to disparate treatment and are prejudicial to SHCC.

## COUNT V
## HUD'S DECISION TO IGNORE THE GAO'S RECOMMENDATION IS ARBITRARY AND CAPRICIOUS, AND IN VIOLATION OF LAW

78.     SHCC re-alleges and incorporates herein the allegations contained within paragraphs 1-77 as set forth above.

79.     Pursuant to 5 U.S.C. §706(2)(A), the Court shall set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Under this standard, the court "may set aside a procurement action if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2007) (*quoting Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

80.     The Agency's decision to disregard GAO's recommendation and instead to move forward with the NOFA was set forth in one sentence in a Notice posted on its website, which stated: "The Department has decided to move forward with the 2012 PBCA NOFA and plans to announce awards on December 14, 2012." Exhibit 5. Not only was a rational basis not given for this decision, but no explanation whatsoever was provided. Under the circumstances, the decision was *per se* arbitrary and capricious.

## COUNT VI
## ENTITLEMENT TO DECLARATORY AND INJUCTIVE RELIEF

81.     SHCC re-alleges and incorporates herein the allegations contained within paragraphs 1-80 as set forth above.

82.     This Court "may award any relief that [it] considers proper, including declaratory and injunctive relief" to correct a defective solicitation. 28 U.S.C. § 1491(b)(2).

83.     HUD lacks legal authority to award PBCA cooperative agreements under the NOFA.  PBCA services should be obtained through procurement contracts.

84.     Moreover, the NOFA unduly restricts "full and open competition" in violation of CICA.

85.     Accordingly, SHCC seeks declaratory judgment that the NOFA is not the proper instrument to use to obtain PBCA services and directing HUD to obtain the services through full and open competition resulting in award of a procurement contract.

86.     SHCC also seeks preliminary and permanent injunctive relief preventing HUD from proceeding under the NOFA, and requiring HUD to initiate a procurement process to award procurement contracts for PBCA services.

87.     In the alternative, SHCC seeks a declaration that the NOFA is unduly restrictive and preliminary and permanent injunctive relief preventing HUD from proceeding under the NOFA, and directing HUD to revise the NOFA to remove the restrictions on out-of-state competition, as well as the fee caps, and to revise its scoring scheme.

88.     The requested injunctive relief will not cause any disruption or delay to HUD in receiving PBCA services.  The current PBCA agreements have been extended through March 31, 2013 with an additional 7 option periods of 3-months each, for a total extension of up to 24 months from January 1, 2013.

## COUNT VII
## ENTITLEMENT TO FEES AND COSTS

89.     SHCC incorporates by reference paragraphs 1-88 of the Complaint as if fully set forth herein.

90.     HUD's use of the NOFA has forced SHCC to expend a substantial and entirely avoidable sum to respond to the NOFA.

91.   SHCC also has been forced to incur attorneys' fees to file this protest.

92.   This Court has the authority to award bid and proposal costs pursuant to 28 U.S.C. § 1491(b)(2).

93.   An award of bid and proposal costs is appropriate here, given the egregiousness of the Agency's position, particularly in light of the GAO's decision regarding this matter.

## PRAYER FOR RELIEF

WHEREFORE, SHCC prays this Court enter judgment in its favor and against HUD as follows:

a.   Enjoining HUD from awarding contracts pursuant to the NOFA;

b.   Declaring that HUD's decision to disregard GAO's recommendation was arbitrary and capricious and in violation of applicable statutes and regulations;

c.   Declaring that HUD's use of the NOFA to issue cooperative agreements to secure PBCA contract administration services is improper and that HUD should acquire these services under a procedure that results in the award of a procurement contract;

d.   In the alternative, declaring that the NOFA is unduly restrictive and that HUD should revise the NOFA to remove restrictions on out-of-state competition, as well as the fee caps, and revise its scoring scheme.

d.   Granting SHCC its costs in this action, including reasonable attorneys' fees, to the extent legally available; and

e.   Granting such further relief as the Court may deem just and proper.

DATED:  December 12, 2012

Respectfully submitted,

*Richard G. Vacura*

Richard J. Vacura
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 300
McLean, VA 22102
(703) 760-7764
(703) 760-7777 (fax)

*Counsel of Record for Plaintiff Southwest Housing
Compliance Corporation*

Of Counsel:

Tina D. Reynolds*
K. Alyse Latour
MORRISON & FOERSTER LLP
1650 Tysons Blvd., Suite 300
McLean, VA 22102
(703) 760-7701
* *Admitted only in DC and North Carolina*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

|  |  |  |
|---|---|---|
| SOUTHWEST HOUSING COMPLIANCE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No._____ |
| THE UNITED STATES, | ) ) | Judge:_____ |
| Defendant. | ) ) ) | |

## VERIFICATION

I, Michael Gerber, verify under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of December, 2012.

_____

Michael Gerber
President/CEO
Southwest Housing Compliance Corporation

# EXHIBIT 1

1

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR-5600-N-33]

HUD's Fiscal Year (FY) 2012 Notice of Funding Availability (NOFA) for the
Performance-Based Contract Administrator (PBCA) Program for the Administration of
Project-Based Section 8 Housing Assistance Payments Contracts

AGENCY: Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

ACTION: Notice of Funding Availability (NOFA) for HUD's Fiscal Year (FY) 2012
Performance-Based Contract Administrator (PBCA) Program for the Administration of Project-
Based Section 8 Housing Assistance Payments Contracts.

SUMMARY: HUD announces this NOFA for the Performance-Based Contract Administrator
Program for the Administration of Project-Based Section 8 Housing Assistance Payments (HAP)
Contracts. Specifically, this NOFA provides applicant information, submission deadlines,
funding criteria and other requirements for this Program including the availability of an annual
contributions contract (ACC) with a public housing agency (PHA) for each of the 42 States for
which an ACC has not previously been awarded, to provide for the administration of project-
based Section 8 HAP contracts for Section 8 projects located in the 42 States identified in
Appendix A to this NOFA.

There are 53 "States," as defined in the ACC, as each of the 50 United States, the District of
Columbia, the Commonwealth of Puerto Rico, and the United States Virgin Islands. After
publication on its website of an Invitation for Submission of Applications on February 25, 2011,
HUD awarded an ACC to a PHA for each of the following 11 states: South Dakota, Iowa, Puerto
Rico, Vermont, Minnesota, New Hampshire, Maine, North Dakota, Montana, Wyoming and the
United States Virgin Islands. HUD now seeks to award an ACC to a PHA for each of the
remaining 42 states through this program NOFA. See Appendix A of this NOFA for the list of
remaining 42 states.

In addition to the application requirements set forth in this NOFA, applicants must also
comply with all terms and conditions contained in the Notice of HUD's Fiscal Year (FY) 2012
Notice of Funding Availability (NOFA), Policy Requirements, and General Section to HUD's
FY2012 NOFAs for Discretionary Programs (General Section), posted to www.Grants.gov
(Grants.gov) on September 19, 2011.

APPLICATION DEADLINE DATE: The application deadline date is 11:59:59 p.m. Eastern
Time on April 10, 2012. Applications must be received by Grants.gov no later than 11:59:59
p.m. Eastern Time on the application deadline date.

FOR FURTHER INFORMATION CONTACT: Questions regarding specific program
requirements should be directed to the agency contact identified in this NOFA. Questions
regarding the FY2012 General Section should be directed to the Grants Management Office; at
202-708-0667 (this is not a toll-free number).Persons with hearing or speech impairments may
access the number via TTY by calling the Federal Relay Service at 800-877-8339.

2

OVERVIEW INFORMATION:

A. **Federal Agency Name:** U.S. Department of Housing and Urban Development.

B. **Funding Opportunity Title:** Performance-Based Contract Administrator (PBCA) Program for the Administration of Project-Based Section 8 Housing Assistance Payments Contracts.

C. **Announcement Type:** Initial announcement.

D. **Funding Opportunity Number:** The Federal Register number for this NOFA is FR-5600-N-33. The information collection requirements contained in this document have been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520) and assigned OMB control number 2577-0157, 2502-0582, 2502-0587, 2577-0169, 2577-0229, 2510-0011, 2577-0259, 2502-0542, 2535-0116, and 2577-0270. In accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection displays a currently valid OMB control number.

E. **Catalog of Federal Domestic Assistance (CFDA) Number(s):** 14.327

F. **Application Deadline Date:** The deadline date is 11:59:59 p.m. Eastern Time on **April 10, 2012.** Applications must be received by Grants.gov no later than 11:59:59 p.m. Eastern Time on the application deadline date. Applications must meet the timely receipt requirements of the **General Section**. See Section IV of the **General Section** regarding application submission procedures and timely filing requirements. Applicants need to be aware that following receipt, applications go through a validation process in which the application may be accepted or rejected. Please allow time for the process to ensure that you meet the timely receipt requirements.

Please see the FY2012 **General Section** for instructions for timely receipt, including actions to take if the application is rejected. Applicants should carefully read the section titled "INSTRUCTIONS ON HOW TO DOWNLOAD AN APPLICATION PACKAGE AND APPLICATION INSTRUCTIONS" in the **General Section**. This section contains information on using Adobe Reader, HUD's timely receipt and grace period policies, and other application information. The latest version of Adobe Reader used by Grants.gov is Adobe Reader 9.4 which is compatible with PCs and MAC computers.

G. **Additional Information:**

1. **Purpose of the Program.** The purpose of HUD's PBCA program is to implement the policy of the United States, as established in section 2 of the United States Housing Act of 1937 (1937 Act), of assisting States and their political subdivisions in addressing the shortage of affordable housing and of vesting the maximum amount of responsibility and flexibility in program administration in PHAs that perform well. The PBCA program furthers these policies by effectuating the authority explicitly provided under section 8(b)(1) of the 1937 Act for HUD to enter into ACCs with PHAs for the administration of Section 8 HAP contracts. For the project-based programs authorized under Section 8, the 1937 Act authorizes HUD to enter into an ACC with a PHA as defined in section 3(b)(6)(A) of the 1937 Act. The ACC is the funding

mechanism to support the PHA's public purpose in making assistance payments to Section 8 project owners.  See the ACC at http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp or Appendix C of this NOFA.

2.  **Available Funds.**  Funding for this NOFA is subject to the availability of appropriations.

3.  **Type of Funds.**  Administrative fees to PBCAs.

4.  **Award Information.**   Funding for this NOFA is subject to the availability of appropriations.

5.  **Matching Funds.**  There is no matching requirement for applications under this program NOFA.

6.  **Eligible Applicants.**  PHAs as described in further detail in this NOFA.

7.  **Eligible Activities.**  PHAs selected must complete PBTs and meet the performance and compliance requirements in the ACC.  The tasks that successful PHAs must perform include but are not limited to the following: monitoring project owners for compliance in providing decent, safe, and sanitary housing to assisted residents; ensuring that payments to property owners are calculated accurately and paid in a timely manner; and submitting required documents to HUD (or a HUD-designated agent).

## FULL TEXT OF ANNOUNCEMENT

## I.  FUNDING OPPORTUNITY DESCRIPTION.

**A.  Program Description.**  HUD announces this NOFA for the Performance-Based Contract Administrator (PBCA) Program for the Administration of Project-Based Section 8 Housing Assistance Payments (HAP) Contracts.  Specifically, this NOFA provides applicant information, submission deadlines, funding criteria and other requirements for this Program, including the availability of an annual contributions contract (ACC) with a public housing agency (PHA) for each of the 42 States for which an ACC has not yet been awarded (as identified in Appendix A to this NOFA) to provide for the administration of project-based Section 8 HAP contracts for Section 8 projects located in each of those States.

There are 53 "States," as defined in the ACC as each of the 50 United States, the District of Columbia, the Commonwealth of Puerto Rico, and the United States Virgin Islands.  After publication on its website of an Invitation for Submission of Applications on February 25, 2011, HUD awarded an ACC to a PHA for each of the following 11 states: South Dakota, Iowa, Puerto Rico, Vermont, Minnesota, New Hampshire, Maine, North Dakota, Montana, Wyoming and the United States Virgin Islands.   HUD now seeks to award an ACC to a PHA for each of the remaining 42 States through this program NOFA.

**B.  Purpose of the Program.**  The purpose of HUD's PBCA program is to implement the policy of the United States, as established in section 2 of the 1937 Act, of assisting States and their political subdivisions in addressing the shortage of affordable housing and of vesting the

4

maximum amount of responsibility and flexibility in program administration in PHAs that perform well. The PBCA program furthers these policies by effectuating the authority explicitly provided under section 8(b)(1) of the 1937 Act for HUD to enter into ACCs with PHAs for the administration of Section 8 HAP contracts. For the project-based programs authorized under Section 8, the 1937 Act authorizes HUD to enter into an ACC with a PHA as defined in section 3(b)(6)(A) of the 1937 Act. The ACC is the funding mechanism to support the PHA's public purpose in making assistance payments to Section 8 project owners. The ACC includes Exhibit A, section 4 of which includes a detailed treatment of the Administrative Fee. Section 5, "Performance Requirements Summary" (PRS), includes a table that specifies the Acceptable Quality Level (AQL) for performance of each of the 8 Performance-Based Tasks (PBTs), the Performance-Based Allocation Percentage, the method used to evaluate performance, and the frequency with which HUD will assess and pay the Basic Administrative Fee Earned. See http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp or Appendix C of this NOFA.

**C. Authority.** The NOFA is issued pursuant to section 102 of the Department of Housing and Urban Development Reform Act of 1989, Pub. L. 101-235; 103 Stat. 1987 (Dec. 15, 1989); and section 8 of the United States Housing Act of 1937 (1937 Act), 42 U.S.C. § 1437f, Pub. L. 93-383; 88 Stat. 662 (Aug. 22, 1974) (Section 8). Funding for this NOFA is subject to the availability of appropriations.

**D. Crossing State Lines.** HUD believes that nothing in the 1937 Act prohibits an instrumentality PHA that is "authorized to engage in or assist in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act from acting as a PHA in a foreign State. However, HUD will consider applications from out-of-State applicants *only* for States for which HUD does not receive an application from a legally qualified in-State applicant. Receipt by HUD of an application from a legally qualified in-State applicant will result in the rejection of any applications that HUD receives from an out-of-State applicant for that state.

Based on past experience, HUD expects to receive at least one application from a legally qualified in-State applicant for the majority of the 42 States identified in Appendix A of this NOFA. However, HUD advises that, in connection with the February 25, 2011 Invitation, HUD received no application from an in-State applicant for Alaska, Hawaii, Mississippi, Nebraska, or Utah.

All opinions recently issued by states' Attorneys General relevant to the administration of the Section 8 PBCA program will be posted at time of publication of this NOFA on http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp

**E. Terms and Definitions.**

**1. In-State Applicant.** An in-State Applicant is an applicant formed under the laws of the same State for which it proposes to serve as PBCA. An in-State applicant may be a governmental entity or an instrumentality of a governmental entity. However, in either case, the entity must demonstrate that it (a) satisfies the definition of PHA in section 3(b)(6)(A) of the 1937 Act and (b) has the legal authority to operate throughout the entire State.

**2. Out-of-State Applicant.** An out-of-State Applicant is an applicant formed under the laws of a State other than the State for which it proposes to serve as PBCA. An out-of-State applicant is typically an instrumentality of a governmental entity. An out-of-State applicant must demonstrate that it (a) satisfies the definition of PHA in section 3(b)(6)(A) of the 1937 Act; and (b) has the legal authority, both under the law of the State of its creation and under the law of the State for which it is applying to act as PBCA, to operate throughout the entire State for which it is applying.

Out-of-State entities are typically limited in their area of operation under the law of the State of their creation to the locality or to the State that they were established to serve. To overcome this obstacle, such entities typically create an instrumentality under the law of its own State (e.g., the State's nonprofit corporation statute), which typically authorizes the nonprofit corporation to operate anywhere inside or outside the State of its creation. Under such a scenario, the resulting nonprofit corporation, rather than the parent entity that created it, becomes the out-of-State applicant.

HUD requires that an out-of-State applicant establish not only that the law of the State under which it was created (e.g., State A) authorizes it to operate throughout the entire State in which it proposes to serve as PBCA (e.g., State B) but also that the law of such State (e.g., State B) does not prohibit such an arrangement. HUD also requires that each out-of-State applicant supplement its Reasoned Legal Opinion (RLO) (see definition below) with a Supplemental Letter (SL) (see definition below) signed by an attorney authorized to practice law in the State for which it applies (e.g., State B) certifying that nothing in the laws of such State in any manner prohibits the applicant, although formed under the laws of a sister State, from acting as a PHA in the State for which it is applying.

**3. Instrumentality.** Whether an in-State applicant or an out-of-State applicant, an instrumentality must be created *directly* by "any State, county, municipality, or other governmental entity or public body" within the meaning of section 3(b)(6)(A) of the 1937 Act. Submission of an RLO on behalf of an instrumentality that itself was created by one or more instrumentalities will result in the disqualification of the application.

An instrumentality entity must be fully formed and in legal existence under applicable laws on the date on which the RLO is signed. A copy of the corporate charter and all other organizational documents in final form (e.g., duly executed and filed with all appropriate State and/or other authorities, as may be required by law) that meet all requirements of this NOFA must be attached and labeled as an exhibit to the RLO. An instrumentality of a governmental entity or public body satisfies the 1937 Act's definition of PHA provided that the instrumentality is "authorized to engage in or assisted in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act.

**4. Statutory Definition of "Public Housing Agency" and Related Statutory Definitions.** A PHA is a creature of State law. Its authority and power to act derive from the State law(s) under which it was created. "Public housing agency" is also a defined term in the 1937 Act, which authorizes HUD to enter into ACCs with a "public housing agency" as defined in section 3(b)(6)(A) of the 1937 Act, for the administration of Section 8 HAP Contracts. Before entering into an ACC, HUD must ascertain that the entity satisfies the 1937 Act's definition of PHA.

Section 3(b)(6)(A) of the 1937 Act, which applies to the project-based Section 8 program, provides in relevant part: "the term 'public housing agency' means any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." Applicants are advised that section 3 of the 1937 Act, 42 U.S.C. § 1437a, contains definitions of terms that appear within the foregoing definition (e.g., "public housing," "development," "operation"). Section III. D. 2.b. below sets forth the specific elements of an RLO required for applicants other than an instrumentality (generally referred to as a "governmental entity"). Section III. D.2.c. below sets forth the specific elements of an RLO required for instrumentality applicants.

5. **Performance-Based Tasks (PBTs).** PBTs are described in Exhibit A, Section 3 of the ACC and listed below for reference. There are eight of these tasks for which the PHA, as contract administrator, is responsible. The principal tasks of the PHA in accordance with the ACC include, but are not limited to: monitoring project owners for compliance in providing decent, safe, and sanitary housing to assisted residents; ensuring payments to property owners are calculated accurately and paid in a timely manner; submitting required documents to HUD (or a HUD-designated agent); and complying with applicable Federal law and regulations, including 24 C.F.R. parts 880, 881, 883, 884, 886 subpart A, 886 subpart C and/or 891 subpart E, as applicable, and other program requirements, as they exist at the time of ACC execution and as amended or otherwise issued. In this NOFA PBTs are listed in the rating factors as:

- PBT #1 – Management and Occupancy Reviews;
- PBT #2 – Adjust Contract Rents;
- PBT #3 – Review and Pay Monthly Vouchers;
- PBT #4 – Renew HAP Contracts;
- PBT #5 – Tenant Health, Safety, and Maintenance Issues;
- PBT #6 – Administration – Monthly and Quarterly Reports;
- PBT #7 – Administration – Annual Reports and Certifications; and
- PBT #8 – Annual Financial Reports – PHA Fiscal Year End.

6. **Reasoned Legal Opinion (RLO).** HUD requires that each applicant, whether an in-State or an out-of-State applicant, establish through an RLO that the State statute under which it was created authorizes it to operate throughout the entire State in which the entity proposes to serve as PBCA. HUD requires that out-of-State applicants supplement their RLO with an SL that establishes that nothing in the laws of the State for which the applicant is applying in any manner prohibits the applicant, although formed under the laws of a sister State, from acting as a PHA in the State for which it is applying. If an RLO or an SL fails to satisfy any criterion or any part of any criterion required to establish legal eligibility under this NOFA, the applicant will not be provided an opportunity to cure such failure, and the application will be rejected without further review.

7. **Full Time Equivalent (FTE).** One FTE is defined as 280 hours per work year.

8. **Supplemental Letter (SL).** In addition to an RLO, HUD requires that each out-of-State applicant submit a Supplemental Letter (SL) signed by an attorney authorized to practice law in

the State for which it applies (e.g., State B) certifying that nothing in the laws of such State in any manner prohibits the applicant, although formed under the laws of a sister State, from acting as a PHA in the State for which it is applying.

## II. AWARD INFORMATION

**A. Funding Availability.**   Funding for this NOFA is subject to the availability of appropriations.

**B.  Type of Awards.**  The ACCs that HUD seeks to award via this NOFA are cooperative agreements.  Pursuant to the Federal Grant and Cooperative Agreement Act of 1977 (FGCA) (31 U.S.C. § 6304 et seq.), a cooperative agreement is the appropriate vehicle for making such an award when the principal purpose of the relationship between the Federal government and a State, or the political subdivision of a State (e.g., a PHA), is the transfer of money and services in order to accomplish a public purpose of support authorized by Federal statute, and substantial involvement is anticipated between HUD and the PHA during performance of the ACC.  31 U.S.C. § 6305.   A principal purpose of the ACC between HUD and the PHA is to transfer funds (project-based Section 8 subsidy and performance-based contract administrator fees, as appropriated by Congress) to enable PHAs to carry out the public purposes of supporting affordable housing as authorized by sections 2(a) and 8(b)(1) of the 1937 Act.  HUD will notify all applicants as to whether or not they have been selected for an award.  If selected, HUD's notice will constitute HUD's approval, subject to the execution of a cooperative agreement. HUD intends to have substantial and ongoing involvement in the review, development, and operation of the PBCA Program. The cooperative agreement will state the expected substantial involvement of HUD during the period of performance.  Note that the ACC is not  subject to A-102 (Grants and Cooperative Agreements With State and Local Governments) which is codified for HUD at 24 CFR Part 85 based on the Department's determination that the Section 8 programs are not appropriate for management under the uniform requirements of Part 85. However, the Department has determined that the PBCA program is subject to A-87 (Cost Principles for State, Local, and Indian Tribal Governments).

**C. Number of Awards.**  Only one applicant per state may be awarded an ACC.  HUD expects to provide 42 awards.

**D. Period of Performance.**  The PBCA will administer the HAP Contracts that HUD assigns during the ACC term.  The ACC shall have a term of twenty-four (24) months unless extended at the sole election of HUD.  HUD anticipates that ACCs awarded under this NOFA will become effective on October 1, 2012.  The full text of the ACC may be found at: http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp or in Appendix C of this NOFA.


## III. ELIGIBILITY INFORMATION

**A. Eligible Applicants.** Eligible applicants are qualified PHAs. The applicant's RLO must identify the applicant entity as one of the following:

1. **A general or special purpose governmental entity.** A general or special purpose governmental entity includes:

a. A State, municipality, housing authority, or governmental public benefit corporation;

b. A multi-state, interstate or regional governmental entity; or

c. An instrumentality entity.

Any and all determinations concerning an applicant's legal eligibility rest solely with HUD.

**B. Cost Sharing or Matching.** There is no matching requirement for applications under this program NOFA.

**C. Eligible Activities.** PHAs selected must complete PBTs and comply with the performance and compliance requirements in the ACC.

HUD will enter into an ACC which will identify the State in which the PBCA is required to be the contract administrator. Exhibit B of the ACC will identify the HAP Contracts that HUD assigns to the PHA. HUD has the authority under the ACC to unilaterally amend Exhibit B of the ACC in order to add or withdraw HAP contracts that the PBCA is responsible for administering, and, upon exercising this authority, HUD will provide the PBCA with written notice of the revised Exhibit B.

Exhibit A of the ACC contains the PBTs for which the PHA, as contract administrator, is responsible. The principal tasks of the PHA in accordance with the ACC include, but are not limited to: monitoring project owners for compliance in providing decent, safe, and sanitary housing to assisted residents; ensuring payments to property owners are calculated accurately and paid in a timely manner; submitting required documents to HUD (or a HUD designated agent); and complying with applicable Federal law and regulations, including 24 C.F.R. parts 880, 881, 883, 884, 886 subpart A, 886 subpart C and/or 891 subpart E, as applicable, and other program requirements, as they exist at the time of ACC execution and as amended or otherwise issued.

**D. Threshold Requirements.**
1. **General HUD Threshold Nondiscrimination and Other Requirements.** See Section III.C.2 through Section C.5 of the **General Section** for threshold requirements applicable to all programs. Applicants should review those provisions that could result in the failure to receive funding, including the Dun and Bradstreet Universal Numbering System (DUNS) Number Requirement, Resolution of Outstanding Civil Rights Matters, provisions relating to Delinquent Federal Debts, and the Name Check Review. HUD will not make awards to entities that are debarred, suspended, or are on the HUD Limited Denial of Participation List. **Non-compliance with a threshold requirement will result in disqualification.** See Section V.B.1. below for more detail regarding threshold compliance.

2. **Reasoned Legal Opinion Requirement.** HUD requires the submission of a RLO demonstrating that the applicant is legally eligible to serve as PBCA in the State for which it applies.

**NOTE: This is the first threshold requirement which must be satisfied before HUD will review the remainder of an application.**

**a.  General RLO Requirements.**  The following information must be enumerated at the top of the first page of the RLO:

(1)  The full legal name of the applicant (i.e., the entity that, if selected, would enter into an ACC with HUD);

(2)  The State under the laws of which the applicant was formed; and

(3)  The State for which the applicant proposes to serve as PBCA.

If an entity applies to serve as PBCA for more than one State, a separate RLO must be submitted in support of each application.  The RLO must be signed by an attorney.  It may not be signed by or in the name of a law firm or other business entity.  The RLO must state that the signatory is licensed to practice law in the State under the laws of which the applicant was formed.  It must contain a succinct but reasoned (i.e., non-conclusory) analysis establishing that each of the requirements in Section III. D.2.b.(Governmental Entities) or Section III. D.2.c (Instrumentality Entities), as applicable, is satisfied.

It must include proper citation to each provision of Federal, State, and/or local law on which the analysis relies. A legible copy of each such provision, other than any provision of the 1937 Act, must be attached to and labeled as an exhibit to the RLO.  Any RLO that does not satisfy any of these requirements will be rejected without any further review.

While not subject to any page limitation, the RLO should be succinct.  The RLO shall have a cover sheet that specifies the title of the document, identifies the PHA submitting the document, and identifies the State for which the document is being submitted. Each page must be printed on a single side of an 8.5" by 11" sheet of paper using a standard 12-point font.  One copy of the RLO shall be submitted as a Portable Document Format (PDF) file using this file name format: Two-Letter State Postal Abbreviation of the State for which the applicant is applying_Two-Letter State Postal Abbreviation of the State under the laws of which the applicant was formed_ Complete Legal Name of the Applicant_RLO.pdf. The name of the RLO file cannot exceed 50 characters , including spaces and underscores.  If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the RLO file.

**b.  Required Elements of Reasoned Legal Opinion for a Governmental Entity**.  In the case of a governmental entity, the RLO must establish that the entity:

(1) Was created under a statute that confers powers that qualify the entity as a PHA, as defined in the 1937 Act. Although the statute may not explicitly enumerate the power "to engage in or assist in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act, the attorney signing the RLO must conclude and unequivocally state that such power is within the scope of powers explicitly conferred;

(2) Was created under a statute that confers powers that include the power to administer project-based Section 8 HAP Contracts, including the power to perform each of the eight PBTs identified in Exhibit A, Section 3, of the ACC. Although the statute may not explicitly enumerate such powers, the attorney signing the RLO must conclude and unequivocally state that all such powers are within the scope of those explicitly conferred;

(3) Was created under a statute that explicitly authorizes the entity to operate throughout the entire State in which the entity proposes to serve as PBCA or that evidences an unequivocal legislative intent for such entity to have such authority; and

(4) Has properly registered to do business in the State in which the entity proposes to serve as PBCA to the extent that the laws of such State require it to do so. If the laws of such State do not require it to do so, the RLO must contain an affirmative statement to this effect.

**c. Required Elements of Reasoned Legal Opinion for an Instrumentality Entity.** In the case of an instrumentality entity, the RLO must establish that:

(1)  The parent entity (or, in the case of multiple parent entities, each such entity) and the instrumentality entity were created under laws that confer powers that qualify the parent entity (or each such entity) and the instrumentality entity as a PHA, as defined in section 3(b)(6)(A) of the 1937 Act.  Specifically, the RLO must establish that:
    (a)  The parent entity (or each such entity) was created under a statute that confers powers that qualify the parent entity (or each such entity) as a PHA, as defined in section 3(b)(6)(A) of the 1937 Act.  Although the statute may not explicitly enumerate the power "to engage in or assist in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act, the attorney signing the RLO must conclude and unequivocally state that such power is within the scope of powers explicitly conferred; and

    (b)  The instrumentality entity was created under a statute (e.g., a State non-profit corporation law) that confers powers that qualify the instrumentality entity as a PHA, as defined in section 3(b)(6)(A) of the 1937 Act.  Although the statute may not explicitly enumerate the power "to engage in or assist in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act, the attorney signing the RLO must conclude and unequivocally state that such power is within the scope of powers explicitly conferred;

(2)  The corporate charter or other organizational documents of the instrumentality entity explicitly provide that it is authorized "to engage in or assist in the development or operation of public housing," within the meaning of section 3(b)(6)(A) of the 1937 Act, with citation to such specific provision(s);

(3)  The corporate charter or other organizational documents of the instrumentality entity explicitly confer the right on the parent entity (or on each such entity) to:
    (a)  Approve the corporate charter or other organizational documents of the instrumentality, including the right to approve any amendments, with citation to such specific provision(s);

    (b)  Authorize the instrumentality entity to execute the ACC with HUD, with citation to such specific provision(s);

(c)   Control the operation of the instrumentality, with specific identification of the means by which the corporate charter or other organizational documents authorize the parent entity (or entities) to exert such control (e.g., by requiring that the Parent Entity hold a majority of the shares of the instrumentality entity, have a majority vote on the Board of Directors of the instrumentality entity), with citation to the specific provision(s) that confer such authority; and

(d)   Take title to all property, real and/or personal, held by the instrumentality entity upon dissolution or termination of the instrumentality entity, with citation to such specific provision(s);

(4) The instrumentality entity was created under a statute that confers powers that include the power to administer project-based Section 8 HAP Contracts, including the power to perform each of the eight PBTs identified in Exhibit A, Section 3, of the ACC.  Although the statute may not explicitly enumerate such powers, the attorney signing the RLO must conclude and unequivocally state that all such powers are within the scope of those explicitly conferred;

(5) The corporate charter or other organizational documents explicitly authorize the instrumentality to administer project-based Section 8 HAP Contracts, with citation to such specific provision(s);

(6) The instrumentality entity was created under a statute that explicitly authorizes entities created there under to operate throughout the entire State in which the entity proposes to serve as PBCA or that evidences an unequivocal legislative intent for such entities to have such authority;

(7) The corporate charter or other organizational documents explicitly authorize the instrumentality entity to operate throughout the entire State in which the entity proposes to serve as PBCA, with citation to such specific provision(s); and

(8) The entity has properly registered to do business in the State in which the entity proposes to serve as PBCA to the extent that the laws of such State require it to do so.  If the laws of such State do not require it to do so, the RLO must contain an affirmative statement to this effect.

d.   **General Supplemental Letter (SL) Requirements.**  If an applicant proposes to serve as PBCA in a State other than the State under the laws of which it was formed, an SL must be enclosed with the RLO.  The following information must be enumerated at the top of the first page of the SL:

(1) The full legal name of the applicant (i.e., the entity that, if selected, would enter into an ACC with HUD);

(2) The State under the laws of which the applicant was formed; and

(3) The State for which the applicant proposes to serve as PBCA.

The SL must be signed by an attorney.  It may not be signed by or in the name of a law firm or other business entity.  The SL must state that the signatory is licensed to practice law in the

State in which the applicant proposes to serve as PBCA. The substantive content of the SL must meet the standard of Section III. D.2.e. It must include proper citation to each provision of Federal, State, and/or local law on which the analysis relies. A legible copy of each such provision, other than any provision of the 1937 Act, must be attached to and labeled as an exhibit to the SL. Any SL that does not satisfy any of these requirements will be rejected without any further review.

**e. Standard for Entities Proposing to Serve as PBCA in a State Other than the State under the Laws of Which the Entity was Formed.** HUD will consider the substantive content of the SL requirement satisfied so long as it meets the requirements of this section.

(1) The SL must contain an unequivocal statement that the signatory has examined all the laws of the State governing the creation and operation of PHAs, including any provision of State law that defines that term or comparable term, and that nothing in such laws in any manner prohibits or precludes the applicant, having been formed under the laws of a sister State, from acting as a PHA in and throughout the State for which it is applying to serve as PBCA.

(2) The SL must state that the applicant has registered to do business in the State. Conclusive documentary proof of such registration must be attached to and labeled as an exhibit to the SL. If the law of the State in which the applicant proposes to act as PBCA does not require such registration, the SL must contain an affirmative statement to this effect.

(3) The SL contain an unequivocal statement as to whether the laws of the State or any other applicable laws impose any requirements or conditions that must be satisfied before the applicant may act throughout the State as a PHA. To the extent that they do, the SL must identify each such requirement, with citation to the state law provision imposing each such requirement. A legible copy of each such statutory provision must be attached to and labeled as an exhibit to the SL. Conclusive documentary proof that all such requirements or conditions have been satisfied must be attached to and labeled as an exhibit to the SL. For example, if the laws of such State or any other applicable laws require the existence of any cooperative agreements, contracts, or any other legally binding agreements between the applicant and any other party, including any PHA(s) established under the laws of the State, in order for the applicant to have the authority to operate throughout the entire State, the SL must clearly identify such law(s), and a copy of any and all such cooperative agreements, contracts, or other legally binding agreements, duly executed for a term through the anticipated term of the ACC (i.e., September 30, 2014), must be attached to and labeled as an exhibit to the SL.

**f. Required by All Applicants.** The RLO and any SL must conclude with a definitive, *unqualified* statement explicitly certifying that all representations therein are true and correct. Any RLO and any SL that does not contain such a statement will be rejected without any further review.

**3. Basic Administrative Fee Percentage.** The proposed Basic Administrative Fee Percentage for a State is not to exceed 2.0%. Applications proposing a fee that exceeds 2.0% will be rejected.

**IMPORTANT NOTES RELATED TO THE BASIC ADMINISTRATIVE FEE PERCENTAGE:**

**NOTE 1:**  The Basic Administrative Fee Percentage is calculated as follows:
The Grand Total (All Years) amount from the Grant Application Detailed Budget (form HUD-424-CB) is divided by two (2) to arrive at the annualized grand total.  Then, the annualized grand total is divided by the sum of the annual per-unit per-month 2-bedroom FMRs for the State as published in the portfolio of Active PBCA Assigned Section 8 Contracts for this NOFA at
http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp

**NOTE 2:** Exhibit A, Section 3.1, PBT #1 – Management and Occupancy Reviews has been revised to include a risk-based requirement and a separate requirement for Mark-to-Market projects.  Two Exhibits have been added to the ACC:

Exhibit G:  MOR Ratings for Projects with PBCA Administered HAP Contracts

Exhibit H:  Mark-to-Market Projects with PBCA Administered HAP Contracts

The information for each State is available at
http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp in two documents titled "MOR Ratings for Projects" and "Mark-to-Market Projects".

**NOTE 3:**  The ACC defines the Basic Administrative Fee Percentage as "The percentage of the applicable annual per unit per month 2-bedroom Fair Market Rent within the State, which is used to calculate the monthly Basic Fee."  The Basic Administrative Fee Amount is "The amount that results when the Administrative Fee Percentage, approved by the United States Department of Housing and Urban Development, is multiplied by the current applicable 2-Bedroom Fair Market Rent for each Covered Unit under a Housing Assistance Payments Contract on the first day of the month during the Performance-Based Annual Contributions Contract Term."

The annual per unit per month 2-bedroom Fair Market Rent for each Covered Unit for the Assigned Section 8 HAP Contracts in each State is titled "Active PBCA Assigned Section 8 Contracts for NOFA" and is available at
http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp

**NOTE 4:**  To view basic administrative fee percentages proposed by applicants in the prior competition, please see
http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/rfp/sec8rfp

**E. Program Requirements.**  Successful applicants will not be awarded until Program Requirements are met.

**1.  Disaster Plan.**  The applicant shall provide a Disaster Plan that details how the PHA and, if applicable, contractors that perform services that provide fifty (50) percent or more of the full time equivalent (FTE) employees required to perform PBTs Numbers one (1) through six (6) as specified in Exhibit A, Section 3, of the ACC will ensure continued operations in the event of a natural or human-caused disaster.  The Disaster Plan portion of the application is not subject to a page limitation but should be written in a concise manner.  The Disaster Plan is not a Factor for

Award but will be reviewed to ensure that each of the topics described below is addressed. It must include a cover sheet specifying the title of the document and identifying the PHA submitting the document and the State for which the document is being submitted. Each page must be printed on a single side of an 8.5" by 11" sheet of paper using a standard 12-point font. One copy of the Disaster Plan portion of the application shall be submitted as a PDF file using this file name format: Two Letter State Postal Code_PHA Complete Name_DISASTER. File names cannot exceed 50 characters, including spaces and underscores. If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the file.

**NOTE:** The Two Letter State Postal Code is for the State for which the application is submitted.

a. **Elements of the Disaster Plan.** The PHA Disaster Plan portion shall include:
(1) **Incident Response Staff;** including the names, titles, incident response authority and responsibilities, and contact information for assigned staff and any contractors or sub recipients.

(2) **Communication Back-up Plans and Systems,** including:
   (a) **Procedures and methods of notifying and updating owners,** and residents regarding changes in service procedures and the resumption of routine operation; and

   (b) **Procedures and methods of notifying HUD in the event of an incident,** including updating HUD regarding changes in service procedures until the resumption of routine operations, the performance status of each PBT or, if any PBT is not being fully performed, actions being taken to restore full performance of each PBT.

(3) **Operating and Management Back-Up Plans and Systems.** Procedures to relocate functions and staff to alternative office locations and/or telework sites; ensure access to IT systems; maintain internal and external communication systems (telephone, fax, email); and maintain supervisory, accounting, financial, and human resource functions.

(4) **Information Technology (IT) Back-up Plans and Systems.** Procedures to maintain IT staff support and ensure operability, data protection and system security.

(5) **Preparedness.** Plan to provide annual training for employees and, if applicable, contractor employees, and annual testing of back-up plans and systems.

b. **The Disaster Plan Coordinator.** The PHA shall have a Disaster Plan Coordinator who has the education and experience to develop, manage, and test disaster, continuity of operations, or emergency management plans. The Disaster Plan Coordinator shall be considered "qualified" if he/she has education (e.g., professional degree and/or professional certification or training) and experience as a practitioner in emergency management and response, emergency operations, continuity of operations (COOP), disaster planning and response, or risk management. The Disaster Plan Coordinator must attach a qualifications statement or resume to the application. The Disaster Plan Coordinator shall review and approve the disaster plan for the organization. The Disaster Plan must address required elements of the disaster plan. The Disaster Plan Coordinator must ensure that all employees and, if applicable, contractor employees, will

participate in disaster plan training within the next twelve (12) months and that all backup plans and systems identified in the disaster plan will be tested within in the next twelve (12) months. A signed copy of the plan must be submitted to the designated HUD CAOM (Contract Administration Oversight Monitor).

**2.   FTE Chart.**  See Appendix B of this NOFA for template and Rating Factor 2 for more information.  The PHA shall submit a FTE Statement that identifies the FTEs required to perform PBTs numbers one (1) through six (6) as specified in Exhibit A of the ACC for the first twelve (12) month period of the ACC Term.  For each PBT, identify the positions by title responsible for managing, supervision, and performing each PBT.  Include the FTEs for PHA and contractor employees.  Only include contractors that contract directly with the PHA.  Do not include sub-contractors of contractors.·  One (1.00) FTE is defined as 2,080 work hours per year.

The FTE Statement shall be in the following format with the actual number of contractors, if any, included in the table below:

Identify the Contractor(s) by name and DUNS Number enumerated in the columns.
Contractor #1:  Name of Contractor/ DUNS #
Contractor #2:  Name of Contractor/ DUNS #
Contractor #3:  Name of Contractor/ DUNS #
Contractor #4:  Name of Contractor/ DUNS #
Add additional Contractors or position titles to list and add additional columns to the table as required.

**3.   HUD's Electronic Line of Credit Control System.**  Applicants must be eligible to acquire rights and access under HUD's Electronic Line of Credit Control System (eLOCCS).

**4.   Prohibition Against Lobbying Activities.**  Unless excluded from this requirement by other provisions of law, applicants are subject to the provisions of Section 319 of Public Law 101-121 (approved October 23, 1989) (31 U.S.C. § 1352) (the Byrd Amendment), which prohibits recipients of Federal contracts, grants, or loans from using appropriated funds for lobbying the executive or legislative branches of the Federal government in connection with a specific contract, grant, or loan.  In addition, applicants must disclose, using Standard Form SFLLL "Disclosure of Lobbying Activities," any funds, other than federally appropriated funds, that will be or have been used to influence Federal employees, members of Congress, or congressional staff regarding specific grants or contracts.  Federally recognized Indian tribes and tribally designated housing entities (TDHEs) established by federally recognized Indian tribes as a result of the exercise of the tribe's sovereign power are excluded from coverage of the Byrd Amendment, but state-recognized Indian tribes and TDHEs established only under state law must comply with this requirement.

**5.   Compliance with Fair Housing and Civil Rights Laws.**  Applicants who are selected for award must comply with the fair housing and civil rights requirements specified in Section III.C.5.a of the **General Section**.  In addition, successful applicants must  certify that they will comply with the requirements of the Fair Housing Act (42 U.S.C. §§ 3601-19), Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), Section 504 of the Rehabilitation Act of 1973 (29

U.S.C. § 794), the Age Discrimination Act of 1975 (42 U.S.C. § 6101), and title II of the Americans with Disabilities Act of 1990 (42 USC §§ 12131-12134).

**6. Affirmatively Furthering Fair Housing.** Under Section 808(e)(5) of the Fair Housing Act, HUD has a statutory duty to affirmatively further fair housing. HUD requires the same of its funded recipients. Successful applicants will have a duty to affirmatively further fair housing. In addition, successful applicants will be required to certify that they will affirmatively further fair housing. Successful applicants must comply with certain requirements regarding affirmatively furthering fair housing, including affirmative fair housing marketing, rather than the General Section. Specifically, successful applicants must: (1) adopt actions and procedures and maintain records of the implementation of the actions and procedures taken to affirmatively further fair housing; (2) make information available on the existence and location of housing, facilities, and services that are accessible to persons with disabilities; and (3) ensure that reasonable steps are taken to perform affirmative fair housing marketing. The purpose of the affirmative fair housing marketing plan is to provide equal opportunity to those individuals least likely to apply for the housing regardless of race, color, national origin, sex, religion, familial status, or disability. <u>Please see Rating Factor 3 for more information on submitting the Affirmatively Furthering Fair Housing narrative.</u>

**7. Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency (LEP).** Executive Order 13166 seeks to improve access to federally assisted programs and activities for individuals who, as a result of national origin, are limited in their English proficiency. Applicants obtaining Federal financial assistance from HUD shall take reasonable steps to ensure meaningful access to their programs and activities to LEP individuals. As an aid to recipients, HUD published *Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons* in the Federal Register on January 22, 2007 (72 FR 2732), found at http://www.lep.gov/guidance/HUD_guidance_Jan07.pdf Also see Section III.C.5.c of the General Section for more information.

**8. Effective Communication.** Successful applicants must ensure that all communications shall be provided in a manner that is effective for persons with hearing, visual, and other communications-related disabilities consistent with Section 504 of the Rehabilitation Act of 1973. (This includes ensuring that training materials are in appropriate alternative formats as needed, e.g., Braille, audio, large type, sign language interpreters, and assistive listening devices). See 24 CFR § 8.6.

**9. Monitoring.** The PBCA will monitor each property owner and ensure compliance with the terms of the HAP Contract. In discharging these and all other responsibilities under the ACC, the PBCA will comply, and will ensure compliance by owners, with Federal law, HUD's implementing regulations, the Section 8 Renewal Guide, and all other requirements and guidance that HUD deems applicable, as they exist at the time of ACC execution and as amended or otherwise issued from time to time during the ACC term. In the case of HAP Contracts that expire during the ACC term, the PBCA will enter into a renewal contract with Section 8 owners, as appropriate, in accordance with the Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA) (42 U.S.C. § 1437f note), HUD's implementing regulations, and the

provisions of the Section 8 Renewal Guide, which may be found at:
http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_14528.pdf.

**10.  Page Specifications.** Each page must be printed on a single side of an 8.5" by 11" sheet of paper using a standard 12-point font.

**11.  Compliance with Standards in the ACC.**  Applicants must meet all performance, reporting and task standards listed in the ACC.

**12.  Point Threshold.**  Applicants must receive at least 45 points of 70 available in Rating Factors for Capability, Soundness of Approach and Policy Priorities to qualify for award.

**IV.  APPLICATION AND SUBMISSION INFORMATION**

**A.  Address to Request an Application Package.**  See the **General Section** for specific procedures concerning the electronic application submission and timely receipt requirements. Copies of the published NOFAs and application forms for HUD programs announced through NOFAs may be downloaded from the Grants.gov website at http://www.Grants.gov.  Applicants need to download the application and the instructions for this NOFA from Grants.gov.

**B.  Grants.gov Customer Support.**  If applicants have difficulty accessing the information, customer support is available from Grants.gov by calling its Support Desk at 800-518-GRANTS (toll-free), or by sending an email to www.support@Grants.gov.  Grants.gov now also provides a toll number for those that have difficulty accessing a toll-free number.  The number is 606-545-5035 (toll charge).  The Grants.gov help desk is open 7 days a week, 24 hours a day, except Federal holidays.

**C.  Content and Form of Application Submission.**
**1.  Electronic Submission.**  Applications must be submitted electronically, as prescribed in the **General Section** using the Grants.gov website. To submit via Grants.gov, applicants must have a DUNS number which is registered in the Central Contractor Registration (CCR); have a User ID and password for the Grants.gov system; and be authorized by the eBusiness Point of Contact for the applicant identified in box 8a of the SF424, to be the authorized agency representative to submit the application.  Failure to meet these registration steps or to not properly enter the registered DUNS number and User ID and password associated to the applicant DUNS number in the Grants.gov system, can result in the application being rejected by Grants.gov.  Please carefully read the registration requirements.  Registration can take 2-4 weeks to complete.

**2.  Page Limitation, Font Size and Format for Naming of Files.**  Narrative statements cannot exceed the number of single-sided standard 8.5" by 11" pages specified in the application document descriptions.  Application documents must be in 12 point font.  File names must conform to the requirements specified in the application document descriptions and cannot contain spaces, special characters (!,@,#,#,$,%,^,&,*,(,),) or exceed 50 characters in length including any underscores. Files names that do not adhere to these directions will result in the application receiving a virus detect message and being rejected from the Grants.gov system. Spaces and underscores count to the 50 characters. Please see the **General Section** for details regarding submission to grants.gov and file naming requirements.  All files must be in

Microsoft® Word® except the FTE Statement document which must be in Microsoft Excel format to preserve its integrity as executed by the PHA and, if applicable, the contractor.

**3.  Application Submission Requirements.**
a.  Applicants must read and follow the application submission requirements carefully.

b.  Applications must be filed following the instructions for this opportunity as specified in the **General Section** and this NOFA posted to the Grants.gov website.

c.  Applications must be formatted for 8.5" by 11" viewing and printing.

d.  All pages of each document must be numbered sequentially.

e.  All application document files are assigned required file names that begin with the two letter State postal code of the State for which the applicant is applying.

f.  Zip files contained within zip files cannot be accommodated; documents in such files will not be reviewed.

g.  Zip files must use this file name format: Two Letter State Postal Code_PHA Complete Name_APPLICATION. The name of the file cannot exceed 50 characters, including spaces and underscores. If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the file.

**NOTE:** The Two Letter State Postal Code is for the State for which the application is submitted.

h.  By submitting an application on Grants.gov, you are certifying that:

- The Executive Director of the PHA certifies that information provided in the Application is true and correct;

- If the PHA is contracting with an entity that provides services equal to fifty (50) percent or more of the FTE employees required to perform PBTs Numbers one (1) through six (6) as detailed in the FTE Statement, the information provided in this Application relative to its services and performance is true and correct.

**4.  Application Requirements.**
a.  **Content of Application.**  This section sets forth the contents of the application and the procedures applicants must follow to submit applications in response to this NOFA.  Failure to comply with these procedures may result in the applicant being disqualified from award consideration.  Each application submitted in response to this NOFA shall include the following documents:
(1)  **Abstract.**  Consisting of up to four-pages, it is a summary of the proposed project, which will not be scored and does not count toward the narrative page limit. The abstract must contain the following:
(a)  **Name of PHA Entity**

    (b)  **Street Address**
    (c)  **City, State, Zip Code**
    (d)  **Contact Name and Title**
    (e)  **Contact Telephone Number**
    (f)  **Contact E-mail Address**
    (g)  **Name of State of Application**
    (h)  **Proposed Basic Administrative Fee Percentage (not to exceed 2.0%)**

(2) **Supporting Documents.** A list of supporting documents and forms in the following order found in the application and instruction download. **A list of documents for each zip file.**

(3) **SF424 Application for Federal Assistance.** Applicants must include the nine digit ZIP code (ZIP code plus four digits) associated with the applicant address in box 8d of the SF424. Applicants must also provide a project name in Line 11 of the SF424 and use the same project name in all references to the application as the information will pre-populate the other forms contained in the application download package.

(4) **SF424 Supplement Survey on Equal Opportunity for Applicants.** Titled "Faith Based EEO Survey" (SF424SUPP) on Grants.gov (optional submission).

(5) **SFLLL_Disclosure_of_Lobbying_Activities.** Note that federally recognized Indian tribes are not required to submit this form (see the **General Section**).

(6) **HUD2880_Applicant_Recipient_Disclosure_Update_Report.** Titled "HUD Applicant Recipient Disclosure Report" on application download on Grants.gov.

(7) **HUD 2993 Ackowledgement of Application Receipt.** For applicants submitting paper applications only. This is not applicable to those using Grants.gov.

(8) **Narrative Response to Factors for Award.** The total narrative response cannot exceed the equivalent of 60 single-sided standard 8-1/2" x 11" pages total in 12 point font, not including attachments for each narrative.  There are no page limits for Rating Factors 3 and 4.
    (a) **Capability Statement, see Rating Factor 1.** (10 page limit). Includes General Experience, Experience with PBTs, Experience Training Personnel to Ensure Performance of PBTs and Ensuring Compliance.

The Capability Statement portion of the Application must describe the applicant's experience actually performing the ACC and the PBTs described in Exhibit A, Section 3, of the ACC or experience performing tasks which are strongly related to the PBTs, such as:  managing a portfolio of affordable multifamily housing units, managing public housing projects, managing a housing choice voucher program, managing a project-based voucher program, serving as a Traditional Contract Administrator, completing health and safety work order requests submitted by tenants, tracking and resolving tenant complaints and submitting reports to state or federal regulatory agencies.  The applicant may describe the experience of the PHA, the PHA's instrumentality, or one or more contractors with whom the PHA has contracted, or proposes to contract with, to provide services related to the Capability Statement.  The Capability Statement is a Factor for Award.

The applicant is to provide a narrative response for each of the subfactors in the rating factor. The applicant's responses must be in the same order and numbered as the subfactors appear. Only information submitted for a specific subfactor will be considered for the corresponding subfactor for which it was written.

One copy of the Capability Statement of the Application shall be submitted as a Microsoft® Word® file using this file name format: Two Letter State Postal Code_PHA Complete Name_CAPABILITY. The name of the file cannot exceed 50 characters , including spaces and underscores. If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the file.

**NOTE:** The Two Letter State Postal Code is for the State for which the application is submitted.

   **(b)  Technical Approach narrative (30 page limit). See Rating Factor 2.** The Technical Approach portion of the Application must describe the applicant's technical approach to performing the ACC and the PBTs described in Exhibit A of the ACC. The applicant may describe the technical approach of the PHA, the PHA's instrumentality, or one or more contractors with whom the PHA has contracted or proposes to contract with, to provide services related in the Technical Approach.   Rating Factor 2 includes descriptions of five (5) subfactors that the applicant must address in the Technical Approach and the points for each section.

The applicant is to provide a narrative response for each of the subfactors and the FTE Chart (Not a Factor for Award). The applicant's response may include tables and graphs. The applicant's responses must be in the same order and numbered as the subfactors appear. Only information submitted for a specific subfactor will be considered for the corresponding subfactor for which it was written

One copy of the Technical Approach portion of the Application shall be submitted as a Microsoft® Word® file using this file name format:  Two Letter State Postal Code_PHA Complete Name_TECHNICAL. The name of the file cannot exceed 50 characters , including spaces and underscores. If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the file.

**NOTE:** The Two Letter State Postal Code is for the State for which the application is submitted.

The FTE chart shall be submitted as an Microsoft Excel file using this file name format: Two Letter State Postal Code_PHA Complete Name_APPCERT. The name of the file cannot exceed 50 characters , including spaces and underscores. If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the file.

   **(c)  Quality Control Plan narrative (20 page limit). See Rating Factor 2.** The Quality Control Plan portion of the application must describe the internal control procedures that the

applicant will implement to ensure quality performance of the ACC and the PBTs described in Exhibit A, Section 3, of the ACC. The applicant may describe the internal control procedures of the PHA, the PHA's instrumentality, or one or more contractors with whom the PHA has contracted or proposes to contract with, to provide services related to each Subfactor in the Quality Control Plan. Rating Factor 2, includes descriptions of seven (7) "Subfactors" that the applicant must address in the Quality Control Plan and the points for each Subfactor.

The applicant is to provide a narrative response for each of the subfactors. The applicant's responses must be in the same order and numbered as the subfactors appear. Only information submitted for a specific subfactor will be considered for the corresponding subfactor for which it was written.

One copy of the Quality Control Plan portion of the Application shall be submitted as a Microsoft® Word® file using this file name format: Two Letter State Postal Code_PHA Complete Name_QCP. The name of the file cannot exceed 50 characters , including spaces and underscores. If it does, it will be rejected. However, rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters, including spaces and underscores, in the naming of the file.
Note: the Two Letter State Postal Code is for the State for which the application is submitted.

  (d) **Narrative on Affirmatively Furthering Fair Housing.** Applicants must submit a narrative describing how they intend to fulfill the Affirmatively Furthering Fair Housing requirement, including describing how they will address impediments to fair housing as described in Section III.E.6. above. See Rating Factor 3.

  (e) **Policy Priority Narrative on Job Creation, See Rating Factor 4.**

  (f) **Proposed Fee, See Rating Factor 5.** Include fee percentage in Abstract, described above in part (**1**).

(9) **Reasoned Legal Opinion (RLO),** including charter and other required organizational documents, and Supplemental Letter, if applicable. The RLO file must use the following file name format :the two letter State postal code of the State for which the applicant is applying, _ the two letter State postal code of the State under the laws of which the applicant was formed, _ the complete legal name of the applicant. Refer to Section III.D.2.a above for General RLO Requirements. The name of the RLO file cannot exceed 50 characters, if it does, it will be rejected; and rejection for this reason can be avoided by providing as much of the complete legal name of the applicant as possible up to a total of 50 characters in the naming of the RLO file.

(10) **Disaster Plan. See Program Requirements at Section III.E.1**

(11) **Fair Housing Requirements.** Applicants must describe how they will address impediments to fair housing.

(12) **HUD_424_CB_Detailed_Budget**. A budget for all funds (Federal and non-Federal). The HUD 424 CB is a standard form budget template, and includes budget lines that are not allowable items under the Program, e.g., land and building acquisition costs. When completing

the HUD 424 CB, applicants should please ensure that only budget items allowed under the PBCA Program are populated.(in the application download)

(13) **HUD96011_Facsimile_Transmittal** ("Facsimile Transmittal Form" on Grants.gov). The form must be submitted with each application and be used as the coversheet for any facsimile sent for the application, if the applicant is not faxing any documents, the applicant must still complete the facsimile transmittal form.  In the section of the form titled "Name of Document Transmitting," the applicant should enter the words "Nothing Faxed with this Application." Complete the remaining highlighted fields and enter the number "1" in the section of the form titled "How many pages (including cover) are being faxed?"  The applicant must move the form to the right side of the Grants.gov application to open and complete the form.  Forms on the right side of the application get uploaded as part of the application submission with the forms getting embedded ID numbers.  The embedded ID numbers allow HUD to match the faxes to each application submission. **Please refer to the General Section for a detailed discussion.**

NOTE: HUD will not accept entire applications submitted by fax, unless a waiver has been obtained pursuant to Section IV.C.5, below (Waiver of Electronic Application Requirement), or applicant is responding to a curable deficiency pursuant to Section V.B.4 (Corrections to Deficient Applicants).  If an applicant submits an application by fax or in paper copy and has not received a waiver to the electronic application submittal, the entire application will be disqualified.

**5.  Receipt Dates and Times.**  The deadline date is 11:59:59 p.m. Eastern Time on **April 10, 2012.**  Applications must be received by Grants.gov no later than 11:59:59 p.m. Eastern Time on the application deadline date.  Applications must meet the timely receipt requirements of the **General Section.**  See Section IV of the **General Section** regarding application timely filing requirements.

6.  **Other Submission Requirements.**
a.  **Waiver of Electronic Application Requirement.**  Applicants must follow the electronic application instructions included in the **General Section,** unless granted a waiver for cause of the required electronic application requirement.  The request for a waiver must provide a justification for cause in accordance with HUD's waiver policy at 24 CFR 5.1005.  Applicants requesting a waiver must submit the request in writing no later than fifteen (15) days prior to the application deadline date.  The letter must be addressed to Carol J. Galante, Acting Assistant Secretary for Housing, Federal Housing Commissioner at the address below.  The waiver can be submitted via email or fax to:

U.S. Department of Housing and Urban Development
451 Seventh Street SW, Room 6151
Washington, DC  20410
ATTN: Mr. Kerry E. Hickman, Acting Director, Office of Housing Assistance Contract
      Administration Oversight (HACAO)
Telephone Number:  (202) 402-3885
Email:  Kerry.E.Hickman@hud.gov
FAX: 202-708-1010

Paper applications will not be accepted from applicants that have not been granted a waiver. If an applicant is granted a waiver, the approval notice will provide instructions for application submission and receipt requirements. All applications in paper format must have received a waiver to the electronic application requirement and must be received no later than 3:59:59 p.m. Eastern Time close of business on the application deadline date to allow scanning of any packages in accordance with HUD Security procedures.

## V. APPLICATION REVIEW INFORMATION

**A. Rating Criteria.** Applications will be scored based upon their response to the subfactors associated with each rating factor, or "Factor for Award." The technical point value associated with each subfactor is the maximum value that can be assigned. The points awarded for the rating factors will be up to 100 points. Points will be assigned to each of the rating factors identified below. Applicants should review the rating factors carefully and respond specifically to each factor. This NOFA does not include bonus points under the EZ/EC/RC-II or the Preferred Sustainable Status Bonus Points. Applicants must receive a total score of 45 of 70 points available in the Rating Factors 1 through 4 for Capability, Soundness of Approach and Policy Priorities to qualify for an award.

**1. Rating Factor 1: Capability of the Applicant and Relevant Organizational Experience (Up to 20 Points).** The applicant must submit a detailed Capability Statement that describes the applicant's relevant organizational and past experience performing each of the following subfactors. The applicant may describe the experience of the PHA, the PHA's instrumentality, and contractors with which the PHA has contracted to provide services in each subfactor a. through d.

**a. General Experience (up to 8 points).** The applicant should describe the nature and length of its experience serving as contract administrator for multifamily housing projects with project-based Section 8 HAP contracts (actual experience). The applicant may also describe the nature and length of its experience administering functions and processes strongly related to serving as contract administrator or providing strongly related contract administration activities for multifamily housing projects and rent subsidy programs (strongly related experience). Examples of strongly related experience include, but are not limited to the following: managing a portfolio of affordable multifamily housing units, managing public housing projects, managing a Housing Choice Voucher program, managing a project-based voucher program, serving as a Traditional Contract Administrator, completing health and safety work order requests submitted by tenants, tracking and resolving tenant complaints, and submitting reports to state or federal regulatory agencies. To receive the maximum points, the applicant's response must be comprehensive (i.e. whether its experience addresses all of the required components described in each subfactor) and include specific examples of its experience. The applicant's response must include the number of years of its general experience.

Nature of Experience (up to 5 points)
Up to 5 points will be awarded based on the comprehensiveness of the response, demonstrated knowledge of contract administration and clarity of response. The same points will be assigned for actual and/or strongly related experience.

Duration of Experience (up to 3 points)
Up to 3 points will be awarded for length of experience indicated in the response.

- If the applicant has five (5) or more years of actual or strongly related experience, three (3) points will be assigned.

- If the applicant has three (3) to four (4) years of actual or strongly related experience, two (2) points will be assigned.
- If the applicant has one (1) to two (2) years of actual or strongly related experience, one (1) point will be assigned.

- If the applicant has less than one (1) year of actual or strongly related experience, zero (0) points will be assigned.

b. **Experience with Performance-Based Tasks (PBTs) (up to 6 points).** The applicant should describe, for each PBT in Exhibit A, Section 3 of the ACC (and listed below for reference), its experience performing the PBT or performing tasks that are strongly related to the PBT. The same points will be assigned for actual and/or strongly related experience. Up to six (6) points may be assigned. To receive the maximum points, the applicant's response must be comprehensive (i.e. experience addresses all of the required components described in each subfactor) and include specific examples of its experience performing a wide range of PBTs. The applicant's response must include the number of years of its experience performing the PBT. No additional points are assigned to the years of experience but applicants with less than one year of experience will be assigned zero (0) points. The applicant's experience performing each of the following PBTs will be evaluated and assigned points as follows:

Experience with PBTs #1 through #5 (up to 4 points);

Experience with PBTs #6 through #8 (up to 2 points). The list of PBTs is provided for your reference below:

- PBT #1 – Management and Occupancy Reviews

- PBT #2 – Adjust Contract Rents

- PBT #3 – Review and Pay Monthly Vouchers

- PBT #4 – Renew HAP Contracts

- PBT #5 – Tenant Health, Safety, and Maintenance Issues

- PBT #6 – Administration – Monthly and Quarterly Reports

- PBT #7 – Administration – Annual Reports and Certifications

- PBT #8 – Annual Financial Reports -- PHA Fiscal Year End

**c. Experience Training Personnel to Ensure Performance of PBTs (up to 4 points).** Each applicant should describe its experience training personnel to ensure performance of each of PBTs #1 through #6 or tasks that are strongly related to PBTs #1 through #6. The number of years of experience is not applicable to the descriptions. The same points will be assigned for actual and/or strongly related experience. To receive the maximum points the applicant's response must be comprehensive and include specific examples of training sessions and successful results.

The applicant's experience training personnel to perform each of the PBTs will be evaluated and assigned points as follows:

- Experience with all of PBTs #1 through #6 will be assigned four (4) points.
- Experience with three (3) to five (5) of PBTs #1 through #6, <u>must include PBT#1</u>, will be assigned three (3) points.

- Experience with three (3) to five (5) of PBTs #1 through #6, <u>not including PBT#1</u>, will be assigned two (2) points.

- Experience with one (1) or two (2) of PBTs #1 through #6 will be assigned one (1) point.

- No experience with any of PBTs #1 through #6 will be assigned zero (0) points.

**d. Experience Ensuring Compliance (up to 2 points).** Each applicant should describe its experience monitoring Federal statutes, regulations, and program requirements, identifying and interpreting changes or additions, and implementing policies and procedures that ensured efficient, effective and consistent compliance. This includes experience complying with fair housing and equal opportunity statutes, regulations, and program requirements. This may be demonstrated, for example, by describing relevant policies and procedures (reasonable accommodations, effective communication), affirmative outreach requirements, efforts to ensure program accessibility for persons with disabilities, etc. To receive the maximum points the applicant's response must be comprehensive and include specific, successful examples that relate to the program and ACC.

**2. Rating Factor 2: Soundness of Approach (up to 48 Points) including: Technical Approach (up to 24 Points), and Quality Control Plan (up to 24 Points).**

**a. Technical Approach (up to 24 Points).** Each applicant should submit a description of its technical approach, including relevant organizational staff, to performing each of the following subfactors as they relate to the ACC (in addition to the FTE Chart if working on elements required by the ACC not a PBT listed in the subfactors below). The applicant may describe the technical approach of the PHA, the PHA's instrumentality, or one or more contractors with whom the PHA has contracted to provide services in each subfactor. Up to 24 points may be assigned to the Technical Approach.

**b. Technical Approach: Annual Work Plan (up to 2 points).** Each applicant should describe a sound technical approach to planning the performance of all PBTs during the first twelve (12) month period of the ACC term as required in the ACC under PBT #7, Annual Work Plan. Up to

two (2) points may be assigned.  Points will be assigned based on the comprehensiveness of the response (i.e. approach addresses all of the required components described in each subfactor) and the reasonableness of the proposed approach to ensure performance of all PBTs.  See example of point allocation in Section V.A.2.e, above.

**c. Technical Approach: PBTs (up to 12 points).**  Each applicant should describe a sound technical approach to performing each of the PBTs specified in Exhibit A, Section 3 of the ACC and listed below for reference.  Up to twelve (12) points may be assigned. To receive the maximum points, the applicant must describe an effective approach that includes specific steps to ensure performance of all eight (8) PBTs.  If contractor entities are used or proposed to be used for more than 50% of FTEs for PBTs 1-6 in multiple states (as noted in the FTE statement) applicant must describe how they will balance the workload for the PBTs 1-6.  Points will be assigned based on the comprehensiveness of the response (i.e. whether the approach addresses all of the required components described in each subfactor) and the proposed approach to ensure performance of all required PBTs.

The technical approach for each of the following components will be evaluated and assigned points as follows:

- PBT #1 – Management and Occupancy (up to 2 points).

- PBT #2 – Adjust Contract Rents (up to 2 points).

- PBT #3 – Review and Pay Monthly Vouchers (up to 2 points).

- PBT #4 – Renew HAP Contracts (up to 2 points).

- PBT #5 – Tenant Health, Safety, and Maintenance Issues (1 point or zero point).

- PBT #6 – Administration – Monthly and Quarterly Reports (1 point or zero point).

- PBT #7 – Administration – Annual Reports and Certifications (1 point or zero point).

- PBT #8 – Annual Financial Reports – PHA Fiscal Year End (1 point or zero point).

Applicants must complete and submit the **FTE statement** (see Appendix B of this NOFA) showing all staff and contractors who will be performing PBTs 1-6.

**d. Technical Approach: General ACC Requirements (up to 2 points).**  Each applicant should describe a sound technical approach to administering the general requirements of the ACC.  Up to two (2) points may be assigned. Points will be assigned based on the comprehensiveness of the response and the reasonableness of the proposed approach to ensure performance of all required components of the ACC. For example, a response that addresses each of the below components and relates directly to performance requirements in the ACC will receive 2 points. One point may be given for less complete responses.  Responses that are nonresponsive to the ACC or don't address the above components will receive 0 points. The technical approach should include the following components.

- Executive leadership and oversight (if applicable, include a detailed description of planned oversight of all contractors with whom the applicant PHA intends to contract directly);

- Legal representation;

- Equal opportunity management with staff, tenants, and applicants;

- Plan for communication with HUD;

- Plan for communication/engagement with owners and management agents;

- Plan for communication/engagement with tenants; and

- Plan for communication/engagement with tenants and applicants with disabilities.

**e. Technical Approach: Information Systems and Security (up to 2 points).** Each applicant should describe a sound technical approach to information and information system security and privacy for data entered into or pulled from HUD Systems. Up to two (2) points may be assigned. Points will be assigned based on the comprehensiveness of the response and the reasonableness of the proposed approach to ensure performance of all required components. See example of point allocation in Section V.A.2.e, above. The technical approach should include the following components:

- Security for HUD Systems—TRACS;

- Security for HUD Systems—EIV System;

- Security for HUD Systems—iREMS;

- Security for Non-HUD Information Technology Systems that contain program related data; and

- Security for print-based program documents.

**f. Technical Approach: Preparing to Assume ACC Responsibilities (up to 6 points).** Each applicant should describe a sound technical approach to preparing to assume responsibility for administration of the ACC and performance of the PBTs upon the effective date of the ACC in each of the three (3) components that follow. If specific items do not need to be acquired or added, the applicant must describe what is in place (i.e. surplus office space within the PHA's facility) or why it is not required. Up to six (6) points may be assigned. Points will be assigned based on the comprehensiveness of the response (i.e. approach addresses all of the required components described in each subfactor) and the proposed impact of the approach to ensure performance of all required components. To receive the maximum points, the applicant must describe a sound approach that explains specific steps to ensure performance of all three (3) components listed below. The technical approach for each of the following components will be evaluated and assigned points as follows:

- A description of office facilities, communication systems, information technology systems to be acquired or added to existing operations and a timeline from award to full readiness (up to 2 points);

- A description of accounting systems; banking, insurance and fidelity bonding arrangements to be acquired or added to existing operations and timeline from award to full readiness (up to 2 points); and

- A description of hiring and training of personnel to be added and a timeline from initiation to full readiness (up to 2 points).

**g.  Quality Control Plan (up to 24 Points).**  Each applicant should submit a detailed Quality Control Plan (QCP) that describes internal control procedures for each of the following subfactors (1) through (7).  The applicant may describe the internal control procedures of the PHA, the PHA's instrumentality, or one or more contractors with whom the PHA has contracted to provide services in each subfactor.  Up to 24 points may be assigned to the QCP.  Points will be assigned based on the comprehensiveness of its internal control procedures, as they relate to the ACC, to ensure the applicant's organizational expertise and capacity to ensure the steps and procedures described meet the objectives of the subfactors.

**(1)  Internal Control Procedures: PBTs (up to 8 points).**  For each PBT specified in Exhibit A, Section 3 of the ACC (and listed below for reference), describe how they will achieve Acceptable Quality Level (AQL) performance of the specified PBT in the Performance Requirements Summary (PRS) Table, Exhibit A, Section 5 of the ACC.  Up to eight (8) points may be assigned.  To receive the maximum points, the applicant must describe an effective plan that includes specific steps to measure and evaluate the  performance of all eight (8) PBTs listed below at the specified AQL.  Points will be assigned based on the comprehensiveness of the response (i.e. approach addresses all of the required components described in each subfactor) and the proposed approach to ensure performance of all required components.

The QCP for each of the PBTs will be evaluated and points assigned as follows:

- PBT #1 - Management and Occupancy (1 point or zero points).

- PBT #2 – Adjust Contract Rents (1 point or zero points).

- PBT #3 – Review and Pay Monthly Vouchers (1 point or zero points).

- PBT #4 – Renew HAP Contracts (1 point or zero points).

- PBT #5 – Tenant Health, Safety, and Maintenance Issues (1 point or zero points).

- PBT #6 – Administration – Monthly and Quarterly Reports (1 point or zero points).

- PBT #7 – Administration – Annual Reports and Certifications (1 point or zero points).

- PBT #8 – Annual Financial Reports – PHA Fiscal Year End (1 point or zero points).

**(2) Internal Control Procedures: Conflicts of Interest (up to 2 points).** Each applicant should describe the internal control procedures that will be implemented to ensure that the conflicts of interest stipulated in Section 10, "Conflicts of Interest," of the ACC are prevented, detected and resolved.  Up to two (2) points may be assigned.  Points will be assigned based on the comprehensiveness of the response (i.e. whether the approach addresses all of the required components described in each subfactor) and the proposed impact of the approach to ensure performance of all required components.  See example of point allocation in Section V.A.2.e, above.  See ACC for outcomes.

**(3) Internal Control Procedures: Accountability (up to 2 points).** Each applicant should describe the internal control procedures that will be implemented to ensure accountability and separation of duties to detect and prevent fraud, waste, and abuse of funds.  Up to two (2) points may be assigned.  Points will be assigned based on the comprehensiveness of the response and the proposed impact of the approach to ensure performance of all required components.  See example of point allocation in Section V.A.2.e, above.

**(4) Internal Control Procedures: Privacy (up to 2 points).** Each applicant should identify the internal control procedures that will be implemented to prevent, detect, and report privacy breaches. Up to two (2) points may be assigned.  Points will be assigned based on the comprehensiveness of the response and the proposed impact of the approach to ensure performance of all required components. See example of point allocation in Section V.A.2.e, above.

**(5) Internal Control Procedures: Information Systems (up to 2 points).** Each applicant should describe the internal control procedures for information and information system access, management, and security for HUD systems, non-HUD systems that contain program related data, and print-base program documents.  Up to two (2) points may be assigned.  Points will be assigned based on the comprehensiveness of the response and the proposed impact of the approach to ensure performance of all required components. See example of point allocation in Section V.A.2.e, above.

**(6) Internal Control Procedures: Training (up to 2 points).** Each applicant should describe how they will provide initial and continuous training and cross training of staff to perform PBTs and comply with the requirements of the ACC and HUD.  Up to two (2) points may be assigned. Points will be assigned based on how clear the plan is, how staff is identified to be trained and frequency of training.

**(7) Internal Control Procedures: QCP Elements 1 through 6 (up to 6 points).** Each applicant should describe the internal control procedures that will be implemented to review the effectiveness of each element of the QCP and the date(s) scheduled for each QCP element review.  Up to six (6) points may be assigned.  To receive the maximum points, the applicant must describe a plan that includes specific steps to ensure the  six (6) internal control descriptions  in the QCP. Points will be assigned based on the comprehensiveness of the response and the proposed impact of the approach to ensure performance of all required components.

- PBTs (1 point or zero point);
- Conflicts of Interest (1 point or zero point);
- Accountability (1 point or zero point);
- Privacy (1 point or zero point);
- Information Systems (1 point or zero point); and
- Training (1 point or zero point).

**3. Rating Factor 3: Policy Priority: Affirmatively Furthering Fair Housing (up to 1 Point).**
Applicants will be awarded one (1) point for demonstrating how their application affirmatively
furthers Fair Housing. Each applicant should identify specific activities, outputs and outcomes
that further these policy priorities over the period of performance.

HUD is interested in funding housing and community development activities that afford
residents an opportunity to live in a variety of neighborhoods and not be confined to affordable
housing choices in areas of high poverty or areas that are not racially or ethnically diverse.
Recognizing that housing and community development efforts must address a complex network
of social and economic factors in order to promote more diverse, inclusive communities, HUD
seeks to encourage applicants to undertake comprehensive and effective strategies to
affirmatively further fair housing. Each applicant should describe how it will take affirmative
steps to achieve the following outcome: **Address impediments to fair housing and promote
fair housing rights and choice.** The applicant must describe the methods that will be used to
achieve these outcomes. Examples include review of HUD-assisted projects to ensure
compliance with federal civil rights and equal opportunity regulations, implement actions and
procedures to affirmatively further fair housing, perform affirmative fair housing marketing, and
make information available on the existence and location of housing, facilities, and services that
are accessible to persons with disabilities, and maintain records of the actions, goals, and
outcomes. The applicant should also present a timetable for achieving the identified outcomes.

**4. Rating Factor 4: Policy Priority: Job Creation (1 Point).**
Applicants will be awarded one (1) point for demonstrating how their application creates jobs
and promotes economic development in the community. Each applicant should identify specific
activities, outputs and outcomes that further these policy priorities over the period of
performance.

Under the Job Creation/Employment policy priority, HUD seeks to fund applicants that
undertake activities that sustain economic development and create jobs in low-income
communities. Each applicant should describe the number and type of activities that will improve
access to job opportunities in the community through information sharing, coordination with
Federal, state, and local entities, and other means. To receive one policy priority point,
applicants are expected to describe how they will achieve the following outcome: **Expand job
creation and other economic opportunities in the community.** The applicant must describe
the methods that will be used to achieve these outcomes. Examples include specifying the
number of jobs created and specifying the number of other activities that expand job creation and
other economic opportunities. According to the proposed methods, the applicant should identify
the anticipated outputs (i.e. number of jobs created, number of activities planned) during the
period of performance.

**5. Rating Factor 5: Scaled Fee Score.** Basic Administrative Fee (up to 30 Points)
In addition to technical points, applicants will receive up to 30 points for the basic administrative
fee percentage proposed in the application. All proposed fees will be rounded to the nearest
.01%. The proposed Basic Administrative Fee Percentage for a State is not to exceed 2.0%.

Points will be assigned as follows:

* 1.0% or below          30 points
* 1.01-1.1%              28 points
* 1.11-1.2%              25 points
* 1.21-1.3%              22 points
* 1.31-1.4%              19 points
* 1.41-1.5%              16 points
* 1.51-1.6%              13 points
* 1.61-1.7%              10 points
* 1.71-1.8%              7 points
* 1.81-1.9%              4 points
* 1.91-2.0%              1 point

The proposed fee points are added to the technical points to obtain the total score. The
application with the highest total score in the state will be awarded the ACC.

In circumstances where the highest total scores for a state are equal, the applicants with tied
scores will have a tie-breaker based on highest point score for Rating Factor 5. If there is still a
tie, HUD will select the applicant with the highest point score for Rating Factor 1.

**B. Certifications.** By signing the electronic application on Grants.gov, the applicant certifies
that the Disaster Plan will be complete and correct before awards are made. The applicant is also
certifying that all the statements and information contained in the application is true and correct
and upon which HUD can rely.

**C. Reviews and Selection Process.**
**a. Application Screening.** Applicants requesting funds will be screened for completeness.
Applciations from ineligible entities will not be reviewed. Applicants that do not include the
Reasoned Legal Opinion in their application will not be reviewed. If an applicant proposes an
administrative fee over 2%, the application will not be reviewed. Applications that do not meet
the timely receipt requirements or provide file formats that do not meet HUD requirements as
specified in the FY2012 **General Section** cannot be read by HUD and therefore will not be
reviewed.

**b. Technical Evaluation Panel.** Applications that pass the initial screening review will be
forwarded to the Technical Evaluation Panel (TEP). The TEP is composed of teams of
Multifamily Housing staff who will review and evaluate the applications forwarded to them. .
HUD will conduct the substantive review of the application in accordance with the rating criteria
described in this NOFA. As part of the review process, HUD may contact the applicant by
telephone, email, or mail for the sole purpose of clarifying or confirming application

information, but not to improve the substance of the application. Detailed rules regarding corrections to deficient applications appear in Section V. B. 4. below. If contacted for clarifying or confirming information, the applicant must respond within the time parameters as provided in Section V. B. 4. Rating factors and subfactors are not are curable deficiencies.

Each application will be evaluated and scored on its own merit by a TEP Team.

**c. Corrections to Deficient Applications.** After the application deadline, and in accordance with the electronic submission grace period, HUD may not, consistent with its regulations in 24 CFR part 4, subpart B, consider any unsolicited information provided by an applicant. After HUD receives an application, HUD may contact an applicant to clarify an item in its application or to correct curable (correctable) technical deficiencies. HUD <u>may not</u> seek clarification of items or responses that improve the substantive quality of an applicant's response to any rating factors or which correct deficiencies which are in whole or part of a rating factor. In order not to unreasonably exclude applications from being rated and ranked, HUD may contact applicants to ensure proper completion of the application, and will do so on a uniform basis for all applicants.

Curable (correctable) technical deficiencies are limited to: inconsistencies in the funding request, failure to submit certifications or statements that are not threshold requirements and do not impact the score of an applicant, and failure to submit an application that contains a signature by an official able to make a legally binding commitment on behalf of the applicant (e.g. Disaster Plan or FTE Chart). In the case of an applicant that received a waiver of the regulatory requirement to submit an electronic application, the technical deficiency may include failure to submit an application that contains an original signature. If HUD finds a curable deficiency in the application, HUD will notify the applicant by electronic mail describing the clarification or technical deficiency. Clarifications or corrections of technical deficiencies in accordance with the information provided by HUD must be received by HUD within 14 calendar days of the date of receipt of the HUD notification and be sent by electronic mail to the address provided in the notice. (If the deadline date falls on a Saturday, Sunday, or Federal holiday, then the applicant's correction must be received by HUD on the next day that is not a Saturday, Sunday, or Federal holiday).

In the case of electronic submissions to Grants.gov, any clarifications or cure items must be submitted electronically using the facsimile telephone number 800-HUD-1010 and form HUD96011, Facsimile Transmittal, contained in the last application package submitted to HUD. The additional information provided by facsimile will be matched to the electronic application in HUD's files. When submitting technical deficiency cure items, please place the following information in the box labeled "Name of Document Submitting" on form HUD96011: Technical Cure plus the name of the document. If the name of the document is long and you need space to fit the document name, simply label the Technical Cure as TC followed by the document name. When submitting a facsimile, applicants must follow the facsimile requirements found elsewhere in this notice. If the deficiency is not corrected within the above time frame, HUD will reject the application as incomplete, and it will not be considered for funding.

For paper applications the applicant must be registered in CCR with an active registration on the deadline date nad have a DUNS number. An application with the wrong DUNS number entered in the SF424 will be treated as a technical deficiency and the applicant will be permitted to

provide a corrected SF424 to the location indicated in the waiver approval within the specified cure period and in accordance with the notification of the need to cure the application. Failure to correct the deficiency and meet the requirement to have a DUNS number and active registration in the CCR will render the application ineligible for funding. All applicants are advised to check and maintain their DUNS numbers and CCR registrations with the posting of this NOFA so any updates or changes are completed well in advance of application deadline dates.

d. **Ranking and Selection.**
**(1) Threshold Requirements.** Applicants that do not meet the threshold requirements of the **General Section** or this NOFA will not receive an award of funds from HUD regardless of score or ranking.

(2) **Minimum Score.** HUD will make awards to applicants meeting the threshold and minimum score requirements.

(3) HUD reserves the right to not fund an application if information comes to the attention of HUD that adversely affects an applicant's eligibility or integrity in managing an award, adversely affects HUD's evaluation or scoring of an application, or indicates evidence of fraud or mismanagement on the part of an applicant.

(4) HUD will rank applications in order by score and select the highest rated application by State. If there are mulitple applications covering a state, HUD will select the highest rated application for that State and then skip all others within that State. If there is a tie score for a given State, HUD will use the tie breaker methodlogy identifed in this NOFA.

(5) **Limitations on Award Amounts.** HUD reserves the right to reduce or adjust the funding amount based upon:
  (a) The reasonableness of the overall program relative to the number of units covered;
  (b) The level of funds available for award under the program; and
  (c) Workload reduction.

(6) If there are funds remaining that are less than the requested level of an applicant deemed elgibile for funding, HUD may offer the remaining funds to the applicant at a reduced funding amount. If an applicant turns down an award offer, HUD will make an offer of funding to the next highest-ranking eligibile application.

**VI.** AWARD ADMINISTRATION.

**A. Selection and Notification.** HUD will notify all applicants as to the outcome of the selection process. If an applicant is selected, HUD's notice concerning the amount of the award (based on the approved application) will constitute HUD's selection, subject to execution of the award documents by HUD. Successful PBCA Program applicants will be notified of the selection and will receive instructions for proceeding. The selection does not become final until the cooperative agreement and other award documents are signed and executed.

**B. LOCCS Access.** Applicants must be eligible to acquire rights and access under HUD's Electronic Line of Credit Control System (eLOCCS). The award notice will provide directions for obtaining LOCCS access.

**C. Debriefing.** For a period of 120 days, beginning not more than 30 days after the final awards for assistance are publicly announced, HUD will provide a debriefing to a requesting unsuccessful applicant related to that application. A debriefing request must be made in writing or by email by the applicant's authorized official whose signature appears on the SF424, or by his or her successor in the office and submitted to Kerry.E.Hickman@hud.gov or to:

> Mr. Kerry E. Hickman, Acting Director
> Office of Housing Assistance and Contract Administration Oversight
> Multifamily Housing Programs
> U.S. Department of Housing and Urban Development
> 451 Seventh Street SW, Room 6151
> Washington, DC 20410

Information provided during a debriefing will include, at a minimum, the final score received for each rating factor, final evaluation comments for each rating factor, and the final assessment indicating the basis upon which the award was provided or denied.

**D. Administrative and National Policy Requirements.** In addition to the requirements listed below, please review all requirements in the **General Section**.

**E. Reporting Requirements.**
**1. Monthly and Quarterly Reporting Requirements.** All Awardees must report to HUD monthly and quarterly as specified under PBT #6, Exhibit A of the ACC.

**2. Annual Reporting Requirement.** All awardees must report to HUD annually as specified under PBT #7 and PBT #8, Exhibit A of the ACC.

**3. General Requirements.** Generally Federal funds maintain their Federal character with regard to program eligible uses in perpetuity, and continue to remain subject to all annual reporting requirements. Specifically, after the close of the award period, Awardees with funds remaining in financing programs will prospectively be required to report basic information on the Program on an annual basis until the funds are either: (1) rolled into another eligible activity; or (2) fully disbursed through default. HUD reserves the right to require the grantee to report on real property managed by the applicant during the award period and for uses in perpetuity.

**4. Racial and Ethnic Data.** If you are collecting client-level data, HUD requires that funded recipients collect racial and ethnic beneficiary data. HUD has adopted the Office of Management and Budget's Standards for the Collection of Racial and Ethnic Data. In view of these requirements, the applicant should use HUD27061, Racial and Ethnic Data Reporting Form found on www.hudclips.org or a comparable electronic data system for this purpose.

**5. Transparency Act Reporting.** Recipient Reporting is required under the Federal Financial Assistance Accountability and Transparency Act of 2006, as amended.
**a. Prime Awardee Reporting.** Prime recipients of HUD financial assistance are required to report sub-awards made either as pass-through awards, sub-recipient awards, or vendor awards in the Federal government-wide website www.fsrs.gov or its successor system. Starting with awards made October 1, 2010, prime financial assistance awardees receiving funds directly from

HUD are required to report sub-awards and executive compensation information both for the prime award and sub-awards, including awards made as pass-through awards or awards to vendors, where the initial award is $25,000 or greater or the cumulative award will be $25,000 or greater if funding incrementally as directed by HUD in accordance with OMB guidance.

The reporting of award and sub-award information is in accordance with the requirements of Federal Financial Assistance Accountability and Transparency Act of 2006, as amended by section 6202 of Public Law 110-252, hereafter referred to as the "Transparency Act" and OMB Guidance issued to the Federal agencies on September 14, 2010 (75 FR 55669) and in OMB Policy guidance. The prime awardee will have until the end of the month plus one additional month after a sub-award or pass-through award is obligated to fulfill the reporting requirement.

The Transparency Act requires the creation of a public government-wide website in which the following sub-award data will be displayed:

    (1)  Name of entity receiving award;
    (2)  Amount of award;
    (3)  Funding agency;
    (4)  North American Industry Classification System (NAICS) code for contracts/CFDA program for financial assistance awards;
    (5)  Program source;
    (6)  Award title descriptive of the purpose of the funding action;
    (7)  Location of the entity (including Congressional district);
    (8)  Place of Performance (including Congressional district);
    (9)  Unique identifier of the entity and its parent;  and
  (10)  Total compensation and names of top five executives.

For the purposes of reporting into the Federal Funding Accountability and Transparency Act (FFATA) Sub-award Reporting System (FSRS) reporting site, the unique identifier is the DUNS number the entity has obtained from Dun and Bradstreet, and for Prime awardees the DUNS number registered in the Central Contractor Registration as required by HUD regulation 24 CFR 5.1004.

**b.  Prime Awardee Executive Compensation Reporting.**  Prime awardees must also report in the government-wide website the total compensation and names of the top five executives in the prime awardee organization if:

    (1)  More than 80 percent of the annual gross revenues are from the Federal government, and those revenues are greater than $25 million annually; and

    (2)  Compensation information is not readily available through reporting to the Securities and Exchange Commission (SEC).

**c.  Sub-award Executive Compensation Reporting.**  Prime awardees must also report in the government-wide website the total compensation and names of the top five executives in the sub-awardees, pass-through or vendor organization if:

    (1)  More than 80 percent of the annual gross revenues are from the Federal government, and those revenues are greater than $25 million annually; and

(2)   Compensation information is not readily available through reporting to the SEC.

**d.   Transparency Act Reporting Exemptions.**  The Transparency Act exempts any sub-awards less than $25,000 made to individuals and any sub-awards less than $25,000 made to an entity with annual expenditures less than $300,000.  Sub-awards with a cumulative total of $25,000 or greater are subject to sub-award reporting beginning the date the sub-award total award amount reaches $25,000.  Any other exemptions to the requirements must be approved by the Office of Management and Budget.

**6.   Compliance with Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), hereafter referred to as "Section 872".**  Section 872 requires the establishment of a government-wide data system – the Federal Awardee Performance and Integrity Information System (FAPIIS) - to contain information related to the integrity and performance of entities awarded Federal financial assistance and making use of the information by Federal officials in making awards. OMB is in the process of issuing regulations regarding Federal agency implementation of Section 872 requirements. A technical correction to this **General Section** may be issued when such regulations are promulgated.

HUD anticipates that the terms and conditions to its FY2012 awards will contain requirements related to meeting FFATA and Section 872 requirements.

**F.  Funding Restrictions.**
**1.   Pre-award Costs.**  Awards under this NOFA are not allowed for reimbursement of pre-award costs (i.e., applicants may not use funding received under this NOFA for the cost of preparing their application).

**2.   Rescission of Award or Termination of ACC Based on False Certification.**  If, at any time after making an award to or executing an ACC with an applicant, HUD determines that any material representation in the RLO or any SL is false, such determination shall constitute a basis for HUD to rescind the award or terminate the ACC.

## VII.  AGENCY CONTACTS.

**Further Information and Technical Assistance.**  Before the application deadline date, HUD staff may provide general guidance and technical assistance about this NOFA.  However, staff is not permitted to assist in preparing the application.  Also, following selection of applicants, but before awards are announced, staff may assist in clarifying or confirming information that is a prerequisite to the offer of an award.  An applicant may contact Mr. Kerry E. Hickman, Acting Director, Office of Housing Assistance and Contract Administration Oversight, Department of Housing and Urban Development, 451 Seventh Street, SW, Room 6151, Washington, DC 20410, by email to Kerry.E.Hickman@hud.gov or telephone 202-402- 3885(this is not a toll-free number).  This number can be accessed via TTY by calling the toll-free Federal Relay Service Operator at 800-877-8339.

For technical support for downloading an application or electronically submitting an application, please call Grants.gov help desk at 800-518-GRANTS (this is a toll-free number) or send an email to www.support@Grants.gov.

## VIII.  OTHER INFORMATION

**A. Paperwork Reduction Act Statement.**  If it is determined that the Paperwork Reduction Act of 1995 (44 U.S.C. §§ 3501-3520) is applicable to the information collection requirements in this Notice, using OMB control numbers 2577-0157, 2502-0582, 2502-0587, 2577-0169, 2577-0229, 2510-0011, 2577-0259, 2502-0542, 2535-0116, and 2577-0270.  In accordance with the Paperwork Reduction Act, HUD may not consider or sponsor, and a person is not required to respond to, a collection of information unless the collection displays a valid OMB control number.  HUD expects to hold an information webcast via satellite for potential applicants to learn more about the Program and preparation of an application.  For more information about the date and time of this webcast, consult the HUD website at www.hud.gov.

**B. Environmental Impact.**  This NOFA does not direct, provide for assistance or loan and mortgage insurance for, or otherwise govern or regulate, real property acquisition, disposition, leasing , rehabilitation, alteration, demolition, or new construction, or establish, revise or provide for standards for construction or construction materials, manufactured housing, or occupancy.  Accordingly, under 24 C.F.R. 50.19(c)(1), this NOFA is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 USC 4321).

Dated: _____FEB 2 9 2012_____

Carol J. Galante,
Acting Assistant Secretary for Housing – Federal Housing
    Commissioner

[FR-5600- N-33]

**Appendix A.  List of Available States for Applications by PHAs for PBCAs**

1.  Alabama
2.  Alaska
3.  Arizona
4.  Arkansas
5.  California
6.  Colorado
7.  Connecticut
8.  Delaware
9.  Florida
10. Georgia
11. Hawaii
12. Idaho
13. Illinois
14. Indiana
15. Kansas
16. Kentucky
17. Louisiana
18. Maryland
19. Massachusetts
20. Michigan
21. Mississippi
22. Missouri
23. Nebraska
24. Nevada
25. New Jersey
26. New Mexico
27. New York
28. North Carolina
29. Ohio
30. Oklahoma
31. Oregon
32. Pennsylvania
33. Rhode Island
34. South Carolina
35. Tennessee
36. Texas
37. Utah
38. Virginia
39. Washington
40. West Virginia
41. Wisconsin
42. The District of Columbia

Appendix B.  FTE Chart  Found in the Instructinos Download

Appendix C.  Performance-Based Annual Contributions Contract (ACC) found in the Instructions Download

# EXHIBIT 2

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Invitation for Submission of Applications:  Contract Administrators for
Project-Based Section 8 Housing Assistance Payments (HAP) Contracts

40

United States Department of Housing and Urban Development

Invitation for Submission of Applications: Contract Administrators for Project-Based Section 8
Housing Assistance Payments (HAP) Contracts

CONTENTS                                                                          Number

1.      INTRODUCTION.................................................................... 3
2.      OVERVIEW OF CONTRACT ADMINISTRATOR RESPONSIBILITIES....... 4
        2.1.    Reasoned Legal Opinion....................................................... 4
        2.2.    Statutory Definition of "Public Housing Agency and Related Statutory
                Definitions................................................................... 5
        2.3.    PHA Type...................................................................... 6
        2.4.    Required Elements of Reasoned Legal Opinion for a Governmental
                Entity........................................................................... 7
        2.5.    Required Elements of Reasoned Legal Opinion for an Instrumental Entity    7
        2.6.    Entities Proposing to Serve as PBCA in a State Other than the State
                under the Laws of Which the Entity was Formed............................ 9
3.      GUIDANCE FOR SUBMITTING APPLICATIONS................................. 9
        3.1.    Service Area Designation...................................................... 9
        3.2.    Limitation on the Total Number of Covered Units Administered by the
                PHA and Serviced by Certain Subcontractors................................ 9
        3.3.    Application Contents, Organization, and Digital File Requirements........ 10
                3.3.1.  Application Certifications............................................ 10
                3.3.1.1.  PHA Certification................................................. 11
                3.3.1.2.  Full-Time Equivalent (FTE) Certification........................ 12
                3.3.1.3.  Sub-Contractor Certification..................................... 13
                3.3.2.  Capability Statement................................................ 15
                3.3.3.  Technical Approach................................................. 15
                3.3.4.  Quality Control Plan............................................... 16
                3.3.5.  Reasoned Legal Opinion............................................ 16
                3.3.6.  Disaster Plan...................................................... 17
        3.4.    Application Submission and Due Date........................................ 18
4.      FACTORS FOR AWARD AND FACTOR WEIGHTS............................... 18
                4.1.    Capability Statement................................................ 19
                4.2.    Technical Approach................................................. 20
                4.3.    Quality Control Plan............................................... 21
5.      APPLICATION EVALUATON.................................................... 22
6.      AMENDMENTS AND ADDITIONAL GUIDANCE.............................. 22

2

1.   **INTRODUCTION**

The U.S. Department of Housing and Urban Development (HUD), Office of Housing Assistance
Contract Administration Oversight (HACAO), is issuing this "Invitation for Submission of
Applications: Contract Administrators for Project-Based Section 8 Housing Assistance Payments
(HAP) Contracts" (Invitation) for the purpose of receiving applications from Public Housing
Agencies (PHA) to administer the Project Based Section 8 Housing Assistance Payments (HAP)
Contracts as Performance-Based Contract Administrators (PBCA). The Invitation is issued
pursuant to section 8 of the United States Housing Act of 1937 (1937 Act), 42 U.S.C. 1437f
(Section 8). HUD will select one PBCA for each of the fifty United States, the District of
Columbia, the United States Virgin Islands, and the Commonwealth of Puerto Rico (State). The
successful applicant for each State, except for the State of California, will enter into a single
Performance-Based Annual Contributions Contract (ACC) with HUD effective October 1, 2011,
to administer HAP Contracts with owners of Section 8 projects in the State. The successful
applicant for the State of California will enter into two ACCs: one for Northern California, which
will be under the jurisdiction of the HUD San Francisco Hub Office, and one for Southern
California, which will be under the jurisdiction of the HUD Los Angeles Hub Office. HUD will
consider Applications submitted by joint ventures and other public/private partnerships between
PHAs and other public or private for-profit or non-profit entities.

After execution of the ACC, HUD will assign existing HAP Contracts, as defined in the ACC, to
the PBCA. Throughout the ACC term, HUD may make further assignments of HAP Contracts
to the PBCA and may withdraw HAP Contracts as necessary.

HUD seeks through this Invitation to achieve three (3) programmatic and three (3) administrative
objectives.

Programmatic objectives:

- Calculate and pay Section 8 rental subsidies correctly;

- Administer project-based Section 8 HAP Contracts consistently; and

- Take actions to ensure owners fulfill their obligations to provide decent, safe, and
sanitary housing for eligible families.

Administrative objectives:

- Execute an ACC only with a PHA that has the qualifications and expertise to
oversee and manage affordable housing, and that has the capacity and the
necessary personnel and other resources to perform the required contract
administration services;

- Obtain the best value for dollars spent for contract administration services; and

3

**42**

- Encourage the development of joint ventures and/or partnerships for contract administration services to obtain the benefit of the best practices of both public and private sectors.

## 2.   OVERVIEW OF CONTRACT ADMINISTRATOR'S RESPONSIBILITIES

The PBCA will administer the HAP Contracts that HUD assigns during the ACC term.  In the case of HAP Contracts that expire during the ACC term, the PBCA will enter into a renewal contract with Section 8 owners, as appropriate, in accordance with the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), HUD's implementing regulations, and the provisions of the Section 8 Renewal Guide.  The PBCA will monitor each property owner and ensure compliance with the terms of the HAP Contract.  In discharging these and all other responsibilities under the ACC, the PBCA will comply, and will ensure compliance by owners, with Federal law, HUD's implementing regulations, the Section 8 Renewal Guide, and all other requirements and guidance that HUD deems applicable, as they exist at the time of ACC execution and as amended from time to time during the ACC term.

The ACC will identify the State in which the PBCA is required to provide HAP Contract administration services.  Exhibit B of the ACC will identify the HAP Contracts that HUD assigns to the PHA for servicing.  HUD has the authority under the ACC unilaterally to amend Exhibit B of the ACC to add or withdraw HAP contracts from time to time that the PBCA is responsible for administering and, upon exercising this authority, will provide the PBCA with written notice of the revised Exhibit B.

Exhibit A of the ACC contains the Performance Based Tasks (PBTs) that the PHA must perform.

The principal tasks of the PHA under the ACC include, but are not limited to, the following:

- Monitoring compliance by project owners with their obligation to provide decent, safe, and sanitary housing to assisted residents;

- Paying property owners accurately and timely;

- Accurately and timely submitting required documents to HUD (or a HUD designated agent); and

- Complying with applicable Federal law and HUD regulations and requirements, as they exist at the time of ACC execution and as amended from time to time.

## 2.1   Reasoned Legal Opinion

HUD requires the submission of a Reasoned Legal Opinion (RLO) to determine whether an applicant is legally qualified under this Invitation to serve as PBCA.  The RLO must state the full legal name of the applicant (i.e., the entity that, if selected, would enter into an ACC with HUD) and the type of PHA (see Section 2.3, "PHA Type") that the entity purports to be.  If an entity applies to serve as PBCA for more than one State, a separate RLO must be submitted in support

4

of each application. The RLO must state that the signatory is licensed to practice law in the State under the laws of which the PHA was formed. It should be succinct but must contain a reasoned (i.e., non-conclusory) analysis establishing that each of the applicable requirements in Section 2.1 through 2.6 of this Invitation is satisfied. It must include proper citation to any codified provisions on which the analysis relies. A legible copy of each such provision, other than any provision of the 1937 Act, must included with the RLO.

HUD will respond in writing by indicating that it has determined that the applicant is legally qualified or, if not, by identifying any legal deficiencies in the RLO. The attorney representing the applicant will be permitted to submit a single Follow-Up Letter (FUL) to cure any such deficiencies. The attorney who signs the FUL may be a different attorney from the one who signs the RLO as long as he or she is licensed to practice law in the State under the laws of which the PHA was formed and the FUL states so. HUD must receive the FUL no later than seven (7) calendar days of the date of HUD's response. If HUD does not receive a FUL that cures all deficiencies by 5:00 p.m. Eastern Standard Time by the date on which it is due, the application will be disqualified.

If the applicant proposes to serve as PBCA in a State other than the State under the laws of which it was formed, a Supplemental Letter (SL) must be enclosed with the RLO. The SL must state that the signatory is licensed to practice law in the State in which the applicant proposes to serve as PBCA. It should be succinct but must contain a reasoned (i.e., non-conclusory) analysis establishing that the laws of the State in which the applicant proposes to serve as PBCA do not prohibit the applicant from acting as a PHA throughout the entire State. The SL must contain a clear statement that such laws neither explicitly nor implicitly prohibit the applicant from acting as a PHA throughout the entire State. See Section 2.6.

The RLO, any FUL, and any SL must conclude with a statement explicitly certifying that all representations that they contain are true and correct. If, at any time after execution of any ACC with the applicant, HUD determines that any material representation in the RLO, any FUL, and/or any SL on which HUD relied in evaluating the applicant's legal qualifications is false, such determination shall constitute a basis for HUD to rescind the ACC. It is therefore crucial that the RLO, any FUL, and any SL accurately and clearly represent the facts and the governing law and that the legal conclusions that they contain be sound.

All determinations regarding legal eligibility rest solely with HUD and are final.

## 2.2.   Statutory Definition of "Public Housing Agency" and Related Statutory Definitions

A public housing agency is a creature of State law. Its authority and power to act derive from the State law(s) under which it was created. "Public housing agency" is also a defined term in the 1937 Act, which authorizes HUD to enter into ACCs with "public housing agencies," as "public housing agency" (PHA) is defined in section 3(b)(6)(A) of the 1937 Act, for the administration of Section 8 HAP Contracts. Before entering into an ACC for this purpose, HUD must ascertain that the entity satisfies the 1937 Act's definition of PHA. Section 3(b)(6)(A) of the 1937 Act, which applies to the project-based section 8 program, provides in relevant part, "the term 'public

5

housing agency' means any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." The 1937 Act further defines terms that appear within the foregoing definition.

For example, section 3(b)(1) provides, "The term 'public housing' means low-income housing, and all necessary appurtenances thereto, assisted under this Act other than under section 8. The term 'public housing' includes dwelling units in a mixed finance project that are assisted by a public housing agency with capital or operating assistance." Section 3(b)(1) further provides, "The term 'low-income housing' means decent, safe, and sanitary dwellings assisted under this Act."

Section 3(c) provides as follows:

> When used in reference to public housing:
>
> (1) The term "development" means any or all undertakings necessary for planning, land acquisition, demolition, construction, or equipment, in connection with a low-income housing project . . . [ and]
>
> (2) The term "operation" means any or all undertakings appropriate for management, operation, services, maintenance, security (including the cost of security personnel), or financing in connection with a low-income housing project. The term also means the financing of tenant programs and services for families residing in low-income housing projects, particularly where there is maximum feasible participation of the tenants in the development and operation of such tenant programs and services.

**2.3.   PHA Type**

To qualify as a PHA that may enter into an ACC with HUD, the RLO must identify the entity as one of the following:

> A general or special purpose governmental entity:  Such governmental entities include a State, municipality, housing authority, or governmental public benefit corporation;
>
> A multi-state, interstate or regional governmental entity; or
>
> An instrumentality entity:  An instrumentality entity must be created directly by "any State, county, municipality, or other governmental entity or public body." Submission of an RLO on behalf of an entity that itself was created by one or more instrumentalities of a governmental entity or public body will result in the disqualification of the Application. The instrumentality entity may be a for-profit or a not-for-profit entity.  An instrumentality entity must be fully formed and in legal existence under applicable laws

6

**45**

on the date on which the RLO is signed.  A copy of the corporate charter and all other organizational documents in final form (e.g., duly executed and filed with all appropriate State and/or other authorities, as may be required by law) that meet all requirements of this Invitation must be enclosed with the RLO.

In concept, the required elements of the RLO are very similar whether the applicant is a governmental entity or an instrumentality entity.  In practice, however, more steps are required to establish the legal eligibility of an instrumentality entity (see Section 2.5).

**2.4     Required Elements of Reasoned Legal Opinion for a Governmental Entity**

In the case of a governmental entity, the RLO must establish that the entity:

(1)  Was created under a statute that confers powers that qualify the entity as a PHA, as defined in the 1937 Act.  Although the statute may not explicitly enumerate the power "to engage in or assist in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act, the attorney signing the RLO must conclude and state that such power is within the scope of powers explicitly conferred;

(2)  Was created under a statute that confers powers that include the power to administer project-based section 8 HAP Contracts, including the power to perform each of the eight PBTs identified in Exhibit A, Section 3, of the ACC.  Although the statute may not explicitly enumerate such powers, the attorney signing the RLO must conclude and state that all such powers are within the scope of those explicitly conferred;

(3)  Was created under a statute that explicitly authorizes the entity to operate throughout the entire State in which the entity proposes to serve as PBCA or that evidences a legislative intent for such entity to have such authority; and

(4)  Has registered to do business in the State in which the entity proposes to serve as PBCA to the extent that the laws of such State require it to do so.  If such laws do not require it to do so, the RLO must state this.

**2.5.    Required Elements of Reasoned Legal Opinion for an Instrumentality Entity**

In the case of an instrumentality entity, the RLO must establish that:

(1)  The parent entity (or, in the case of multiple parent entities, each such entity) and the instrumentality entity were created under laws that confer powers that qualify the parent entity (or each such entity) and the instrumentality entity as a PHA, as defined in the 1937 Act. Specifically, the RLO must establish that:

(a)  The parent entity (or each such entity) was created under a statute that confers powers that qualify the parent entity (or each such entity) as a PHA, as defined in the 1937 Act.  Although the statute may not explicitly enumerate the power "to engage in or assist in the development or operation of public housing" within the meaning of

7

section 3(b)(6)(A) of the 1937 Act, the attorney signing the RLO must conclude and state that such power is within the scope of powers explicitly conferred; and

(b)  The instrumentality entity was created under a statute (e.g., a State non-profit corporation law) that confers powers that qualify the instrumentality entity as a PHA, as defined in the 1937 Act.  Although the statute may not explicitly enumerate the power "to engage in or assist in the development or operation of public housing" within the meaning of section 3(b)(6)(A) of the 1937 Act, the attorney signing the RLO must conclude and state that such power is within the scope of powers explicitly conferred;

(2)  The corporate charter or other organizational documents of the instrumentality entity explicitly provide that it is authorized "to engage in or assist in the development or operation of public housing," within the meaning of the definition of PHA in the 1937 Act, with citation to such specific provision(s);

(3)  The corporate charter or other organizational documents of the instrumentality entity explicitly confer the right on the parent entity (or on each such entity) to:

(a)  approve the corporate charter or other organizational documents of the instrumentality, including the right to approve any amendments, with citation to such specific provision(s);

(b)  authorize the instrumentality entity to execute the ACC with HUD; with citation to such specific provision(s);

(c)  control the operation of the instrumentality, with specific identification of the means by which the corporate charter or other organizational documents authorize the parent entity (or entities) to exert such control (e.g., by requiring that the Parent Entity hold a majority of the shares of the instrumentality entity, have a majority vote on the Board of Directors of the instrumentality entity, etc.), with citation to the specific provision(s) that confer such authority; and

(d)  take title to all property, real and/or personal, held by the instrumentality entity upon dissolution or termination of the instrumentality entity, with citation to such specific provision(s);

(4)  The instrumentality entity was created under a statute that confers powers that include the power to administer project-based section 8 HAP Contracts, including the power to perform each of the eight PBTs identified in Exhibit A, Section 3, of the ACC.  Although the statute may not explicitly enumerate such powers, the attorney signing the RLO must conclude and state that all such powers are within the scope of those explicitly conferred;

(5)  The corporate charter or other organizational documents explicitly authorize the instrumentality to administer project-based section 8 HAP Contracts, with citation to such specific provision(s);

8

(6) The instrumentality entity was created under a statute that explicitly authorizes entities created there under to operate throughout the entire State in which the entity proposes to serve as PBCA or that evidences a legislative intent for such entities to have such authority;

(7) The corporate charter or other organizational documents explicitly authorize the instrumentality entity to operate throughout the entire State in which the entity proposes to serve as PBCA, with citation to such specific provision(s); and

(8) The instrumentality entity has registered to do business in the State in which the entity proposes to serve as PBCA to the extent that the laws of such State require it to do so. If such laws do not require it to do so, the RLO must state this.

### 2.6  Entities Proposing to Serve as PBCA in a State Other than the State under the Laws of Which the Entity was Formed

As stated in Section 2.1, if an applicant proposes to serve as PBCA in a State other than the State under the laws of which it was formed, an SL must be enclosed with the RLO. The SL must state that the signatory is licensed to practice law in the State in which the applicant proposes to serve as PBCA. It should be succinct but must contain a reasoned (i.e., non-conclusory) analysis establishing that the laws of the State in which the applicant proposes to serve as PBCA do not prohibit it from acting as a PHA throughout the entire State. The SL must contain a clear statement that such laws neither explicitly nor implicitly prohibit the applicant from acting as a PHA throughout the entire State. A legible copy of any codified provision(s) on which the analysis in the SL relies, other than any provision of the 1937 Act, must be enclosed.

As noted in Section 2.1, any SL, like the RLO and any FUL, must conclude with a statement explicitly certifying that the representations that it contains are true and correct. If, at any time after execution of any ACC with the applicant, HUD determines that any material representation on which HUD relied in evaluating the legal qualifications of the applicant, including the representations that the SL contains, is false, such determination shall be the basis for HUD to rescind the ACC.

### 3.   GUIDANCE FOR SUBMITTING APPLICATIONS

### 3.1.   Service Area Designation

HUD will accept Applications to provide contract administration services by "State," which is defined in the ACC as one of the fifty United States, the District of Columbia, the United States Virgin Islands, or the Commonwealth of Puerto Rico. Entities applying to serve as PBCA in more than one State must submit a separate Application for each State for which it applies.

### 3.2.   Limitation on the Total Number of Covered Units Administered by the PHA and Serviced by Certain Subcontractors

A PHA may submit Applications for multiple States under this Invitation. The total number of Covered Units for all Applications submitted by a PHA shall not exceed thirty-three (33) percent

9

of the total number of units in the Portfolio of All Active Project-Based Section 8 Contracts as published by HUD at the following Uniform Record Locator (URL): http://www.hud.gov/offices/hsg/mfh/rfp/sec8rfp.cfm. If the sum of the total number of Covered Units for all Applications exceeds thirty-three (33) percent, all Applications submitted by the PHA will be rejected.

Certain sub-contractors may be engaged by PHAs to perform services under separate Applications to this Invitation where the sub-contractor provides fifty (50) percent or more of the full-time equivalent (FTE) employees required to perform PBT numbers one (1) through six (6) as specified in Exhibit A, Section 3, of the ACC. The total number of Covered Units for Applications for which such a sub-contractor is engaged shall not exceed thirty-three (33) percent of the total number of units in the Portfolio of All Active Project-Based Section 8 Contracts. If the sum of the total number of Covered Units for such a sub-contractor exceeds this unit limitation, the Applications for all PHAs engaging that sub-contractor will be rejected.

### 3.3.    Application Contents, Organization, and Digital File Requirements

This section sets forth the contents of the application and the procedures applicants must follow to submit applications in response to this Invitation. Failure to comply with these procedures may result in the applicant being disqualified from award consideration.

Each application submitted in response to this Invitation shall include the following documents, each of which is described below.

1.    Application Certifications, including Full-Time Equivalent Certification and, if applicable, Sub-Contractor Certification

2.    Capability Statement

3.    Technical Approach

4.    Quality Control Plan

5.    Reasoned Legal Opinion, including Supplemental Letter, if applicable

6.    Disaster Plan, including Disaster Plan Certification

### 3.3.1.   Application Certifications

The Application Certifications portion of the Application shall contain the information set forth in Section 3.3.1.1, PHA Certification; Section 3.3.1.2, Full-Time Equivalent (FTE) Certification; and 3.3.1.3, Sub-Contractor Certification, if the PHA has entered into an agreement with a sub-contractor for services that provide fifty (50) percent or more of the FTE employees required to perform PBTs one (1) through six (6) as detailed in the FTE Certification.

10

**49**

The Application Certifications portion of the Application shall be submitted as a Portable Document Format (PDF) file using this file name format: Two Letter State Postal Code_PHA Complete Name_APPCERT.

### 3.3.1.1. PHA Certification

The Executive Director of the PHA must certify that the information provided in the Application is true and correct. The PHA Certification portion shall be on PHA letterhead. Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font.

The PHA Certification shall include:

1.  Name of Entity:

2.  Street Address:

3.  City, State, Zip Code:

4.  Contact Name and Title:

5.  Contact Telephone Number:

6.  Contact E-mail Address:

7.  This Application is for the State of:

8.  The proposed Basic Administrative Fee Percentage for this State is (not to exceed 2.5%):

9.  List all States, beginning with the State for which this Application is submitted, for which the PHA is submitting an Application under this Invitation. For each State, specify the number of units for active Section 8 Project-Based Contracts in each State, and the total number of units for active Section 8 Project Based Contracts for all listed States.

10. The percentage of total number of units from item nine (9) above divided by the total number of units for active Section 8 Project-Based Contracts in the Portfolio of Section 8 Project-Based Contracts (not to exceed 33%) is:

11

**50**

11.   PHA Certification

I declare that the information in this Application is true and correct.

Signature: _____

Name of Official: _____

Title: _____

Date of Execution: _____

### 3.3.1.2. Full-Time Equivalent (FTE) Certification

The PHA shall submit a FTE Certification that identifies the FTEs required to perform PBTs numbers one (1) through six (6) as specified in Exhibit A of the ACC for the first twelve (12) month period of the ACC Term. For each PBT, identify the positions by title responsible for managing, supervision, and performing each PBT. Include the FTEs for PHA and sub-contractor employees. Only include sub-contractors that contract directly with the PHA. Do not include sub-contractors of sub-contractors. One (1.00) FTE is defined as 2,080 work hours per year. The FTE Certification shall be in the following format with the actual number of Sub-contractors, if any, included in the table:

Identify the Sub-contractor(s) enumerated in the columns:
Sub-contractor #1:  Name of Sub-contractor
Sub-contractor #2:  Name of Sub-contractor
Sub-contractor #3:  Name of Sub-contractor
Sub-contractor #4:  Name of Sub-contractor
Add additional Sub-contractors to list and add additional columns to the table as required.

| Positions and Full-Time Equivalents (FTEs) | Total FTEs | PHA FTEs | Sub-contractor #1 FTEs | Sub-contractor #2 FTEs | Sub-contractor #3 FTEs | Sub-contractor #4 FTEs |
|---|---|---|---|---|---|---|
| PBT #1 Management and Occupancy Reviews | | | | | | |
| Position title 1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Position title 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PBT #1 Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | |
| PBT #2 Adjust Contract Rents | | | | | | |
| Position title 1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Position title 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PBT #2 Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

12

**51**

| | | | | | |
|---|---|---|---|---|---|
| PBT #3 Review and Pay Monthly Vouchers | | | | | |
| Position title 1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Position title 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PBT #3 Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | |
| PBT #4 Renew HAP Contracts and Process Terminations or Expirations | | | | | |
| Position title 1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Position title 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PBT #4 Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | |
| PBT #5 Tenant Health, Safety, and Maintenance Issues | | | | | |
| Position title 1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Position title 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PBT #5 Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | |
| PBT #6 Administration - Monthly and Quarterly Reports | | | | | |
| Position title 1 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Position title 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PBT #6 Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| GRAND TOTAL FTEs | 00.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PERCENTAGE OF GRAND TOTAL FTEs | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% |

### 3.3.1.3. Sub-Contractor Certification

If the PHA is contracting with a sub-contractor for services that provide fifty (50) percent or more of the FTEs employees required to perform PBTs Numbers one (1) through six (6) as detailed in the FTE Certification, an authorized officer of the sub-contractor must complete a Sub-Contractor Certification and certify that the information provided in this Application relative to its services and performance is true and correct. The Sub-Contractor Certification shall be on sub-contractor letterhead. Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font. The Sub-contractor Certification shall be enclosed in the

13

PHA's Application Certifications in one PDF file using the file name format specified in Section 3.3.1.

The Sub-Contractor Certification shall include:

1. Subcontractor Name:

2. Street Address:

3. City, State, Zip Code:

4. Contact Name and Title:

5. Contact Telephone Number:

6. Contact E-mail Address:

7. List all States, beginning with the State and PHA for which this Application is submitted, that the sub-contractor has entered into an agreement with a PHA submitting an Application to this Invitation to provide fifty (50) percent or more of the FTE employees required to perform Performance-Based Tasks one (1) through six (6) as specified in Exhibit A, Section 3, of the ACC. The list shall include the Name of the State, Name of PHA, number of active Section 8 Project-Based Contracts for each State and the total number units for all active Section 8 Project-Based Contracts for all listed States:

8. The percentage of total number of units for all States from item seven (7) above divided by the total number of units for active Section 8 Project-Based Contracts in the Portfolio of Section 8 Project-Based Contracts (not to exceed 33%) is:

9. Sub-Contractor Certification

I declare that the information in this Application related to sub-contractor services and performance is true and correct.

Signature: _____

14

Name of Official: _____

Title: _____

Date of Execution: _____

### 3.3.2.  Capability Statement

The Capability Statement portion of the Application should exhibit the applicant's capability to perform the ACC and the PBTs described in Exhibit A, Section 3, of the ACC.  The Capability Statement is a factor for award.  Section 4, Factors for Award, details the six (6) "Elements" that the applicant must address in the Capability Statement.

The applicant is to provide a narrative response for each of the elements.  The applicant's responses must be in the same order and numbered as the elements appear.  Only information submitted for a specific element will be considered for the corresponding element for which it was written.

The Capability Statement portion of the application may not exceed ten (10) pages, excluding the cover sheet and contact information for the references identified in Element 2 and Element 3. Applicants exceeding the allowable page limits will only have the number of pages specified evaluated.  The cover sheet shall specify the title of the document, identify the PHA submitting the document, and identify the State for which the document is being submitted.  Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font.

One copy of the Capability Statement of the Application shall be submitted as aPDF file using this file name format:  Two Letter State Postal Code_PHA Complete Name_CAPABILITY.

### 3.3.3.  Technical Approach

The Technical Approach portion of the Application should exhibit the applicant's technical ability to perform the ACC and the PBTs described in Exhibit A of the ACC.  The Technical Approach is a factor for award.  Section 4, Factors for Award, details the five (5) "Elements" that the applicant must address in the Technical Approach.

The applicant is to provide a narrative response for each of the elements.  The applicant's responses must be in the same order and numbered as the elements appear.  Only information submitted for a specific element will be considered for the corresponding element for which it was written

The Technical Approach portion of the Application may not exceed thirty (30) pages, excluding a cover sheet and table of contents.  Applicants exceeding the allowable page limits will only have the number of pages specified evaluated.  The cover sheet shall specify the title of the document, identify the PHA submitting the document, and identify the State for which the document is being submitted.  Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font.

15

One copy of the Technical Approach portion of the Application shall be submitted as a PDF file using this file name format: Two Letter State Postal Code_PHA Complete Name_TECHNICAL.

### 3.3.4.  Quality Control Plan

The Quality Control Plan portion of the application should exhibit the applicant's ability to design, manage, and monitor the internal controls required to ensure quality performance of the ACC and the PBTs described in Exhibit A, Section 3, of the ACC. The Quality Control Plan is a factor for award. Section 4, Factors for Award, details the seven (7) "Elements" that the applicant must address in the Quality Control Plan.

The applicant is to provide a narrative response for each of the elements. The applicant's responses must be in the same order and numbered as the elements appear. Only information submitted for a specific element will be considered for the corresponding element for which it was written.

The Quality Control Plan portion of the application may not exceed twenty (20) pages, excluding a cover page and table of contents. Applicants exceeding the allowable page limits will only have the number of pages specified evaluated. The cover sheet shall specify the title of the document, identify the PHA submitting the document, and identify the State for which the document is being submitted. Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font.

One copy of the Quality Control Plan portion of the Application shall be submitted as a PDF file using this file name format: Two Letter State Postal Code_PHA Complete Name_QCP.

### 3.3.5.  Reasoned Legal Opinion

The Reasoned Legal Opinion (RLO) portion of the application must establish the applicant's legal eligibility to perform as a contract administrator by submission of an RLO, any FUL that HUD requires after reviewing the RLO, and, if applicable, a SL, as provided in Sections 2.1 through 2.6. Applicants will not be ranked or rated based on submission of these documents. However, only those applicants that, in HUD's sole determination, meet the requirements of Section 2.1 through 2.6 will be eligible.

While not subject to any page limitation, the RLO, any FUL, and any SL should be succinct. The RLO shall have a cover sheet that specifies the title of the document, identifies the PHA submitting the document, and identifies the State for which the document is being submitted. Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font. One copy of the RLO, any FUL, and any SL shall be submitted as a PDF file using this file name format:  Two Letter State Postal Code_PHA Complete Name_RLO.

16

### 3.3.6.  Disaster Plan

The PHA shall provide HUD a PHA Disaster Plan that details how the PHA and, if applicable, subcontractors that perform services that provide fifty (50) percent or more of the full time equivalent (FTE) employees required to perform PBTs Numbers one (1) through six (6) as specified in Exhibit A, Section 3, of the ACC, in the event of a natural or human caused disaster.

The Disaster Plan portion of the Application is not subject to a page limitation but should be written in a concise manner. It must include a cover sheet specifying the title of the document and identifying the PHA submitting the document and the State for which the document is being submitted.   Each page must be printed on a single side of an 8 1/2 x 11 sheet of paper using a standard 12-point font.   One copy of the Disaster Plan portion of the Application shall be submitted as a PDF file using this file name format:  Two Letter State Postal Code_PHA Complete Name_DISASTER.

The PHA Disaster Plan portion shall include:

    a.    Incident Response Staff:  The names, titles, incident response authority and responsibilities, and contact information for assigned staff.

    b.    Communication Back-up Plans and Systems:

        o    Procedures and methods of notifying and updating owners, and residents regarding changes in service procedures and the resumption of routine operations.

        o    Procedures and methods of notifying in the event of an incident, updating HUD regarding changes in service procedures until the resumption of routine operations, the performance status of each PBT or, if any PBT is not being fully performed, actions being taken to restore full performance of each PBT.

    c.    Operating and Management Back-Up Plans and Systems:  Procedures to relocate functions and staff to alternative office locations and/or telework sites; ensure access to IT systems; maintain internal and external communication systems (telephone, fax, email); and maintain supervisory, accounting, financial, and human resource functions.

    d.    Information Technology (IT) Back-up Plans and Systems:  Procedures to maintain IT staff support and ensure operability, data protection and system security.

    e.    Preparedness:  Plan to provide annual training for employees and, if applicable, subcontractor employees, and annual testing of back-up plans and systems.

17

The PHA shall provide HUD a PHA Disaster Plan Certification, on PHA letterhead, executed by a Disaster Plan Coordinator who has the education and experience to develop, manage, and test disaster, continuity of operations, or emergency management plans.  The Disaster Plan Coordinator must attach a qualifications statement or resume to the certification.

The Disaster Plan Certification shall include:

This is to certify that I have reviewed the disaster plan for this organization and, if applicable, subcontractors that perform services that provide fifty (50) percent or more of the full time equivalent (FTE) employees required to perform PBTs Numbers one (1) through six (6) as specified in Exhibit A, Section 3, of the ACC and to best of my knowledge and belief:

(1)    The disaster plan addresses each of the following topics:

    a.    Incident Response Staff

    b.    Communication Back-up Plans and Systems

    c.    Operating and Management Back-Up Plans and Systems

    d.    Information Technology (IT) Back-up Plans and Systems

    e.    Preparedness

(2)    All employees and, if applicable, sub-contractor employees will participate in disaster plan training within the next twelve (12) months.

(3)    All backup plans and systems identified in the disaster plan will be tested within in the next twelve (12) months.

## 3.4.    Application Submission and Due Date

The Application PDF files must be submitted by email to PBCA_Invitation@hud.gov.  The "Subject" of the email message must be the "Two Letter State Postal Code, PHA Complete Name, Application PBCA."  If more than one (1) email message is required to transmit the Application PDF files, the "Subject" of each email must indicate the number of each transmittal and the total number of transmittals, e.g., "Two Letter State Postal Code, PHA Complete Name, Application, Transmittal 1 of 2."  The complete Application must be submitted not later than 5:00 P.M. EDT, Friday, April 28, 2011.

The Department will not accept Applications that arrive after the due date and time.

## 4.    FACTORS FOR AWARD AND FACTOR WEIGHTS

The Factors for Award and Factor Weights are:

18

1.    Capability Statement  30%

2.    Technical Approach  35%

3.    Quality Control Plan  35%

Applicants will be rated and ranked based upon their response to the elements associated with each Factor. The point value associated with each element is the maximum value that it can be assigned.

### 4.1.    Capability Statement

The applicant must submit a detailed Capability Statement that addresses each of the following Elements.

Element 1:    Describe the PHA's experience, within the last five (5) years, providing contract administration services for multifamily housing projects with project based Section 8 Housing Assistance Payments (HAP) contracts. Or, briefly describe the PHA's experience, within the last five (5) years, administering functions and processes strongly related to providing contract administration services for multifamily housing projects and rent subsidy programs. (10 Points)

Element 2:    Describe the PHA's experience, within the last five (5) years, working with three (3) private sector multifamily owners or management agents that have properties with project-based Section 8 HAP contracts. Or, describe the PHA's experience, within the last five (5) years, working with three (3) private sector multifamily owners or management agents that have properties with rental assistance for low- or moderate-income tenants. On a separate sheet of paper, not included in the page limitation, provide the project name and personal contact information for the three (3) owners or management agents described. It is the PHA's responsibility to notify each owner or management agent that HUD will make two (2) attempts to contact them for a brief telephone interview. (30 Points)

Element 3:    Describe the PHA's experience, within the last five (5) years, working with the Office of Multifamily Housing or other HUD Program Offices if the PHA has not worked with the Office of Multifamily Housing. On a separate sheet of paper, not included in the page limitation, provide contact information for two (2) front-line HUD staff persons at the State or Regional level with whom the PHA has worked on routine programmatic matters. For each HUD staff person, identify the HUD program and/or project names. HUD will contact them for a brief telephone interview. (20 Points)

Element 4:    Describe the PHA's experience, within the past five (5) years, managing and performing each of the PBTs described in Exhibit A, Section 3 of the ACC. Or,

19

**58**

briefly describe the PHA's experience managing and performing tasks that are strongly related to each of the PBTs. (20 Points)

    a.    PBT #1 – Management and Occupancy Reviews.

    b.    PBT #2 – Adjust Contract Rents

    c.    PBT #3 – Review and Pay Monthly Vouchers

    d.    PBT #4 – Renew HAP Contracts

    e.    PBT #5 – Tenant Health, Safety, and Maintenance Issues

    f.    PBT #6 – Administration – Monthly and Quarterly Reports

    g.    PBT #7 – Administration – Annual Reports and Certifications

    h.    PBT #8 – Annual Financial Reports – PHA Fiscal Year End

Element 5:    Describe the PHA's experience, within the last five (5) years, recruiting, hiring, training, and evaluating personnel to ensure effective management and performance of the PBTs or tasks that are strongly related to the PBTs. (10 Points)

Element 6:    Describe the PHA's experience, within the last five (5) years, monitoring federal statues, regulations, and program requirements, identifying and interpreting changes or additions, and implementing policies and procedures that ensured efficient, effective, and consistent compliance. (10 Points)

## 4.2.   Technical Approach

The applicant must submit a detailed Technical Approach plan that addresses each of the following Elements.

Element 1:    Applicant must demonstrate a sound technical approach to managing, performing, and measuring the AQL of each of the PBTs specified in Exhibit A, Section 3 of the ACC. The applicant's response shall begin with an Annual Work Plan that details the month-by-month activities required to fully perform all PBTs during the first twelve (12) month period of the ACC Term. (30 Points)

Element 2:    Applicant must demonstrate their ability to administer the general administrative and operating requirements of the ACC. The description should include, but is not limited to: executive leadership and oversight; legal; financial; accounting; record keeping; reporting; equal opportunity; communication with HUD, owners, management agents, and tenants, especially those that are disabled. (10 Points)

20

Element 3:    Applicant must demonstrate a clear understanding of the processes required to ensure that property owners receive Section 8 HAP payments in a timely fashion. (30 Points)

Element 4:    Applicant must demonstrate a sound technical approach to information and information system access, management, and security for HUD Systems (i.e., Tenant Rental Assistance Certification System (TRACS), Integrated Real Estate Management System (iREMS), Enterprise Income Verification (EIV) system), non-HUD Information Technology Systems that contain program related data, and print-based program documents. (10 Points)

Element 5:    Applicant must demonstrate a sound technical approach to preparing to assume responsibility for administration of the ACC and performance of the PBTs beginning ninety (90) calendar days prior to the effective date of the ACC.  The applicant's technical approach must include:  (20 Points)

     a.    A description of office facilities, communication systems, information technology systems and a time line from initiation to full readiness.

     b.    A description of financial and accounting systems; banking, insurance and fidelity bonding arrangements; and timeline from initiation to full readiness.

     c.    A description of recruiting, hiring, staffing, and training and a timeline from initiation to full readiness.

## 4.3.   Quality Control Plan

The applicant must submit a detailed Quality Control Plan (QCP) that addresses each of the following Elements.

Element 1:    For each PBT specified in Exhibit A, Section 3 of the ACC, describe the internal control procedures that will be implemented to ensure that performance is maintained at the AQL specified in the PRS, Exhibit A, Section 5 of the ACC. (35 Points)

Element 2:    Describe the internal control procedures that will be implemented to ensure accountability and separation of duties to detect and prevent potential fraud, waste, and abuse of funds. (10 Points)

Element 3:    Identify internal control procedures to prevent, detect, and resolve actual or appearances of conflicts of interest as stipulated in Section 10, "Conflict of Interest," of the ACC. (10 Points)

Element 4:    Identify the internal control procedures to prevent, detect, record, and report information privacy breaches. (10 Points)

21

**60**

Element 5:   Describe the internal control procedures for information and information system access, management, and security for HUD systems; non-HUD systems that contain program related data, and print-based program documents.  (15 Points)

Element 6:   Describe the internal control procedures for the initial and continuous training and cross training of staff to perform PBTs and comply with the requirements of the ACC and HUD.  (10 Points)

Element 7:   Describe the methodology that will be used to review, analyze, and evaluate the effectiveness of QCP; and the date(s) scheduled for each QCP review.  (10 Points)

## 5.   APPLICATION EVALUATION

Successful applications are those that demonstrate an applicant's capability to comply with the requirements of the ACC and perform the PBTs.  HUD will establish one or more technical evaluation panels to review the applications received.  HUD will only evaluate, rate and rank applications that are:

    a.    Submitted on or before the due date and time.

    b.    Complete.

    c.    PDF file format.

    d.    PDF file names conform to requirements.

    e.    PDF files are free of viruses or other corruptions and open normally.

    f.    Comply with the Basic Administrative Fee limitation requirement.

    g.    Comply with the unit limitation requirement for the PHA and/or the sub-contractor.

Each application will be evaluated and rated on its own merit by a team of evaluators. Upon completion of individual team member evaluations, the team will to arrive at final rating for the Application. The final rating for the Application will be ranked against the final rating for all Applications for the State.

## 6.   AMENDMENTS AND ADDITIONAL GUIDANCE

HUD may issue amendments to this Invitation.  All amendments, or additional guidance and will be posted on HUD's website at http://www.hud.gov/offices/hsg/mfh/rfp/sec8rfp.cfm

Applicants should regularly check the website for any amendments to the Invitation.

22

# EXHIBIT 3



**G A O**

Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

Comptroller General
of the United States

# Decision

**Matter of:**  Assisted Housing Services Corporation; North Tampa Housing
Development Corporation; The Jefferson County Assisted Housing
Corporation; National Housing Compliance; Southwest Housing
Compliance Corporation; CMS Contract Management Services and
the Housing Authority of the City of Bremerton; Massachusetts
Housing Finance Agency

**File:**  B-406738; B-406738.2; B-406738.3; B-406738.4; B-406738.5;
B-406738.6; B-406738.7; B-406738.8

**Date:**  August 15, 2012

Neil H. O'Donnell, Esq., Dennis J. Callahan, Esq., and Jeffery M. Chiow, Esq.,
Rogers Joseph O'Donnell, Lawrence F. Feheley, Esq., and Allen Handlan, Esq.,
Kegler, Brown, Hill & Ritter, and Ricardo L. Gilmore, Esq., Saxon, Gilmore,
Carraway & Gibbons, for Assisted Housing Services Corporation and North Tampa
Housing Development Corporation; Robert K. Tompkins, Esq., Elizabeth M. Gill,
Esq., and Trevor J. Tullius, Esq., Patton Boggs LLP, for The Jefferson County
Assisted Housing Corporation; Michael R. Golden, Esq., Michael A. Hordell, Esq.,
Blair L. Schiff, Esq., Heather Kilgore Weiner, Esq., and Samuel W. Jack, Esq.,
Pepper Hamilton LLP, for National Housing Compliance; Richard J. Vacura, Esq.,
K. Alyse Latour, Esq., and Susan J. Borschel, Esq., Morrison Foerster, for
Southwest Housing Compliance Corporation; Colm P. Nelson, Esq., and Kathryn
Carder McCoy, Esq., Foster Pepper, PLLV, for CMS Contract Management
Services and the Housing Authority of the City of Bremerton; and Andrew Mohr,
Esq., John J. O'Brien, Esq., and Gabriel E. Kennon, Esq., Cohen Mohr LLP, for
Massachusetts Housing Finance Agency, the protesters.
Kasey Podzius, Esq., and Blythe Rodgers, Esq., Department of Housing and Urban
Development, for the agency.
John L. Formica, Esq., and James A. Spangenberg, Esq., Office of the General
Counsel, GAO, participated in the preparation of the decision.

## DIGEST

The Department of Housing and Urban Development's (HUD) use of a notice of
funding availability (NOFA) that results in the issuance of a cooperative agreement
to obtain services for the administration of Project-Based Section 8 Housing
Assistance Payment (HAP) contracts was improper because the "principal purpose"

of the NOFA was to obtain contract administration services for HUD's direct benefit and use, which should be acquired under a procurement instrument that results in the award of a contract.

## DECISION

The Assisted Housing Services Corporation (AHSC), the North Tampa Housing Development Corporation, The Jefferson County Assisted Housing Corporation (JCAHC), National Housing Compliance, the Southwest Housing Compliance Corporation, CMS Contract Management Services and the Housing Authority of the City of Bremerton, and the Massachusetts Housing Finance Agency, protest the terms of Notice of Funding Availability (NOFA) No. FR-5600-N-33, issued by the Department of Housing and Urban Development (HUD), for the administration of Project-Based Section 8 Housing Assistance Payment (HAP) contracts. The protesters argue that HUD's use of a NOFA, which provides for the issuance of cooperative agreements to public housing agencies (PHA) for the administration of the HAP contracts, is improper, because HUD is seeking contract administration services that must be solicited through a procurement instrument that results in the award of contracts.[1]

We sustain the protests.

## BACKGROUND

The Project-Based Section 8 Rental Assistance Program, created by The Housing Act of 1937, as amended and codified, provides affordable housing for eligible low-income households. 42 U.S.C. § 1437f (2006). The program generally provides for the payment of "a rental subsidy to property owners on behalf of low-income tenants residing in those properties." Agency Report (AR) at 2. The rental subsidy is "attached to a specific dwelling," and is generally the difference between the total rental amount for the dwelling, and 30 percent of the tenant's adjusted income. Id.

The agreements by HUD to pay the rental subsidy to the property owners of low-income housing are set forth in HAP contracts. AR at 2. From the authorization of the Project-Based Section 8 Rental Assistance Program in 1974, to 1999, HUD administered approximately 21,000 Section 8 HAP "contracts executed between

---

[1] PHAs are "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A); see 24 C.F.R. § 5.100 (2011); Agency Report (AR) at 6. As explained by HUD, PHAs "are created and given operating authority pursuant to state law." AR at 9.

B-406738 et al.

HUD and private owners of multifamily housing developments."[2]  AHSC Protest (B-406378), Tab 10, HUD Housing Certificate Fund, at 3.

In 1999, because "of staffing constraints," HUD began "an initiative to contract out the oversight and administration of most of its project-based contracts." Project-Based Rental Assistance: HUD Should Update Its Policies and Procedures to Keep Pace with the Changing Housing Market (GAO-07-290), Apr. 2007, at 10. HUD explained at the time that it was seeking "new ways to conduct its business" consistent with its recently announced "2020 Management Reform Plan," which provided for "major staff downsizing, modification of HUD's Field and Headquarters organizational framework, [and] consolidation of HUD's programs."[3]  AHSC Supp. Comments (B-406738; B-406738.2), Tab 37, HUD Audit Related Memorandum No. 99-BO-119-0801, Advisory Report on Section 8 Contract Administration, (Oct. 26, 1998), at 7.  According to HUD, one of the "new ways to conduct its business" would be HUD's issuance of "Requests for Proposals [RFP] for outside contractors to administer HUD's portfolio of Section 8 contract[s]." Id.

HUD's 1999 Request for Proposals

HUD held "its first nationwide competition" for the contract administration services through the issuance of an RFP on May 3, 1999.  AR at 2.  The 1999 RFP provided that HUD was "seeking sources interested in providing contract administration services for project-based [HAP] Contracts under Section 8."  JCAHC Protest (B-406783.3), Tab 1, Federal Register Notice (May 19, 1999)/RFP, at 1.  The RFP, which was restricted to PHAs, explained that HUD administered approximately 20,000 HAP contracts, and that the "RFP cover[ed] contract administration for most of these HUD administered contracts."[4]  Id.  The solicitation informed offerors that

---

[2] The record also shows that as of May 1999, HUD administered approximately 16,000 HAP contracts and PHAs administered approximately 4,200 HAP contracts. AHSC Protest (B-406378), Tab 7, HUD Guidebook for Section 8 Contract Administration Initiative (March 15, 2001), Introduction.

[3] The news release issued by HUD announcing its 2020 Management Reform Plan stated that it aimed "to transform HUD from 'the poster child for inept government' that 'has been plagued for years by scandal and mismanagement' into 'a new HUD, a HUD that works.'"  AHSC Protester's Supp. Comments (B-406738; B-406738.2), Tab 38, HUD Archives:  News Release, HUD No. 97-109, Cuomo Announces Historic Management Reforms to Stamp Out Waste, Fraud and Abuse and Improve Performance (June 26, 1997).

[4] The 1999 RFP stated that "[b]y law, HUD may only enter into an ACC [Annual Contributions Contract, defined below, infra at n.6] with a legal entity that qualifies as a [PHA] as defined in the United States Housing Act of 1937."  JCAHC Protest (B-406783.3), Tab 1, Federal Register Notice/RFP, at 2.  The RFP added that this
(continued...)

"[u]nder this RFP, the offerors will competitively bid to perform contract administration services for properties with project-based Section 8 HAP Contracts."[5] Id. at 2.

The 1999 RFP informed offerors that "[p]roposals in response to [the] RFP may cover an area no smaller than an individual State (or U.S. Territory)." Id. at 1.  The RFP explained that "[u]nder the approximately 20,000 Section 8 HAP Contracts this RFP covers, HUD pays billions of dollars annually to owners on behalf of eligible property residents," and stated that "HUD seeks to improve its performance of the management and operations of this function through this RFP." Id.  The RFP included a detailed statement of work, and stated that the successful PHAs would be required, among other things, to perform the "major tasks" of "[m]onitor[ing] project owners' compliance with their obligation to provide decent, safe, and sanitary housing," paying "property owners accurately and timely," submitting "required documents accurately and timely to HUD (or a HUD designated agent)," and complying "with HUD regulations and requirements . . . governing administration of Section 8 HAP contracts." Id. at 2-11.

The 1999 RFP further stated that HUD would "use Performance-Based Service Contracting" for "work performed under the ACCs awarded in response to this RFP."[6] Id. at 3.  The solicitation explained here that its performance work statement thus included work defined in "measurable, mission-related terms with established performance standards and review methods to ensure quality assurance," and that the ACCs to be awarded "assign[] incentives to reward performance that exceeds the minimally acceptable and assesses penalties for unsatisfactory performance." Id.

The 1999 RFP also included detailed proposal preparation instructions, and informed offerors that "[f]ailure to comply with the guidance of this section will

---

(...continued)
restriction did "not preclude joint ventures or other partnerships between a PHA and other public or private entities to carry out the PHA's contract administration responsibilities." Id.

[5] Although not set forth in the RFP itself, the Federal Register notice that included the RFP noted that the RFP was "not a formal procurement within the meaning of the Federal Acquisition Regulations (FAR)," but that it would "follow many of those principles." JCAHC Protest (B-406783.3), Tab 1, Federal Register Notice/RFP, at 1.

[6] "Annual Contributions Contracts," or ACCs, are written contracts, and the vehicle for the agreement between HUD and a PHA.  AR at 6; 42 U.S.C. § 1437f(b); 24 C.F.R. § 5.403 (2012).

B-406738 et al.

disqualify an Offeror's proposal from consideration by HUD." Id. at 13.  The solicitation included a due date for receipt of proposals, and specified that the ACCs awarded would have an initial "[c]ontract [t]erm" of 2 years, with "up to three (3) additional one-year terms." Id.  The RFP stated that award would be made to the offerors whose proposals "represent the best overall value" to HUD, based upon certain stated evaluation factors, such as "Understanding and Technical Approach" and "Past Performance." Id. at 14-15.  The solicitation further advised offerors that "[w]hile the cost or price factor has no numerical weight in the factors for award, it is always a criterion in the overall evaluation of proposals." Id. at 15.

HUD awarded 37 performance-based ACCs under its 1999 RFP.  AHSC Protest (B-406738), Tab 13, HUD Office of the Inspector General, Audit Report No. 2010-LA-0001, HUD's Performance-Based Contract Administration Was Not Cost Effective (Nov. 12, 2009), at 4.  The record reflects that HUD awarded an additional seven ACCs between 2001 and 2003 under another RFP, and awarded "the nine remaining [ACCs] between 2003 and 2005" under "an invitation for submission of applications." Id.  The record further reflects that, at some point, "HUD received approval from its Office of General Counsel to extend the contracts for an additional 10 years." Id. at 9.

HUD's 2011 Invitation for Submission of Applications

In February 2011, HUD began "its second nationwide competition" for contract administration services through the issuance of an "Invitation for Submission of Applications:  Contract Administrators for Project-Based Section 8 [HAP] Contracts." AR at 3; JCAHC Protest, Tab 3, Invitation for Submission of Applications (ISA).  The ISA informed interested PHAs that it was issued "for the purpose of receiving applications from [PHAs] to administer Project Based Section 8 Housing Assistance Payments [HAP] Contracts as Performance-Based Contract Administrators (PBCA)."[7] Id. at 3.  The ISA provided that HUD would "select one PBCA for each of the fifty United States, the District of Columbia, the United States Virgin Islands, and the Commonwealth of Puerto Rico," with the exception of California, where it would select PBCAs for Northern and Southern California. Id.

The ISA was similar to HUD's 1999 RFP through which HUD had conducted its first competition for these services.  For example, the ISA stated that under the ACCs awarded, the PHAs would be required, among other things, to perform the "principal tasks" of "[m]onitoring compliance by project owners with their obligation to provide decent, safe, and sanitary housing," paying "property owners accurately and timely," submitting "required documents to HUD (or a HUD designated agent)," and complying "with applicable Federal law and HUD regulations and requirements, as

---

[7] The 2011 ISA provided, as did the 1999 RFP, that HUD would only award ACCs to PHAs.  JCAHC Protest (B-406783.3), Tab 3, ISA, at 5-6.

they exist at the time of ACC execution and as amended from time to time." Id. at 4; see JCAHC Protest (B-406783.3), Tab 1, Federal Register Notice/RFP, at 2 (quoted above).

The ISA included relatively detailed instructions for the preparation of applications, and in this regard requested that applications include "portion[s]" addressing, among other things, the applicant's capability, technical approach, quality control plan, and disaster plan. JCAHC Protest, Tab 3, ISA, at 15-18. The ISA informed applicants that the "Factors for Award" were capability statement, technical approach, and quality control plan, and provided the relative weights of these factors for determining awards. Id. at 18-19. With regard to cost or price, in response to questions posed by interested PHAs, HUD stated that the applicants' proposed basic administrative fees "for the highest ranked Applications will be considered in the selection of the awardee[s]." HUD Request for Summary Dismissal on Prior Protests (B-405375.2 et al.), Tab 2, Questions and Answers, at 3.

HUD announced its "awards of the ACCs" under the ISA in July 2011. AR at 3. Our Office subsequently received 66 protests challenging the propriety of the awards of the ACCs for the performance of the contract administration services in 42 states.[8] On August 10, HUD informed our Office and the parties that it would not "make an award of [ACCs] in the states subject to . . . protests," and that HUD intended to "evaluate and revise its competitive award process for the selection of [PBCAs]." AR, Tab 7, HUD Corrective Action Letter, at BATES 311. Our Office dismissed the 66 protests as academic on August 11.

HUD's 2012 NOFA

On March 9, 2012, HUD issued the NOFA that is the subject of this protest. The NOFA provides for the awards of performance-based ACCs to PHAs to serve as the PBCAs for the Project-Based Section 8 HAP contracts for each of the remaining 42 states.[9] AR at 3. The ACCs to be awarded under the NOFA state that the "ACC is a contract between the PHA and HUD to administer project-based Section 8 Contracts as a PBCA," and provide for a base term of 24 months, and for the unilateral extension of the ACC by HUD at HUD's sole discretion. AR, Tab 3, ACC,

---

[8] The 11 "states" with regard to which the awards of ACCs were not protested were: South Dakota, Iowa, Puerto Rico, Vermont, Minnesota, New Hampshire, Maine, North Dakota, Montana, Wyoming, and the United States Virgin Islands. AR, Tab 2, NOFA, at 1.

[9] The NOFA "was published on www.grants.gov, the federal government's electronic clearing house for grant award information, and applications were to be submitted only through that website." AR at 3.

B-406738 et al.

at BATES 190-91.  The NOFA provides that the successful PHAs will be responsible for performing the following "Performance-Based Tasks" with regard to "the Section 8 assisted units" under the HAP contracts "assigned" to the PHA "for contract administration:"[10]

> monitoring project owners for compliance in providing decent, safe, and sanitary housing to assisted residents; ensuring payments to property owners are calculated accurately and paid in a timely manner; submitting required documents to HUD (or a HUD-designated agent); and complying with applicable Federal law and regulations . . . as they exist at the time of ACC execution and as amended or otherwise issued.[11]

AR, Tab 2, NOFA, at BATES 94; Tab 3, ACC, at BATES 186.

The ACCs to be awarded provide for HUD's payment of an administrative fee to the PHA "to pay the operating expenses of the PHA to administer HAP contracts."[12] AR, Tab 3, ACC, at BATES 193-94.  The ACCs also provide that "HUD will make housing assistance payments to the PHAs for Covered Units in accordance with HUD requirements," and direct that the PHAs "shall pay owners the amount of housing assistance payments due to owners under such HAP Contracts from the amount paid to the PHA by HUD for this purpose."[13]  Id. at BATES 192-93.  The

---

[10] The NOFA, like HUD's 1999 RFP and 2011 ISA, provides for the award of "Performance-Based" ACCs that include monetary incentives for performance that exceeds the acceptable level and assesses penalties for unsatisfactory performance.  See AR, Tab 2, NOFA, at BATES 92; Tab 3, ACC, at BATES 185-87, 229-34.

[11] The tasks set forth in the NOFA are nearly identical to those included in HUD's 1999 RFP, through which HUD conducted its first nationwide competition for these services, and HUD's 2011 ISA, through which HUD attempted to conduct its second nationwide competition and ultimately awarded 11 ACCs.  Compare AR, Tab 2, NOFA, at BATES 94 with JCAHC Protest (B-406783.3), Tab 1, Federal Register Notice/RFP, at 2; JCAHC Protest, Tab 3, ISA, at 4.

[12] During the performance of the ACC, the PHA "earns a monthly Basic Administrative Fee based on the Basic Administrative Fee Percentage approved by HUD," as set forth in the PHA's response to the NOFA, multiplied by the current fair market rate for a 2-Bedroom unit for each covered unit as of the first day of the month.  AR, Tab 3, ACC, at BATES 229.

[13] HUD estimates that it will pay PHAs approximately $260 million for their contract administration services, and that HUD, through the PHAs, will distribute approximately $9 billion in HAP payments to property owners.  AR at 3 n.4.

ACCs provide that HUD has the authority "unilaterally amend . . . [the ACC] from time to time to add and/or withdraw HAP contracts by giving the PHA written notice." Id. at BATES 191. The ACCs further provide that "[t]he PHA shall take prompt and vigorous action, to HUD's satisfaction, or as required and directed by HUD, to ensure owner compliance with the terms of HAP Contracts for Covered Units within the scope of the ACC." Id. at BATES 193.

The NOFA includes relatively detailed instructions for PHAs, requiring, for example, that a PHA submit a "Technical Approach narrative," a "Quality Control Plan" narrative, as well as its "Proposed Fee" for the performance of the tasks required. AR, Tab 2, NOFA, at BATES 108-09. The NOFA further includes evaluation factors and subfactors, such as "Capability of the Applicant and Relevant Organizational Experience" and "Soundness of Approach," as well as a rating scheme for the evaluation of the PHA's proposed "Basic Administrative Fee." Id. at BATES 111-19.

The NOFA states that the ACCs will be awarded to the "highest rated application by State," provided that the application meets certain threshold requirements set forth in the NOFA. Id. The agency advised PHAs that "[i]f there is no qualified applicant for any jurisdiction, HUD will administer the HAP contracts for that state internally, in accordance with past practice and the United States Housing Act of 1937." AR, Tab 2, NOFA Questions and Answers, at BATES 152. Of particular relevance here, the NOFA differed from HUD's 1999 RFP and 2011 ISA, by expressly providing that the "[t]he ACCs that HUD seeks to award via this NOFA are cooperative agreements."[14] AR, Tab 2, NOFA, at BATES 95.

These protests, challenging HUD's use of the NOFA, rather than a procurement contract, were filed prior to the due date set for responses to the NOFA.

DISCUSSION

The protesters each raise various arguments about the terms and conditions of the NOFA. All of the protesters argue that HUD's use of a NOFA, and the characterization of the ACCs that HUD seeks to award via this NOFA as cooperative agreements, are improper. The protesters contend that HUD is seeking contract administration services that must be solicited through a procurement instrument that results in the award of contracts.

The question of whether HUD is properly using a NOFA, rather than a procurement contract, involves our bid protest jurisdiction. As set forth more fully below, if HUD may properly use a cooperative agreement in this instance, we have no jurisdiction

---

[14] Neither the 1999 RFP nor 2011 ISA stated that the awards of ACCs to PHAs for the contract administration services were considered by HUD to be the award of cooperative agreements rather than contracts.

B-406738 et al.

**69**

under the Competition in Contacting Act of 1984 (CICA) to hear disputes about these agreements.  On the other hand, if the use of a procurement instrument is required, we have jurisdiction, and will consider whether HUD has complied with applicable procurement laws and regulations.

Under CICA and our Bid Protest Regulations, our Office reviews protests concerning alleged violations of procurement statutes or regulations by federal agencies in the award or proposed award of contracts for goods and services, and solicitations leading to such awards.  31 U.S.C. §§ 3551(1), 3552 (2006); 4 C.F.R. § 21.2(a) (2012).  We generally do not review protests of the award, or protests of solicitations for the award, of cooperative agreements or other non-procurement instruments, because they do not involve the award of a procurement contract, and are thus beyond our jurisdiction.  Energy Conversion Devices, Inc., B-260514, June 16, 1995, 95-2 CPD ¶ 121 at 2.  However, we will review a timely protest asserting that an agency is improperly using a cooperative agreement or other non-procurement instrument, where a procurement contract is required, to ensure that an agency is not attempting to avoid the requirements of procurement statutes and regulations.  Id.

Our Office has noted that the identification of the appropriate funding instrument (grant/cooperative agreement or contract) is important because procurement contracts are subject to a variety of statutory and regulatory requirements that generally do not apply to grants or cooperative agreements.  As noted above, the misidentification of a procurement contract as a cooperative agreement could be used to evade competition and other legal requirements applicable to procurement contracts.  Conversely, a legitimate assistance arrangement, such as a cooperative agreement, should not be burdened by the formalities of procurement contracts.  GAO, Principles of Federal Appropriations Law, vol. II, at 10-18 (3rd ed. 2006).

The Federal Grant and Cooperative Agreement Act (FGCAA) establishes the general criteria that agencies must follow in deciding which legal instrument to use when entering into a funding relationship with a state, locality or other recipient for an authorized purpose.  31 U.S.C. §§ 6301-6308 (2006).  In this regard, the FGCAA provides that an agency must use a procurement contract when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government;" or the agency otherwise "decides in a specific instance that the use of a procurement contract is appropriate."[15]  31 U.S.C. § 6303.

---

[15] The FAR similarly provides that "Contracts shall be used only when the principal purpose is the acquisition of supplies or services for the direct benefit or use of the Federal Government."  FAR § 35.003(a).

The FGCAA further provides that an "agency shall use a cooperative agreement" when the principal purpose of the relationship "is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," and "substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement."[16]  31 U.S.C. § 6305.

Put differently, the use of a grant or cooperative agreement is appropriate if the principal purpose of the agreement is to provide assistance to the recipient to accomplish a public objective authorized by law.  In contrast, if the federal agency's principal purpose is to acquire goods or services for the direct benefit or use of the federal government, then a procurement contract must be used.

Our Office has recognized that it is often difficult to draw fine lines between the types of arrangements that require the use of procurement contracts and those that do not.  Environmental Protection Agency--Inspector General--Cooperative Agreement--Procurement, B-262110, Mar. 19, 1997, 97-1 CPD ¶ 131 at 4.  The principal purpose of the relationship between the federal government and the state, local government, or other entity is not always clear, and we have recognized that this can be particularly so where the federal government provides assistance to specified recipients by using an intermediary.  GAO, Principles of Federal Appropriations Law, vol. II, at 10-20 (3rd ed. 2006); see 360Training.com, Inc. v. United States, 2012 U.S. Claims LEXIS 502 at *11-12 (Fed. Cl. Apr. 26, 2012).  The intermediary or third party situation arises where an assistance relationship, such as a grant or cooperative agreement, is authorized to specified recipients, but the Federal grantor delivers the assistance to the authorized recipients by utilizing another party.  GAO, Principles of Federal Appropriations Law, Vol. II, at 10-19.  In such circumstances, "[t]he choice of instrument for an intermediary relationship depends solely on the principal federal purpose in the relationship with the intermediary."  S. Rep. No. 97-180, at 3 (1981) quoted in GAO, Principles of Federal Appropriations Law, vol. II, at 10-20.

In this regard, where the government's principal purpose is to "acquire" an intermediary's services, which ultimately may be delivered to an authorized recipient, or if the agency otherwise would have to use its own staff to provide the services offered by the intermediary to the beneficiaries, then a procurement contract is the proper instrument.  Id; 360Training.com v. United States, Inc., supra;

---

[16] In contrast, a "grant agreement," rather than a cooperative agreement, shall be used where "substantial involvement is not expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." (Emphasis added).  31 U.S.C § 6304.

B-406738 et al.

Civic Action Institute, B-206272, Sept. 24, 1982, 82-2 CPD ¶ 270 at 4, aff'd, Civil Action Institute--Recon., B-206272.2, Nov. 2, 1982, 82-2 CPD ¶ 399.  On the other hand, where the Government's principal purpose is to "assist" the intermediary in providing goods or services to the authorized recipient, the use of an assistance instrument, such as a cooperative agreement, is proper.  GAO, Principles of Federal Appropriations Law, vol. II, at 10-20.

The FGCAA gives agencies considerable discretion in determining whether to use a contract, grant, or cooperative agreement, and our Office will not question such determinations unless it appears that the agency acted unreasonably, disregarded statutory and regulatory guidance, or lacked authority to enter into a particular relationship.  Civic Action Institute, supra, at 3.  In determining whether an agency's selection and proposed use of a grant or cooperative agreement, rather than a contract, is reasonably based and consistent with statutory and regulatory guidance, our analysis of the nature of the contemplated relationship between the federal agency and the other party includes the consideration of the substance of the proposed agreement based upon the surrounding circumstances.  B-257430, Sept. 12, 1994.

In contending that the instruments at issue here are properly designated cooperative agreements, HUD points out that The Housing Act of 1937, as amended and codified, provides that it "is the policy of the United States . . . to assist states and political subdivisions of States to address the shortage of housing affordable to low-income families."  42 U.S.C. § 1437(a)(B); AR at 11; Supp. AR at 2.  HUD maintains that the NOFA, which will result in the issuance of cooperative agreements, is in furtherance of the Act's stated policy to provide assistance to states and political subdivisions of states.  HUD specifically argues here that the "principal purpose of the ACCs between HUD and the PHAs is to assist the states and local governments by having PHAs, which are governmental entities, administer [HAP] contracts with property owners in order to serve the federal, state, and PHAs' public purpose of promoting affordable housing for low-income families."  AR at 11.

Referencing the FGCAA criteria for cooperative agreements, HUD further explains that through the ACCs, HUD transfers a "thing of value" to the PHAs, by providing the PHAs with the funds necessary to make payments under the HAP contracts, as well as by paying the PHAs an "administrative fee" that compensates the PHAs for its services.[17]  AR at 12.  HUD notes here that under the ACC, a PHA may use the

---

[17] HUD appears to argue that because PHAs are "member[s] of a class eligible to receive assistance" under The Housing Act of 1937, and because HUD, under the ACCs, provides the PHAs with the funds necessary to make payments under the HAP contracts and administrative fees for their services, PHAs cannot be considered "intermediaries."  AR at 14; Supp. AR at 14-15.

"excess funds generated by the ACC to provide additional housing services" under other programs supported by the PHA, and that HUD is therefore supporting "the PHA's public purpose." Id.

HUD further maintains that it "is not assigning work to PHAs that it is otherwise required to do," based upon its view that HUD "is not obligated to administer the HAP contracts itself." AR at 13. HUD argues here that "[t]here is nothing in the United States Housing Act of 1937, or, more specifically, Section 8 of that Act, that obligates HUD to administer HAP contracts." Supp. AR at 10. HUD also explains that the cognizant PHAs, rather than HUD, are listed as contract administrators on the majority of HAP contracts currently in effect, and that because of this, HUD is not obligated to serve as a contract administrator. Id. HUD thus concludes that its issuance of a NOFA providing for the issuance of cooperative agreements for the administration by PHAs of Project-Based Section 8 HAP contracts was reasonable and consistent with applicable statutes and regulations.

In addressing HUD's arguments, we begin with the agency's assertion that the principal purpose of the ACCs to be awarded under the NOFA--consistent with The Housing Act of 1937--is to "assist" PHAs "to address the shortage of housing affordable to low-income families" by providing a thing of value, that is, money, to the PHAs. See 42 U.S.C § 1437(a)(B); AR at 11; Supp. AR at 2. In this regard, we find unpersuasive HUD's argument that its payments to property owners in accordance with the terms of its HAP contracts can properly be considered as the transfer of a thing of value to the PHAs. As set forth above, although the HAP contract payments are made through the PHAs in accordance with their obligations under the ACCs to administer the HAP contracts, the PHAs themselves have no rights to the payments (or control over them) once HUD authorizes the payments and transfers the funds to the PHAs for distribution. The PHAs, consistent with their roles as contract administrators, act only as a "conduit" for the payments. See AR, Tab 4, 53 Fed. Reg. 8050 (1988), at BATES 247 (HUD's explanation as to why it views its Section 8 housing assistance payments as "outside the scope" of Office of Management and Budget's Circular A-102 that governs grants and cooperative agreements with state and local governments). That is, and as described above, the PHAs have no right to retain or use for other purposes any of the funds it receives for payment to the property owners. In fact, the ACCs require that the funds, once received by the PHAs from HUD, be promptly transferred to the property owners, and require that any excess funds and interest earned on HAP funds by the PHAs be remitted to HUD or invested in accordance with HUD requirements. AR, Tab 3, ACC, at BATES 194.

Next, although we agree that HUD is clearly providing "a thing of value" to the PHAs through HUD's payment of an administrative fee, we do not agree that the principal purpose of HUD's payment of administrative fees to the PHAs is to "assist" the PHAs in the performance of their mission. Rather, as evidenced by the record, the administrative fees are paid to the PHAs as compensation for their provision of

B-406738 et al.

**73**

service--i.e., administering the HAP contracts. This arrangement, that is, the payment of fees by HUD for the PHAs' services as contract administrators, is provided for by the NOFA and ACCs to be awarded. See AR, Tab 3, ACC, at BATES 194 ("The PHA shall use Administrative Fees to pay the operating expenses of the PHA to administer HAP Contracts").

We also disagree with HUD's assertion that it is under no obligation to administer the HAP contracts because the PHAs, and not HUD, are listed as the contract administrators on most HAP contracts.[18] In this regard, the "HUD Occupancy Handbook" acknowledges, in the context of the Project-Based Section 8 rental assistance program, that "HUD has primary responsibility for contract administration but has assigned portions of these responsibilities" to PHAs whose "responsibilities focus on the day-to-day monitoring and servicing of Section 8 HAP contracts." Supp. AR, Tab 17, HUD Occupancy Handbook 4350.3 REV-1, at BATES 533. Further, the Project-Based Section 8 HAP "Basic Renewal Contract" provided by HUD specifically obligates HUD, and not the contract administrator, to provide the housing assistance payments. Supp. AR, Tab 18, Project-Based Section 8 HAP Basic Renewal Contract, at BATES 546. HUD's HAP Basic Renewal Contract notes elsewhere that "HUD shall take any action HUD determines necessary for the continuation of housing assistance payments to the Owner in accordance with the Renewal Contract" where a PHA, serving as the contract administrator, fails to transfer the housing assistance payments to the property owner as required under the relevant HAP contract. Id. at BATES 551.

Accordingly, we agree with the protesters that the circumstances here most closely resemble the intermediary or third party situation, which we described on page 10, infra. As applied here, HUD is providing assistance to low-income households, in the form of a rental subsidy paid to property owners, pursuant to the terms of HAP contracts. Rather than administering the program through which this assistance is provided, that is, the Project-Based Section 8 Rental Assistance Program--as HUD has in the past and continues to do in limited circumstances--HUD has retained, through its 1999 RFP and 2011 ISA, and is seeking to retain through this NOFA, the services of PHAs to perform the HAP contract administration services.

Given our view, as set forth above, that HUD is legally obligated to pay the property owners under the terms of the HAP contracts, and HUD's recognition that it has primary responsibility for contract administration but has assigned portions of these responsibilities to PHAs, we also find that HUD's principal purpose for its relationship with the PHAs as contemplated by the NOFA and set forth in the ACC,

---

[18] Although the PHAs are sometimes signatories, as the "Contract Administrator," on the HAP contracts, HUD is also a signatory on these contracts. Supp. AR at 10; Supp. AR, Tab 18, Project-Based Section 8 HAP Basic Renewal Contract, at BATES 553.

B-406738 et al.

is to acquire the PHAs' services as contract administrators.  In this regard, the asserted "public purpose" provided by the PHAs under the NOFA--the administration of HAP contracts--is essentially the same purpose HUD is required to accomplish under the terms of its HAP contracts, wherein HUD is ultimately obligated to the property owners.  As such, the principal purpose of the NOFA and ACCs to be awarded under the NOFA is for HUD's direct benefit and use.[19] B-257430, Sept. 12, 1994, at 4.  Again, the NOFA provides, and HUD's past practices demonstrate, that if a PHA is unable to provide contract administration services for the Project-Based Section 8 rental assistance program, HUD staff has provided and will provide such services.  See 360Training.com v. United States, Inc., supra (an agency is acquiring the intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide the services offered by the intermediary); see also GAO, Principles of Federal Appropriations Law, Vol. II, at 10-20.

For the reasons set forth above, we conclude that HUD's issuance of a NOFA providing for the award of cooperative agreements was unreasonable and in disregard of applicable statutory guidance.  We also conclude that HUD is required to use a procurement instrument that results in a contract in order to obtain the provision of contract administration services by PHAs for the Project-Based Section 8 HAP contracts.  Finally, given our conclusion that HUD should use a procurement instrument that results in the award of contracts, rather than a notice that results in the execution of cooperative agreements, these protests fall squarely within the jurisdiction of our Office.  See Energy Conversion Devices, Inc., supra.

The protesters also argue that certain terms of the NOFA are inconsistent with procurement statute and regulation, including the FAR, and are otherwise improper.  We need not address these concerns.[20]  In this regard, HUD "admits that it did not

---

[19] Contrary to HUD's arguments, as indicated above, the PHAs' general function as state or local entities responsible for public housing and their receipt of administrative fees under the ACC cannot be considered to be the primary purpose of the ACC.

[20] The protesters also argue that HUD is without authority to enter into cooperative agreements with PHAs with regard to the Project-Based Section 8 rental assistance program.  In this regard, our Office has long recognized that while federal agencies generally have "inherent" authority to enter into contracts to procure goods or services for their own use, there is no comparable inherent authority to enter into assistance relationships (i.e., cooperative agreements or grants) to give away the government's money or property to benefit someone other than the government.  65 Comp. Gen. 605, 607 (1986); GAO, Principles of Federal Appropriations Law, Vol. II, at 10-17.  Given our determination that HUD should solicit the contract administration services here through a procurement instrument that results in a contract, rather than a cooperative agreement, we need not decide whether HUD is
(continued...)

B-406738 et al.

follow the requirements in CICA or the FAR" in preparing its NOFA, and that it "would expect the protests to be sustained" should our Office determine, as we have, that the protests are within GAO's jurisdiction.[21] HUD Response to Protesters' Requests for Documents (June 12, 2012) at 2. As a result, the protests are sustained.

RECOMMENDATION

We recommend that HUD cancel the NOFA, and solicit the contract administration services for the Project-Based Section 8 rental assistance program through a procurement instrument that will result in the award of contracts. In so doing, the agency should address the other concerns expressed by the protesters to the extent appropriate. We also recommend that the agency reimburse the protesters their costs of filing and pursuing the protests. 4 C.F.R. § 21.8(d)(1). The protesters' certified claims for costs, detailing the time expended and costs incurred, must be submitted to the agency within 60 days after receipt of this decision. 4 C.F.R. § 21.8(d)(1).

The protests are sustained.

Lynn H. Gibson
General Counsel

_____

(...continued)
otherwise authorized to enter into cooperative agreements with regard to the Project-Based Section 8 rental assistance program.

[21] In light of HUD's concession, during the development of the protest record, we agreed with HUD that it need not provide documents or arguments responding to the protesters' assertions that certain aspects of the NOFA, if considered as a solicitation that will result in a contract, fail to comply with CICA, the FAR, or other applicable procurement statutes or regulations.

B-406738 et al.

# EXHIBIT 4



**STATEMENT**
**ON**
**PERFORMANCE-BASED CONTRACT ADMINISTRATOR PBCA**


Pursuant to its statutory obligations, on Friday, October 19, HUD responded to the GAO's recommendations of August 15, 2012, relating to the PBCA. We informed the GAO that we are continuing to assess the legal and operational issues raised by its recommendations.  We will inform the public as soon as further determinations are made.

**77**

# EXHIBIT 5

6

# NOTICE OF FUNDING AVAILABLITY (NOFA)

**What's New**
> **PBCA Notification**
> **HUD Statement on GAO Protest – October 19, 2012**

NOTICE:
The Department has decided to move forward with the 2012 PBCA NOFA and plans to announce awards on December 14, 2012.

### Protests filed at GAO regarding 2012 PBCA NOFA

NOTICE OF FUNDING AVAILABLITY (NOFA) for the Performance-Based Contract Administrator (PBCA) Program for the Administration of Project-Based Section 8 Housing Assistance Payments Contracts
> NOFA at **www.grants.gov**
> **NOFA** (PDF)
> **ACC for NOFA** (PDF)
> **NOFA Appendix B FTE Chart**
> **NOFA Technical Correction March 15, 2012**
>> **Technical Correction Two**
> **Highlights of PBCA NOFA & ACC for NOFA** (2012 Changes, Deletions, Additions)(Updated April 6, 2012)
> **Registering and Applying through Grants.gov**
> **March 19, 2012 Training Webcast for the PBCA NOFA**
> **Updated PBCA NOFA & ACC Q&A Summary** (Updated May 25, 2012)
> Submit NOFA for PBCA and ACC NOFA Questions to: **Multifamily Housing-Office of Housing Assistance Contract Administration Oversight.**

NOTE:  The number of Project-Based Section 8 Housing Assistance Payments (HAP) contracts assigned to PBCAs changes periodically as contracts are transferred from Traditional Contract Administrators (TCAs) to PBCAs, contracts are transferred from HUD to PBCAs, or contracts are transferred from PBCAs to HUD.  The number active PBCA assigned Section 8 Contracts listed below may change prior to the execution of the ACC.

> **Active PBCA Assigned Section 8 Contracts for NOFA** (Excel) Updated April 27, 2012.

The management and occupancy review (MOR) requirements under Performance Based Task #1 in Exhibit A, Section 3.1, of the ACC has changed.  MORs are required only for projects with an Unsatisfactory, Below Average, and Satisfactory rating assigned to the last review under the Risk Based MOR approach.  No MORs will

be conducted for projects with an Above Average and Superior rating assigned to the last review during either 12-month period of the ACC Term. MORsare required for all Mark-to-Market projects without regard to the rating assigned to the last review.

' **MOR Ratings for Projects** (Excel) (sorted by state, this list does include Mark-to-Market Projects: Options 1, 2, 3a and 4) Updated June 4, 2012. **The following States have been updated: DE, NC, NJ, PA, SC and WV**
' **Mark-to-Market Projects** (Excel)(sorted by state: Options 3b) Updated June 4, 2012. **The following States have been updated: DE, NC, NJ, PA, SC and WV**

State Attorney General Letters

' **Arizona**
' **California**
' **Connecticut 1**
' **Connecticut 2**
' **Delaware**
' **Hawaii**
' **Illinois**
' **Indiana**
' **Kentucky**
' **Maryland**
' **Michigan**
' **New Mexico 1**
' **New Mexico 2**
' **North Carolina**
' **Oregon 1**
' **Oregon 2**
' **Pennsylvania**
' **Rhode Island**
' **South Carolina**
' **Tennessee**
' **Virginia**
' **West Virginia**

**Proposed Administrative Fee Percentages All Applicants under Invitation 2011 (PDF)**

# EXHIBIT 6

HUD's supplemental report should include responses to the following questions, as well as responses to the issues and arguments raised by the protesters in their comments.

1.  HUD's statutory authority to enter into a cooperative agreement with regard to the Section 8 project-based rental assistance program.

HUD has pointed to the "Declaration of Policy" set forth at 42 U.S.C § 1437(a) "to promote the general welfare of the Nation by employing the funds and credit of the Nation . . . to assist States," and the reference to "annual contribution contracts" with PHAs set forth in 42 U.S.C. § 1437f(b)(1), as HUD's authority to enter into cooperative agreements with PHAs with regard to the Section 8 program at issue.

The protesters' comments challenge HUD's position in a number of ways.  These challenges include the assertion that 42 U.S.C. § 1437f(b)(2), is applicable to the Section 8 project-based rental assistance program here, and that 42 U.S.C. § 1437f(b)(1) is not.

A.  The agency should expand on its argument regarding the statutory basis to enter into a cooperative agreement under the circumstances here.  The agency's argument should include further explanation and analysis, with appropriate citation, supporting the agency's position, and should address the arguments made by the protesters in their comments.

B.  As part of this discussion, the agency should explain its view regarding the applicability of 42 U.S.C. § 1437f(b)(1) to the Section 8 project-based program. With regard to 42 U.S.C. § 1437f(b)(1), the agency asserts in its report that "[t]he statute makes it clear that HUD is authorized to perform the functions assigned to the PHA only when a PHA is unable to implement the statute or no PHA has been created."  Agency Report (AR) at 12.  This assertion should be further explained, recognizing the references to HUD's responsibility to administer the HAP contracts set forth in the CFR (e.g., 24 C.F.R. § 880.505(a)), and HUD's apparent administration of the HAP contracts from the mid-1970s to 2000.

2. Certain aspects of HAP Contracts

GAO's "HUD Rental Assistance" Report" (GAO-05-224) noted that as "of October 2004, HUD's project-based Section 8 program consisted of about 21,900 properties, and HUD transferred contracts for about 11,800 of these properties to PBCAs."

A. How many properties does HUD's project-based Section 8 program consist of today?

B. Does the total number of properties equal the total number of HAP contracts, or do they differ?  Please explain.

C. Are new HAP contracts entered into under HUD's project-based Section 8 program, or are all of the HAP contracts subject to the NOFA renewals?

It is GAO's understanding, and that of the protesters, that HUD and the property owners are the parties to the HAP contracts.  Additionally, past HUD reports refer to HAP contracts as "executed between HUD and private owners of multifamily housing developments."  Protest (B-406738), Tab 10, HUD Housing Certificate Fund, at 3.  As another example, HUD's FY 2013 Budget Request, "Housing: Project-Based Rental Assistance 2013 Summary Statements and Initiatives," states that "[p]roject-based rental assistance is provided through contracts between the Department and owners of multi-family housing."  Protester's Comments (B-406738.3; B-406738.7), Tab 20, HUD's FY 2013 Budget Request, "Housing: Project-Based Rental Assistance 2013 Summary Statements and Initiatives, at A-4.  However, 24 C.F.R. § 880.201 references situations where the HAP contract would be between HUD or the PHA and the property owner.

D. Who are the parties to the HAP contracts?

The protesters argue that HUD, as a party to a HAP contract, is obligated to the property owner to administer the contract.  Certain of the protesters refer to 24 C.F.R. §§ 880.201 and 880.505, wherein HUD is identified in certain circumstances as the contract administrator, and is authorized to "contract with another entity for performance of some or all of its contract administration functions."  HUD asserts that "HUD is not obligated to administer the HAP contracts itself," and that "HUD is not assigning work to the PHAs that it is otherwise required to do."  AR at 13.

E. HUD's supplemental report should address the protesters' arguments here, and provide support for HUD's assertions that it is not obligated to administer the HAP contracts itself and is not assigning work to the PHAs that HUD is not otherwise obligated to do.

3. Background

The record includes numerous GAO and HUD documents concerning HUD's Section 8 project-based program. The GAO documents repeatedly refer to HUD's relationships with PHAs, for the PHA's performance of contract administration services, as "contracts." The record includes a GAO report stating that "[a]ccording to HUD, the use of contract administrators to manage project-based Section 8 housing assistance contract will relieve HUD field staff of many duties they currently perform," and states that HUD "would select contract administrators through a competitive procurement process." Protest (B-406738), Tab 9, Housing and Urban Development, GAO/T-RCED-99-104. Another GAO report referencies a "HUD initiative to contract out the oversight and administration of most of its project-based contracts," with HUD having "hired" PHAs to perform this work. Protest (B-406738), Tab 6, Project Based Rental Assistance, GAO-07-290, at 10. The report states that HUD did so because of HUD's own "staffing constraints." Id.

A HUD document also refers, in the context of HUD's project-based Section 8 program, to HUD's "plans to procure the services of contract administrators to assume many" contract administration duties. Protest (B-406738), Tab 10, HUD Housing Certificate Fund, at 4.

The record further includes the RFP issued by HUD on May 3, 1999, for the provision of contract administration services for Section 8 project-based HAP contracts. Protest (B-406738.3), Tab 1, RFP. The RFP includes a statement of work, evaluation factors, "Proposal Organization," and "Contract Term," and "Factors for Award" sections.

These documents were referenced in the protests and included as exhibits. The agency report did not specifically address these documents, but rather, asserted that HUD "has never awarded an ACC through the means of a procurement contract." AR at 2.

A. HUD supplemental report should include an explanation regarding these documents, and their relevance to the issues in these protests.

B. HUD's supplemental report should also include a response to the protester's assertion that HUD has not previously identified the ACCs issued in connection with the Section 8 project-based HAP contracts in its "mandatory disclosure of assistance agreements." Protester's Comments (B-406738), at 28.